IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INSYS THERAPEUTICS, INC. and INSYS DEVELOPMENT COMPANY, INC., | ) ) ) | |
| Plaintiffs, | ) ) ) | REDACTED – PUBLIC VERSION |
| v. | ) ) | C.A. No. 17-1303-CFC |
| TEVA PHARMACEUTICALS USA, INC., | ) ) | **CONSOLIDATED** |
| Defendant. | ) ) | |

## <u>LETTER TO THE HONORABLE COLM F. CONNOLLY FROM KAREN E. KELLER</u>

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*

OF COUNSEL:
J.C.  Rozendaal
Paul A. Ainsworth
Deirdre Wells
Josephine J. Kim
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1100 New York Ave. NW, Suite 600
Washington, DC  20005
(202) 371-2600

Dated: April 11, 2019

# SHAW KELLER
## LLP

Karen E. Keller
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0702
kkeller@shawkeller.com

April 11, 2019

**BY CM/ECF & HAND DELIVERY**
The Honorable Colm F. Connolly
U.S. District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Wilmington, DE 19801

Re:  *Insys Therapeutics, Inc., et al. v. Teva Pharmaceuticals USA, Inc.*
C.A. No. 17-1303-CFC (Consolidated)

Dear Judge Connolly:

This is a Hatch-Waxman patent case arising from a series of complaints Plaintiffs filed against Teva related to the Subsys® fentanyl product. Despite over six months of meeting and conferring, Teva has been unable to obtain the discovery, in particular the documents and accompanying deposition testimony, to which it is entitled. *See, e.g.*, Ex. B Nov. 2, 2018 email. Plaintiffs have dragged their feet. The deadline for document production was March 6, 2019, and fact discovery closes April 12, 2019. *See* Dkt. 44 at ¶3(a) and (b). Even after the document production deadline, Plaintiffs maintained that the parties were not at an impasse to schedule a discovery conference. *See, e.g.*, Ex. C March 7, 2019 email. Given the stage of the case and the upcoming expert reports, Teva requests the Court's assistance in obtaining either the relevant documents and related deposition testimony or a statement that the documents Teva seeks do not exist. Just yesterday Plaintiffs represented that they plan to produce hundreds of gigs of additional documents, but they could not say what is in them (and whether they address Teva's complaints) or when their production will be complete. Heading into expert discovery Teva deserves to know the contours of the universe of facts that are at issue in this case.

As specified in the attached draft order, Teva requests the Court's assistance with the highest priority items: (1) documents, including email, related to the claimed invention, (2) documents from the past five years, including those in response to Request for Production Nos. 54, 58, 64, 73, and 75, and (3) deposition testimony, at Plaintiffs' expense, to address late-produced documents. *See* Ex. A, Draft Order.

## I.    Failure to produce documents, including email, for the alleged invention

To date, Plaintiffs have not produced documents from which the inventorship of the asserted patents can be determined and reflecting the research and discovery of the claimed inventions. These are some of the most basic—and necessary—documents in a patent litigation, and they are documents that Plaintiffs agreed to produce. *See* Ex. D at Nos. 14, 16, 36-38, 61-63, 65, and 67. Teva's ability to assess Plaintiffs' claim that the named inventors invented the invention claimed in the asserted claims is significantly impacted by Plaintiffs' deficient production. Given the stage of the case, Teva deserves to (1) know what documents exist for these categories, (2) receive them, and (3) question a knowledgeable witness about them.

Under 25 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process,

SHAW KELLER LLP

The Honorable Colm F. Connolly
Page 2

machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." Plaintiffs assert 64 claims from nine patents. Every asserted claim broadly recites formulations, or methods that use formulations, with "a pharmaceutically acceptable salt" of fentanyl. The patents list five "examples of suitable salt forms of fentanyl for use in accordance with the present invention": hydrochloride, chloride, sulphate, tartrate, and citrate. *See, e.g.*, Ex. E, '972 patent, 12:22-26. Plaintiffs have not produced a single document authored by a named inventor discussing the hydrochloride, chloride, sulphate, or tartrate salt forms of fentanyl, let alone documentation to allow Teva to assess whether the named inventors invented formulations and methods of using formulations with these fentanyl salts having the properties in the claims. Similarly, at least 16 asserted claims recite formulations with fentanyl derivatives. These fentanyl derivatives include at least sufentanil, carfentanil, lofentanil and alfatenil. *See, e.g., id.* at 6:23-25. Plaintiffs have not produced a single document authored by a named inventor discussing the carfentanil, lofentanil or alfatenil claimed fentanyl derivatives.

Plaintiffs have likewise produced zero emails sent by any named inventor dated on or before July 16, 2003, when the claimed invention was allegedly conceived. *See* Ex. F, January 21, 2019 Supp. Response to Interrogatory No. 2. But during their depositions, two of the named inventors, who were testifying as corporate witnesses, confirmed that the inventors commonly communicated via email. *See, e.g.*, Ex. G, Goskonda Rough Tr. at 25:17-21, 27:9-28:2 (date in the rough transcript of 2013 should read 2003); Ex. H, Parikh Rough Tr. at 13:24-14:1.

Documents, including email, discussing the alleged invention, including discussion of the claimed fentanyl salt and derivative formulations, are highly relevant. They are relevant to Plaintiffs' inventorship claim as well as Teva's defenses and counterclaims that the inventors did not possess the broad range of inventions claimed and that someone would not be able to make the broad range of claimed inventions based on what the inventors wrote in the patents. Teva deserves to (1) know if there are any documents to support Plaintiffs' claim that the named inventors invented the claimed fentanyl salt and derivative formulations, (2) receive any such documents, and (3) be able to question a knowledgeable witness about them.

## II.   Failure to produce documents from the past five years, including those in response to Request for Production Nos. 54, 58, 64, 73, and 75

As of the document production deadline, Plaintiffs had not produced a single document from the past five years. Although there are some documents from the past five years in Plaintiffs' productions after the completion deadline, Plaintiffs' production continues to lack key documents, including an outright refusal to produce documents in response to Request for Production Nos. 54, 58, 64, 73, and 75.[1] Relevant documents from the past five years are expected to discuss the asserted patents as well as fentanyl products (including Subsys®) such as:

- communications with third-parties, press releases, publications, advertising, marketing, and promotional materials about fentanyl products (including SUBSYS®) (*see* Ex. D at Nos. 8, 12, 47, and 58);

- documents authored by a named inventor relating to the asserted patents' subject

---

[1] For several of these, Plaintiffs' refusal contradicts their agreement to produce "representative documents reflecting the marketing of SUBSYS®." *See* Ex. D at Nos. 12, 47, 56, 64, and 72.

The Honorable Colm F. Connolly
Page 3

matter (*see* Ex. D at Nos. 15 and 34; *see also* Ex. B Nov. 2, 2018 email);

- documents about the similarities, differences, or benefits between SUBSYS® and other fentanyl formulations (*see* Ex. D at Nos. 39 and 40; *see also* Ex. B);

- the SUBSYS® NDA (*see* Ex. D at Nos. 1 and 2; *see also* Ex. B);

- documents related to distribution and use of SUBSYS® and why doctors prescribe SUBSYS® (*see* Ex. D at Nos. 58 and 64);

- documents related to insurance companies concerning fentanyl products (*see id.* at No. 54); and

- documents related to market analysis, prescription, or distribution of fentanyl products, including SUBSYS® (*see id.* at Nos. 73 and 75).

The similarities, differences, or benefits between SUBSYS® and other fentanyl formulations, what Plaintiffs and third parties are saying about fentanyl products (including SUBSYS®), how insurance companies view fentanyl products (including SUBSYS®), what insurance companies are told about how SUBSYS® works and how it compares to other fentanyl products, what Plaintiffs told the FDA about SUBSYS® (including how it compares to other fentanyl products), how Plaintiffs market, promote, and present SUBSYS®, how fentanyl products (including SUBSYS®) are used, why doctors prescribe fentanyl products (including SUBSYS®), the prescription and distribution of fentanyl products (including SUBSYS®), and market analysis of fentanyl products are all directly relevant to Plaintiffs' allegation that the fentanyl formulations recited in the asserted claims exhibit an unexpected result that was neither exhibited in nor expected from other fentanyl formulations. *See* Ex. I, March 19, 2019 Supp. Response to Interrogatory No. 8. They are also relevant to Teva's defenses and counterclaims that the asserted patents are anticipated or obvious in view of the fentanyl products that were previously available and the publications and knowledge in the art about fentanyl.

Likewise, what the named inventors say about the subject matter of the asserted patents is highly relevant to Plaintiffs' inventorship claims. The inventors' views on the scope of their invention and how it relates to previously-available fentanyl products and prior publications and knowledge is also relevant to Teva's invalidity defenses and counterclaims. Plaintiffs' failure to produce these documents, and outright refusal with respect to Request for Production Nos. 54, 58, 64, 73, and 75, impairs Teva's ability to litigate its case.

## III.    Request for deposition, at Plaintiffs' expense, for additional documents

Finally, Teva requests a deposition, at Plaintiffs' expense, to ask questions on any additional documents that are produced. This would include both the hundreds of gigs of additional documents Plaintiffs plan to produce as well as any documents the Court orders Plaintiffs to produce. This may include corporate testimony on Topic Nos. 13, 15-18, 20, and 31, for which Plaintiffs refuse to provide a witness and which overlap with the subject matter discussed above. *See* Ex. J, Insys's Objections and Response to Teva's 30(b)(6) Notice. It may also include testimony on Topics for which Teva previously deposed a corporate witness but did not have the insight of the new documents.

For the above reasons, Teva requests the relief outlined in Exhibit A, attached hereto.

SHAW KELLER LLP
The Honorable Colm F. Connolly
Page 4

Respectfully submitted,

*/s/ Karen E. Keller*

Karen E. Keller (No. 4489)

cc:    All counsel of record (by CM/ECF & e-mail)
       Clerk of Court (by hand delivery)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INSYS THERAPEUTICS, INC. and INSYS DEVELOPMENT COMPANY, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 17-1303-CFC |
| TEVA PHARMACEUTICALS USA, INC., | ) ) | **CONSOLIDATED** |
| Defendant. | ) | |

## <u>DECLARATION OF KAREN E. KELLER</u>

I, Karen E. Keller, declare as follows:

1.      I am counsel of record for Teva Pharmaceuticals USA, Inc. ("Teva").

2.      Pursuant to the Court's procedures, the parties made a reasonable effort to resolve the dispute but were unable to reach agreement.

3.      The reasonable effort to resolve this dispute included oral communications that involved Delaware counsel.

I declare under penalty of perjury of law that the foregoing is true and correct.


Date: April 11, 2019                          Respectfully submitted,


                                              */s/ Karen E. Keller*
                                              Karen E. Keller (No. 4489)

# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INSYS THERAPEUTICS, INC. and | ) | |
| INSYS DEVELOPMENT COMPANY, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-1303-CFC |
| | ) | |
| TEVA PHARMACEUTICALS USA, INC., | ) | **CONSOLIDATED** |
| | ) | |
| Defendant. | ) | |

**[PROPOSED] ORDER**

At Wilmington, this ____ day of _____, 2019, having considered Teva Pharmaceuticals

USA, Inc.'s April 11, 2019 letter (D.I. 71) and Plaintiffs' response thereto, along with any oral

argument entertained by the Court,

**IT IS HEREBY ORDERED THAT:**

1. Within one week, Plaintiffs shall produce documents from which the inventorship of

   the asserted patents, including of the claimed fentanyl salt and fentanyl derivative

   formulations, can be determined and reflecting the research and discovery of the

   claimed inventions, including the claimed fentanyl salt and fentanyl derivative

   formulations. If no such documents regarding the claimed fentanyl hydrochloride,

   fentanyl chloride, fentanyl sulphate, fentanyl tartrate, sufentanil, carfentanil,

   lofentanil, and/or alfatenil formulations exist, Plaintiffs shall provide a written

   statement to that effect.

2.  Within one week, Plaintiffs shall produce the relevant, non-privileged documents from the past five years that are responsive to Request for Production Nos. 1, 2, 8, 12, 15, 34, 39, 40, 47, 54, 58, 64, 73, and 75;

3.  Within one week, Plaintiffs shall provide the name(s) and date(s) for a corporate witness(es) to testify regarding Defendants' 30(b)(6) Topic Nos. 13, 15-18, 20, and 31. The offered date(s) should be before May 1, 2019. The deposition(s) will occur in Washington, D.C.; and

4.  Within one week, Plaintiffs shall provide the name and date for a corporate witness(es) to discuss any documents produced on or after April 11, 2019. The offered date(s) should be before May 1, 2019. The deposition(s) will occur in Washington, D.C. and will be at Plaintiffs' expense.

_____
United States Distric Judge

# Exhibit B

## Deirdre Wells

| | |
|---|---|
| **From:** | Deirdre Wells <DWELLS@sternekessler.com> |
| **Sent:** | Friday, November 02, 2018 11:52 AM |
| **To:** | Stramiello, Michael A.; Charles Wysocki; Fentanyl_Internal; SKTevaFentanyl |
| **Cc:** | Blumenfeld, Jack; Ying, Jennifer; Insys-Subsys-PH |
| **Subject:** | RE: Insys v. Teva: Insys Discovery Deficiencies |

Chad, Mike, and Jennifer,

Thank you for speaking with me regarding Insys's document production and responses and objections to Teva's Requests for Production.  I understand from our call that Insys will be producing documents in response to Teva's Requests for Production on a rolling basis beginning in the next couple of weeks.  I also understand that Insys is not withholding any non-privileged, responsive documents on the basis of their boilerplate objections.

I further understand that Insys agrees to produce documents in response to Teva's Request for Production Nos. 1, 2, 9-11, 15, 24, 25, 27-34, 36, 37, 39-41, 50, 51, 55, 62, 63, 65-67, 69-71, and 74. Thank you for your confirmation on the call that (1) there have been no licensing discussions/negotiations and no licenses in response to Teva's Request for Production Nos. 42-45 and (2) Insys did not sell or offer to sell sublingual fentanyl anywhere prior to the patents' priority dates or otherwise have documents responsive to Teva's Request for Production No. 46.

I understand that you are conferring with your client regarding Teva's Request for Production Nos. 4, 5, 8, 15 (regarding documents and emails after the time of the alleged invention), 23, 54, 56-60, 64, 68, and 72.  Teva is likewise considering your proposal regarding Teva's Request for Production Nos. 48, 53, 55, 73, and 75.

For the privilege log, we propose that the parties serve privilege logs February 14, 14 days after the substantial competition of document deadline, and serve any supplements within 7 days after any additional productions.

Please let me know if you believe any of Teva's understandings are incorrect and whether you agree to Teva's proposed privilege log exchange.

Best,
Deirdre

---

**Deirdre M. Wells**
Director
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** dwells@sternekessler.com
**Direct:** 202.772.8985

**Administrative Assistant:** Kelli Baugh

---

**From:** Deirdre Wells
**Sent:** Saturday, October 27, 2018 4:11 PM
**To:** Stramiello, Michael A.; Charles Wysocki; Fentanyl_Internal; SKTevaFentanyl
**Cc:** Blumenfeld, Jack; Ying, Jennifer; Insys-Subsys-PH
**Subject:** RE: Insys v. Teva: Insys Discovery Deficiencies

Mike,

We can use the below dial-in.

███████████ ████
████████

Best,
Deirdre

---

**Deirdre M. Wells**
Director
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** dwells@sternekessler.com
**Direct:** 202.772.8985

**Administrative Assistant:** Kelli Baugh

---

**From:** Stramiello, Michael A. [mailto:michaelstramiello@paulhastings.com]
**Sent:** Thursday, October 18, 2018 2:22 PM
**To:** Charles Wysocki; Fentanyl_Internal; SKTevaFentanyl; Deirdre Wells
**Cc:** Blumenfeld, Jack; Ying, Jennifer; Insys-Subsys-PH
**Subject:** RE: Insys v. Teva: Insys Discovery Deficiencies

Thanks, Charles. We're available for a call at 11am on October 30th.

Best,
Mike

Michael A. Stramiello, Ph.D.
Paul Hastings LLP
desk: 202.551.1958 | cell: 706.296.5564

---

**From:** Charles Wysocki [mailto:CWYSOCKI@sternekessler.com]
**Sent:** Wednesday, October 17, 2018 1:52 PM
**To:** Stramiello, Michael A.; Fentanyl_Internal; SKTevaFentanyl; Deirdre Wells
**Cc:** Blumenfeld, Jack; Ying, Jennifer; Insys-Subsys-PH
**Subject:** [EXT] RE: Insys v. Teva: Insys Discovery Deficiencies

Mike,

Teva is available at 11 AM on October 30 or 3 PM on October 31. Please let us know which time works for you.

Kind regards,
Charles

---

**Charles Wysocki**
Associate
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** cwysocki@sternekessler.com
**Direct:** 202.772.8933

**Administrative Assistant:** Maria Cabico
**Direct:** 202.772.8816  **Main:** 202.371.2600

**From:** Stramiello, Michael A. [mailto:michaelstramiello@paulhastings.com]
**Sent:** Wednesday, October 17, 2018 10:50 AM
**To:** Charles Wysocki; Fentanyl_Internal; SKTevaFentanyl; Deirdre Wells
**Cc:** Blumenfeld, Jack; Ying, Jennifer; Insys-Subsys-PH
**Subject:** RE: Insys v. Teva: Insys Discovery Deficiencies

Charles,

Thanks for your email. We are not available for a meet and confer tomorrow at 10AM. Would you please propose some times that would work for Teva next week?

Best,
Mike

Michael A. Stramiello, Ph.D.
Paul Hastings LLP
desk: 202.551.1958 | cell: 706.296.5564

**From:** Charles Wysocki [mailto:CWYSOCKI@sternekessler.com]
**Sent:** Monday, October 15, 2018 4:23 PM
**To:** Peterman, Chad
**Cc:** Fentanyl_Internal; Insys-Subsys-PH; SKTevaFentanyl; Deirdre Wells; Blumenfeld, Jack; Ying, Jennifer
**Subject:** [EXT] Insys v. Teva: Insys Discovery Deficiencies

Counsel,

Please find the attached correspondence.

Regards,
Charles



Charles Wysocki
Associate
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
1100 New York Avenue, NW, Washington, DC 20005

**Email:** cwysocki@sternekessler.com
**Direct:** 202.772.8933
**Administrative Assistant:** Maria Cabico
**Main:** 202.371.2600   **Direct:** 202.772.8816

Notice: The information in this electronic transmission (including any attachments) may contain confidential or legally privileged information and is intended solely for the individual(s) or entity(ies) named above. If you are not an intended recipient or an authorized agent, you are hereby notified that reading, distributing, or otherwise disseminating or copying, or taking any action based on the contents of this transmission is strictly prohibited. Any unauthorized interception of this transmission is illegal under the law. If you have received this transmission in error, please immediately notify the sender by return email and then destroy all copies of the transmission.

*******************************************************************
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments. If you reply to this message, Paul Hastings may collect personal information including your name, business name and other contact details, and IP address. For more information about Paul Hastings' information collection, privacy and security principles please click HERE. If you have any questions, please contact Privacy@paulhastings.com.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments. If you reply to this message, Paul Hastings may collect personal information including your name, business name and other contact details, and IP address. For more information about Paul Hastings' information collection, privacy and security principles please click HERE. If you have any questions, please contact Privacy@paulhastings.com.

# Exhibit C

## Deirdre Wells

**Subject:**                              RE: Insys v. Teva, 18-1775 - Discovery dispute

**From:** Ying, Jennifer <jying@MNAT.com>
**Sent:** Thursday, March 7, 2019 11:12 AM
**To:** Nate Hoeschen <nhoeschen@shawkeller.com>; Blumenfeld, Jack <JBlumenfeld@MNAT.com>
**Cc:** Karen Keller <kkeller@shawkeller.com>
**Subject:** RE: Insys v. Teva, 18-1775 - Discovery dispute

Hi Nate –

It's my understanding that the parties are going to be further meeting and conferring on the issue next Wednesday.  Please let me know if you understand differently.

Thank you
Jennifer

**From:** Nate Hoeschen [mailto:nhoeschen@shawkeller.com]
**Sent:** Thursday, March 7, 2019 11:12 AM
**To:** Blumenfeld, Jack; Ying, Jennifer
**Cc:** Karen Keller
**Subject:** [EXT] RE: Insys v. Teva, 18-1775 - Discovery dispute

Jack and Jennifer –

Just wanted to ping you on this again – please let me know when you would be available to join me in calling the Court.

Best,
Nate

**From:** Nate Hoeschen
**Sent:** Monday, March 4, 2019 2:11 PM
**To:** Blumenfeld, Jack <JBlumenfeld@MNAT.com>; Ying, Jennifer <jying@MNAT.com>
**Cc:** Karen Keller <kkeller@shawkeller.com>
**Subject:** Insys v. Teva, 18-1775 - Discovery dispute

Jack and Jennifer,

I hope you're both doing well.  I understand that the parties have reached an impasse regarding Insys' responses to various requests for production in the above-captioned action.  Please let me know if you are available to call over to the Court to request a dispute teleconference.  I am available for the rest of the afternoon today and all afternoon tomorrow if any time in that range would work for you.

Best,
Nate Hoeschen
**SHAW KELLER LLP**
I.M. Pei Building
1105 Market Street
12th Floor

1

Wilmington, DE 19801
(302) 298-0709
nhoeschen@shawkeller.com
www.shawkeller.com

---

This message, including any accompanying documents or attachments, may contain information that is confidential or that is privileged. If you are not the intended recipient of this message, please note that the dissemination, distribution, use or copying of this message or any of the accompanying documents or attachments is strictly prohibited. If you believe that you may have received this message in error, please contact me at (302) 658-9200 or by return e-mail.

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INSYS THERAPEUTICS, INC. and | ) | |
| INSYS DEVELOPMENT COMPANY, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-1303 (GMS) |
| | ) | |
| TEVA PHARMACEUTICALS USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' OBJECTIONS AND RESPONSES TO
DEFENDANT'S FIRST SET OF REQUESTS FOR PRODUCTION (NOS. 1-75)**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and the applicable

Local Civil Rules of the United States District Court for the District of Delaware, Plaintiffs Insys

Therapeutics, Inc. and Insys Development Company, Inc. (collectively, "Insys" or "Plaintiffs")

hereby make the following objections and responses to Defendant Teva Pharmaceuticals USA,

Inc.'s ("Teva's") First Set of Requests (Nos. 1-75) (hereinafter, "Requests").

**PLAINTIFFS' PRELIMINARY STATEMENT**

Plaintiffs have not completed their investigation relating to this action, have not

completed discovery in this action, and have not completed preparation for trial. The following

responses are based on Plaintiffs' knowledge, information and belief at this time, and are

complete as to Plaintiffs' best knowledge at this time. Furthermore, these responses were

prepared based on Plaintiffs' good-faith interpretation and understanding of the Requests, and

are subject to correction for inadvertent errors or omissions, if any.

Pursuant to Rule 26(e), Fed. R. Civ. P., Plaintiffs reserve the right to supplement their

responses as discovery progresses in this action. For instance, Plaintiffs reserve the right to refer

to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all

facts, evidence, documents, and things developed during the course of discovery and trial preparation, notwithstanding the reference to facts, evidence, documents, and things in these responses. In addition, Plaintiffs assume no obligation to voluntarily supplement or amend these responses to reflect information, evidence, documents or things discovered following service of these responses. Nevertheless, these responses are given without prejudice to subsequent revision or supplementation, including objections, based upon any information, evidence, and documentation, which hereinafter may be discovered.

## GENERAL OBJECTIONS

Plaintiffs make the following general objections to the Requests, which apply to each individual Request, whether or not specifically restated therein, and shall have the same force and effect as if fully set forth or specifically cited in response to each individual Request.

1. Plaintiffs incorporate by reference the general objections set forth in Plaintiffs' Responses to Teva's First Set of Interrogatories to Plaintiffs (Nos. 1-8) as though fully set forth herein.

2. Plaintiffs object to the Requests, including the Definitions and Instructions included therein, to the extent that they seek to impose requirements or obligations on Plaintiffs in addition to or different from those imposed by the Federal Rules of Civil Procedure, the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware ("Local Rules"), the District of Delaware Default Standard for Discovery, or any order of this Court.

3. Plaintiffs further object to Teva's Definitions and Instructions to the extent that they purport to alter the plain meaning and/or scope of any specific Request, on the ground that such alteration renders the Request vague, ambiguous, overly broad, unduly burdensome, and/or uncertain.

4.     No objection, limitation, or response, or lack thereof, made herein shall be an admission by Plaintiffs as to: (a) the truth of any of the statements made in any Request; or (b) the existence or nonexistence of documents responsive to any Request.  By stating in their Responses that they will produce documents, Plaintiffs do not waive their objections or represent that any such documents or things actually exist, but rather that Plaintiffs will conduct a reasonable search and attempt to ascertain whether documents and things responsive to the Requests in fact exist.

5.     These responses, and the objections and limitations contained herein, are subject to and without waiver of Plaintiffs' right to: (a) make additional or supplemental objections to these or other Requests; and (b) revise, correct, amend, or modify the responses upon, among other things, the discovery of additional facts and materials, further investigation, or other developments in this suit or any other proceeding, action, or trial.

6.     Plaintiffs object to Teva's definition of the term "foreign counterparts" as vague, ambiguous, overly broad, not relevant to Teva's claims or defenses, and not proportional to the needs of the case, and to the extent it purports to impose obligations on Plaintiffs that exceed their obligations under the Federal Rules of Civil Procedure and the Local Civil Rules.

7.     Plaintiffs object to Teva's use of "Plaintiffs," "Insys," "You," and "Yours," to the extent that the definitions include their respective legal representatives.

8.     Plaintiffs object to Teva's definition of the term "FDA" to the extent it purports to include "any employees thereof" as vague, ambiguous, and overly broad.

9.     Plaintiffs object to Teva's definition of the term "prior art" as vague, ambiguous, and overly broad.

10.     Plaintiffs object to Teva's definition of the terms "communication," "concerning," "person," and "document" as vague, ambiguous, overly broad, and to the extent they purport to impose obligations on Plaintiffs that exceed their obligations under the Federal Rules of Civil Procedure and the Local Civil Rules.

11.     Plaintiffs object to each Request to the extent that it seeks information protected by the attorney-client privilege, the work-product doctrine, and/or any other applicable privilege or immunity.  Nothing contained in Plaintiffs' responses is intended to be, or in any way shall be deemed to be, a waiver of any such applicable privilege or immunity.  Any inadvertent production shall not be deemed a waiver of any privilege with respect to the information produced.

12.     Plaintiffs object to paragraphs 1-10 of Teva's "Instructions" to the extent they purport to impose obligations on Plaintiffs that exceed their obligations under the Federal Rules of Civil Procedure, the Local Civil Rules, and/or any Orders of this Court.  Plaintiffs further object to paragraphs 1-4, 7, and 10 of Teva's "Instructions" as overly broad, unduly burdensome, vague, ambiguous, not relevant to Teva's claims or defenses, and not proportional to the needs of the case.

13.     Plaintiffs further object to the Requests to the extent they seek information protected by domestic or international data protection laws.  Examples of such data protection laws include, but are not limited to, the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801, *et seq.* (financial information); the Health Insurance Portability and Accountability Act and the regulations thereunder, 45 C.F.R. Part 160 and Subparts A and E of Part 164 (medical information); Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the Protection of Individuals with Regard to the Processing of Personal Data and on the

Free Movement of Such Data, 1995 O.J. (L281/31) (European Union personal information); Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the Protection of Natural Persons with Regard to the Processing of Personal Data and on the Free Movement of Such Data, and Repealing Directive 95/46/EC, 2016 O.J. (L119/59) (European Union General Data Protection Regulation) (in force May 25, 2018); and the Swiss Federal Act on Data Protection of June 19, 1992, the Ordinance to the Federal Act on Data Protection of June 14, 1993, and any applicable cantonal data protection act (Swiss personal information).

14.     Plaintiffs object to each Request to the extent that it seeks information created on or after July 31, 2017, the date of Teva's first Notice of Paragraph IV certification with respect to the patents-in-suit pursuant to 21 U.S.C. § 355(j)(2)(A) as overly broad, unduly burdensome, seeking information that is neither relevant nor proportional to the needs of the case, and seeking information that is irrelevant, privileged, and subject to the work-product doctrine.

15.     Plaintiffs object to Teva's Requests as a whole, and to each Request contained therein, to the extent they seek (a) information, the production of which would constitute an unwarranted invasion of the affected persons' rights of privacy and/or confidentiality; (b) private, privileged, and confidential commercial, financial, and/or proprietary business information.

16.     Plaintiffs object to each Request to the extent that it seeks production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and non-disclosure restrictions imposed by contract or applicable law.

17.     Plaintiffs object to each Request to the extent it seeks information or documents, or concerns persons not within the possession, custody, or control of Plaintiffs.

18.    Plaintiffs object to each Request to the extent that it is vague, ambiguous, indefinite, overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, seeking information that is neither relevant nor proportional to the needs of the case, seeking information that is irrelevant to any claim or defense in this action, or would require Plaintiffs to conduct an unreasonable or unduly burdensome search for responsive information.   Subject to their objections, Plaintiffs will conduct a reasonable search for responsive documents and information.

19.    Plaintiffs object to each Request to the extent it is compound or seeks to combine multiple discrete Requests into a single Request, as proscribed by the Federal Rules of Civil Procedure and the Local Rules.

20.    Plaintiffs object to Teva's Requests as a whole, and to each Request contained therein, to the extent that they seek to require Plaintiffs to provide information other than that which may be obtained through a reasonably diligent search of their records.

21.    Plaintiffs object to each Request to the extent that it seeks information that is publicly accessible because it is equally convenient for Teva to obtain such information. Plaintiffs will not conduct a literature or library search or collect or organize information or documents that are as accessible to Teva as they are to Plaintiffs.

22.    Plaintiffs object to each Request to the extent that it seeks information that is obtainable in a manner that is more convenient, less burdensome, and/or less expensive, or where the burden and expense of providing the information outweighs its likely benefit.

23.    Plaintiffs object to each Request to the extent that it seeks information relating to products offered for sale or sold outside of the United States, products not at issue in this lawsuit, and products that may be currently under development by Plaintiffs.

24.     Plaintiffs object to each Request to the extent the subject matter of the Request is more properly addressed by other forms of discovery, including, for example, through expert reports.  Plaintiffs also object to each Request to the extent that it improperly and prematurely seeks the identification of experts or trial witnesses or the substance of their testimony.

25.     Plaintiffs object to Teva's Requests as a whole, and to each Request contained therein, as premature in view of the Court's Default Standard for Discovery, Paragraphs 4(a)–(d), regarding initial discovery in patent litigation.

26.     Any response herein provided by Plaintiffs shall in no way constitute or be construed as a waiver of any objection contained herein.  For any and all information provided in response to each Request, Plaintiffs reserve all objections or other questions regarding the authenticity, competency, relevance, materiality, privilege or admissibility of such information as evidence in this suit or any other proceeding, action or trial.

27.     Plaintiffs' response to each Request is based upon present knowledge, information, and belief.  Plaintiffs object to each Request to the extent that a complete answer may be impractical or infeasible because this lawsuit is still in an early stage, and accordingly reserve the right to supplement or amend their responses in accordance with the Federal Rules of Civil Procedure and Local Rules.

28.     All General Objections are incorporated by reference into each response as though set forth in full therein.

## **OBJECTIONS AND RESPONSES**

### **REQUEST NO. 1:**

NDA No. 202788 and all related documents and communications, including but not limited to all submissions, revisions, updates, amendments, supplements, and contacts and/or correspondence to, from, or with the FDA.

**RESPONSE TO REQUEST NO. 1:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs further object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.  Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests.  (*See, e.g.*, Request No. 2.)  Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case.  Plaintiffs' NDA is not relevant to the infringement, validity, or enforceability of the patents-in-suit.

**REQUEST NO. 2:**

All internal documents and communications concerning the strategic development, preparation, submission, obtaining approval, and maintenance of NDA No. 202788.

**RESPONSE TO REQUEST NO. 2:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.  Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests.  (*See, e.g.*, Request No. 1.)  Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not

relevant to Teva's claims or defenses, and not proportional to the needs of the case.  Plaintiffs' NDA is not relevant to the infringement, validity, or enforceability of the patents-in-suit.

**REQUEST NO. 3:**

All documents and communications to or with the PTO related to any of the Asserted Patents or any of the Related Patents, including but not limited to a complete copy of the prosecution histories of the Asserted Patents and the Related Patents, whether issued, abandoned, or pending.

**RESPONSE TO REQUEST NO. 3:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case.  Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs also object to this Request to the extent it seeks documents in Teva's possession or that are publicly accessible such that it is equally convenient for Teva to obtain such information.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from the prosecution files of the patents-in-suit.

**REQUEST NO. 4:**

All documents and communications concerning Teva's ANDA and/or Teva's ANDA Product, including all evaluations, analyses, studies, tests, and opinions related thereto.

**RESPONSE TO REQUEST NO. 4:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports. Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs object this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests. (*See, e.g.*, Request No. 5.)

**REQUEST NO. 5:**

All documents and communications concerning any comparison of the similarities or differences between SUBSYS® and Teva's ANDA Product.

**RESPONSE TO REQUEST NO. 5:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome,

and not proportional to the needs of the case.  Plaintiffs further object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information.  Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports.  Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs object this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.  Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests.  (*See, e.g.*, Request No. 4.)

**REQUEST NO. 6:**

Documents sufficient to show the ownership of the Asserted Patents.

**RESPONSE TO REQUEST NO. 6:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs also object to this Request to the extent it seeks documents in Teva's possession or that are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs further object to this Request to the extent it seeks documents and things that are not within the possession, custody, or control of Plaintiffs.  Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests.  (*See, e.g.*, Request No. 7.)

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from which the ownership of the patents-in-suit may be determined.

## REQUEST NO. 7:

All documents, agreements, and communications relating to or relevant to Insys's assertion that it owns or has the right to sue on the Asserted Patents and any related patent applications, including all assignment documents, whether or not such assignment documents were ever executed, filed, or recorded.

## RESPONSE TO REQUEST NO. 7:

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs also object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs further object to this Request to the extent it seeks documents in Teva's possession or that are publicly accessible such that it is equally convenient for Teva to obtain such information.  Plaintiffs object to this Request to the extent it seeks documents and things that are not within the possession, custody, or control of Plaintiffs.  Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests.  (*See, e.g.*, Request No. 6.)

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from which the ownership of the patents-in-suit may be determined.

## REQUEST NO. 8:

All documents and communications between Insys and any third party concerning the Asserted Patents, the applications thereto, or the inventions described therein.

**RESPONSE TO REQUEST NO. 8:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests. (*See, e.g.*, Request Nos. 11 and 23.)

**REQUEST NO. 9:**

All documents and communications concerning the validity or enforceability of the Asserted Patents, including but not limited to any correspondence, memoranda, presentation, study, or searches for prior art.

**RESPONSE TO REQUEST NO. 9:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to

obtain such information.  Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports.  Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs further object to this Request as premature, and as improper in its attempt to impose obligations beyond those set forth under the Local Civil Rules and/or the Court's Scheduling Order, to the extent that the Request seeks discovery of documents or information prior to the deadlines set forth in the Court's Scheduling Order.  Plaintiffs will produce and/or disclose documents or information in accordance with the Local Civil Rules and the Court's Scheduling Order.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Teva bears the burden of proving its allegations of invalidity by clear and convincing evidence, and has not articulated any contention that would establish invalidity or unenforceability of the asserted claims of the patents-in-suit.  Therefore, Plaintiffs object to this Request as improper because the patents-in-suit are presumed valid, *see* 35 U.S.C. § 282, and Teva has not carried its burden of proving invalidity and unenforceability.  Plaintiffs are not required to search for and provide documentary evidence of validity and enforceability.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product, responsive documents from the prosecution files of the patents-in-suit, to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 10:**

All documents and communications relating to the patentability of any invention claimed or disclosed in the Asserted Patents, including all correspondence, memoranda, presentations, studies, prior art searches, and the results of any prior art searches.

**RESPONSE TO REQUEST NO. 10:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports. Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs further object to this Request as premature, and as improper in its attempt to impose obligations beyond those set forth under the Local Civil Rules and/or the Court's Scheduling Order, to the extent that the Request seeks discovery of documents or information prior to the deadlines set forth in the Court's Scheduling Order. Plaintiffs will produce and/or disclose documents or information in accordance with the Local Civil Rules and the Court's Scheduling Order. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Teva bears the burden of proving its allegations of unpatentability by clear and convincing evidence, and has not articulated any contention that would establish unpatentability of the asserted claims of the patents-in-suit.  Therefore, Plaintiffs object to this Request as improper because the patents-in-suit are presumed valid, *see* 35 U.S.C. § 282, and Teva has not carried its burden of proving unpatentability.  Plaintiffs are not required to search for and provide documentary evidence of patentability.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product, responsive documents from the prosecution files of the patents-in-suit, to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 11:**

All prior art relating to any Asserted Patents or Related Patents known to Insys (whether or not such prior art was disclosed to the PTO), including (1) any prior art identified during any prior art search conducted by Insys or on Insys's behalf and (2) any prior art identified or made known to Insys by any third party.

**RESPONSE TO REQUEST NO. 11:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs also object to this Request to the extent it seeks documents in Teva's possession or that are publicly accessible such that it is equally convenient for Teva to obtain such information.  Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by

contract or applicable law.  Plaintiffs also objection to this Request as premature to the extent it

seeks expert testimony or calls for information that will be the subject of, and produced in the

course of, expert discovery.  Plaintiffs also object to this Request to the extent is seeks prior art

from "any third party," which is not within the possession, custody, or control of Plaintiffs.

Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-

client privilege, the work product doctrine, or any other applicable privilege or immunity.

Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of

other Requests.  (*See, e.g.*, Request Nos. 8 and 23.)

Subject to and without waiver of the foregoing objections and their General Objections,

Plaintiffs will produce nonprivileged, non-work product documents from the prosecution files of

the patents-in-suit.

**REQUEST NO. 12:**

All press releases, publications, and advertising, marketing, and promotional materials, and documents describing promotional efforts, authored by or on behalf of Plaintiffs concerning any of the Asserted Patents, any of the Related Patents, fentanyl, SUBSYS$^{®}$ or any other fentanyl formulation, or any NDA or ANDA referencing SUBSYS$^{®}$.

**RESPONSE TO REQUEST NO. 12:**

Plaintiffs object to this Request on the grounds set forth in their general objections.

Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome,

not relevant to Teva's claims or defenses, and not proportional to the needs of the case.

Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly

burdensome, and not proportional to the needs of the case.  Plaintiffs also object to this Request

to the extent it seeks documents protected by the attorney-client privilege, the work product

doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product, representative documents reflecting the marketing of SUBSYS®.

**REQUEST NO. 13:**

All documents and communications concerning the tests and/or experiments referenced in any of the Asserted Patents or any of the Related Patents, and the results obtained from those tests and/or experiments.

**RESPONSE TO REQUEST NO. 13:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs further object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.  Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests.  (*See, e.g.*, Request No. 61.)

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from the prosecution files of the file histories of the patents-in-suit and nonprivileged, non-work product documents reflecting the research and discovery of the claimed inventions of the asserted claims of the patents-in-suit,

to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

## REQUEST NO. 14:

All documents and communications relating to the inventorship of any invention claimed or disclosed in the Asserted Patents or the Related Patents, including all documents relating to the contribution of each of the Named Inventors to any such invention.

## RESPONSE TO REQUEST NO. 14:

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from which the inventorship of the claims in the patents-in-suit may be determined.

## REQUEST NO. 15:

All documents authored by any of the Named Inventors relating to the subject matter of the Asserted Patents.

**RESPONSE TO REQUEST NO. 15:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests. (*See, e.g.*, Request No. 34.)

**REQUEST NO. 16:**

All documents and communications relating to the conception, development, and reduction to practice of any invention claimed or disclosed in the Asserted Patents or the Related Patents, including all invention disclosures, laboratory notebook entries, reports, memoranda, analyses, and meeting minutes related thereto.

**RESPONSE TO REQUEST NO. 16:**

Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents reflecting the research and discovery of the claimed inventions of the asserted claims of the patents-in-suit, to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 17:**

All documents and communications supporting, refuting, or relating to any alleged diligence in reducing to practice the subject matter of each of the asserted claims in the Asserted Patents.

**RESPONSE TO REQUEST NO. 17:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs object to the use of the term "alleged diligence in reducing to practice the subject matter of each of the asserted claims in the Asserted Patents" in this Request as vague, ambiguous, overly broad, and unduly burdensome. Plaintiffs also object to this Request to the extent it seeks documents in Teva's possession or that are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents reflecting the research and discovery of the claimed inventions of the asserted claims of the patents-in-suit, to the extent

such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

## REQUEST NO. 18:

Documents sufficient to show Insys's document retention and destruction policy since the earliest conception date of any alleged invention claimed or disclosed in the Asserted Patents.

## RESPONSE TO REQUEST NO. 18:

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product, representative copies of its document retention and destruction policy to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

## REQUEST NO. 19:

Documents sufficient to show Insys's organizational structure since the earliest conception date of any alleged invention claimed or disclosed in the Asserted Patents through present day, including the names, titles, positions, office addresses, and responsibilities of all persons acting on Insys's behalf (e.g., employees, consultants) who are or were involved with the research, development, sale, marketing, regulatory affairs, and/or medical communications relating to SUBSYS®.

## RESPONSE TO REQUEST NO. 19:

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case.

Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce representative nonprivileged, non-work product copies of organizational charts to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

## REQUEST NO. 20:

All documents and communications relating to the preparation of the applications that resulted in the Asserted Patents and any domestic and foreign patent applications related thereto, including all documents reviewed, considered, relied upon, and/or referenced by the patent attorney(s) or agent(s), Named Inventors, or anyone else involved in preparing such applications.

## RESPONSE TO REQUEST NO. 20:

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents in Teva's possession or that are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs further object to this request to the extent is seeks documents from "anyone else" that is not within the possession, custody, or control of Plaintiffs. Plaintiffs object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from the prosecution files of the patents-in-suit.

**REQUEST NO. 21:**

All documents and communications relating to the prosecution of the applications that resulted in the Asserted Patents and any domestic and foreign patent applications related thereto, including all applications, documents, and communications sent to or received from any third party, including the PTO, the Named Inventors, any patent agent or attorney, any prior art researcher, and any person who authored a declaration submitted under 37 CFR 1.132.

**RESPONSE TO REQUEST NO. 21:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents in Teva's possession or that are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs further object to this request to the extent is seeks documents from "any third party" that are not within the possession, custody, or control of Plaintiffs. Plaintiffs object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from the prosecution files of the patents-in-suit.

**REQUEST NO. 22:**

All documents, communications, and things reviewed, considered, and/or relied upon when providing declarations to the PTO during the prosecution of the Asserted Patents.

**RESPONSE TO REQUEST NO. 22:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents in Teva's possession or that are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests. (*See, e.g.*, Request No. 21.)

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from the prosecution files of the patents-in-suit.

**REQUEST NO. 23:**

All documents and communications sent to or received from any third party relating to the Asserted Patents, the applications that resulted therein, any domestic or foreign applications related thereto, and/or the subject matter thereof.

**RESPONSE TO REQUEST NO. 23:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents in Teva's possession or that are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs further object to this request to the extent is seeks documents from "any third party" that are not within the possession, custody, or control of Plaintiffs. Plaintiffs object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests. (*See, e.g.*, Request Nos. 8 and 11.)

**REQUEST NO. 24:**

All documents and communications concerning any actual, threatened, or potential opposition (including foreign oppositions), litigation, reissues, reexaminations, *inter partes* review, interferences, or any other proceedings relating to the validity, enforceability, infringement, and/or extension of the Asserted Patents or the Related Patents.

**RESPONSE TO REQUEST NO. 24:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case.

Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents in Teva's possession or that are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

### REQUEST NO. 25:

All documents and communications supporting, refuting, and/or otherwise relating to any secondary considerations (or objective indicia) of nonobviousness related to the subject matter of the Asserted Patents.

### RESPONSE TO REQUEST NO. 25:

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports. Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs further object to this Request as premature, and as improper in its attempt to impose obligations beyond those set forth under the Local Civil Rules and/or the Court's Scheduling

Order, to the extent that the Request seeks discovery of documents or information prior to the deadlines set forth in the Court's Scheduling Order.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Teva bears the burden of proving its allegations of obviousness by clear and convincing evidence, and has not articulated any contention that would establish obviousness of the asserted claims of the patents-in-suit.  Therefore, Plaintiffs object to this Request as improper because the patents-in-suit are presumed valid, *see* 35 U.S.C. § 282, and Teva has not carried its burden of proving invalidity.  Plaintiffs are not required to search for and provide documentary evidence of validity.  Plaintiffs, however, reserve the right to rely upon evidence of objective indicia of nonobviousness to rebut any *prima facie* case of obviousness that is alleged by Teva.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents supporting objective indicia of nonobviousness of the claimed inventions of the asserted claims of the patents-in-suit to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 26:**

All documents that Insys contends evince the skills and/or qualifications of a person of ordinary skill in the art pertaining to the Asserted Patents, including (1) the educational level; (2) the type of problems encountered in the art; (3) the prior art solutions to those problems; (4) the rapidity with which innovations are made; and (5) the sophistication of the technology.

**RESPONSE TO REQUEST NO. 26:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case.

Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information.  Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

To the extent this Request relates to Teva's allegations of invalidity, Teva bears the burden of proving its allegations of invalidity by clear and convincing evidence, and has not articulated any contention that would establish invalidity of the asserted claims of the patents-in-suit.  Therefore, Plaintiffs object to this Request as improper because the patents-in-suit are presumed valid, *see* 35 U.S.C. § 282, and Teva has not carried its burden of proving invalidity.  Plaintiffs are not required to search for and provide documentary evidence of validity.  Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce Responses to Teva's Invalidity Contentions.


**REQUEST NO. 27:**

All documents, communications, and things supporting, refuting, or otherwise relating to any alleged unexpected results achieved by practicing any of the subject matter claimed in the Asserted Patents.

**RESPONSE TO REQUEST NO. 27:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case.

Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports. Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs further object to this Request as premature, and as improper in its attempt to impose obligations beyond those set forth under the Local Civil Rules and/or the Court's Scheduling Order, to the extent that the Request seeks discovery of documents or information prior to the deadlines set forth in the Court's Scheduling Order. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests. (*See, e.g.*, Request No. 25.)

Teva bears the burden of proving its allegations of obviousness by clear and convincing evidence, and has not articulated any contention that would establish obviousness of the asserted claims of the patents-in-suit. Therefore, Plaintiffs object to this Request as improper because the patents-in-suit are presumed valid, *see* 35 U.S.C. § 282, and Teva has not carried its burden of proving invalidity. Plaintiffs are not required to search for and provide documentary evidence of validity. Plaintiffs, however, reserve the right to rely upon evidence of objective indicia of nonobviousness to rebut any *prima facie* case of obviousness that is alleged by Teva.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents supporting objective indicia of nonobviousness of the claimed inventions of the asserted claims of the patents-in-suit to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 28:**

All documents, communications, and things supporting, refuting, or otherwise relating to any alleged copying by anyone of the subject matter claimed in the Asserted Patents.

**RESPONSE TO REQUEST NO. 28:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports. Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs further object to this Request as premature, and as improper in its attempt to impose obligations beyond those set forth under the Local Civil Rules and/or the Court's Scheduling Order, to the extent that the Request seeks discovery of documents or information prior to the deadlines set forth in the Court's Scheduling Order. Plaintiffs also object to this Request to the

extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.  Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests.  (*See, e.g.*, Request No. 25.)

Teva bears the burden of proving its allegations of obviousness by clear and convincing evidence, and has not articulated any contention that would establish obviousness of the asserted claims of the patents-in-suit.  Therefore, Plaintiffs object to this Request as improper because the patents-in-suit are presumed valid, *see* 35 U.S.C. § 282, and Teva has not carried its burden of proving invalidity.  Plaintiffs are not required to search for and provide documentary evidence of validity.  Plaintiffs, however, reserve the right to rely upon evidence of objective indicia of nonobviousness to rebut any *prima facie* case of obviousness that is alleged by Teva.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents supporting objective indicia of nonobviousness of the claimed inventions of the asserted claims of the patents-in-suit to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

### REQUEST NO. 29:

All documents, communications, and things supporting, refuting, or otherwise relating to any criticism by anyone of the subject matter disclosed in the Asserted Patents.

### RESPONSE TO REQUEST NO. 29:

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs also object to this Request

to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information.  Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports.  Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery.  Plaintiffs further object to this Request as premature, and as improper in its attempt to impose obligations beyond those set forth under the Local Civil Rules and/or the Court's Scheduling Order, to the extent that the Request seeks discovery of documents or information prior to the deadlines set forth in the Court's Scheduling Order.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.  Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests.  (*See, e.g.*, Request No. 25.)

Teva bears the burden of proving its allegations of obviousness by clear and convincing evidence, and has not articulated any contention that would establish obviousness of the asserted claims of the patents-in-suit.  Therefore, Plaintiffs object to this Request as improper because the patents-in-suit are presumed valid, *see* 35 U.S.C. § 282, and Teva has not carried its burden of proving invalidity.  Plaintiffs are not required to search for and provide documentary evidence of validity.  Plaintiffs, however, reserve the right to rely upon evidence of objective indicia of nonobviousness to rebut any *prima facie* case of obviousness that is alleged by Teva.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents supporting objective indicia of nonobviousness of the claimed inventions of the asserted claims of the patents-in-suit to the

extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 30:**

All documents, communications, and things supporting, refuting, or otherwise relating to any alleged long-felt, unmet need for any of the subject matter disclosed in the Asserted Patents.

**RESPONSE TO REQUEST NO. 30:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports. Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs further object to this Request as premature, and as improper in its attempt to impose obligations beyond those set forth under the Local Civil Rules and/or the Court's Scheduling Order, to the extent that the Request seeks discovery of documents or information prior to the deadlines set forth in the Court's Scheduling Order. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests. (*See, e.g.*, Request No. 25.)

Teva bears the burden of proving its allegations of obviousness by clear and convincing evidence, and has not articulated any contention that would establish obviousness of the asserted claims of the patents-in-suit. Therefore, Plaintiffs object to this Request as improper because the patents-in-suit are presumed valid, *see* 35 U.S.C. § 282, and Teva has not carried its burden of proving invalidity. Plaintiffs are not required to search for and provide documentary evidence of validity. Plaintiffs, however, reserve the right to rely upon evidence of objective indicia of nonobviousness to rebut any *prima facie* case of obviousness that is alleged by Teva.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents supporting objective indicia of nonobviousness of the claimed inventions of the asserted claims of the patents-in-suit to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

## REQUEST NO. 31:

All documents, communications, and things supporting, refuting, or otherwise relating to any alleged commercial success by any embodiment of any of the subject matter disclosed in the Asserted Patents.

## RESPONSE TO REQUEST NO. 31:

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain

such information.  Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports.  Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs further object to this Request as premature, and as improper in its attempt to impose obligations beyond those set forth under the Local Civil Rules and/or the Court's Scheduling Order, to the extent that the Request seeks discovery of documents or information prior to the deadlines set forth in the Court's Scheduling Order.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.  Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests.  (*See, e.g.*, Request No. 25.)

Teva bears the burden of proving its allegations of obviousness by clear and convincing evidence, and has not articulated any contention that would establish obviousness of the asserted claims of the patents-in-suit.  Therefore, Plaintiffs object to this Request as improper because the patents-in-suit are presumed valid, *see* 35 U.S.C. § 282, and Teva has not carried its burden of proving invalidity.  Plaintiffs are not required to search for and provide documentary evidence of validity.  Plaintiffs, however, reserve the right to rely upon evidence of objective indicia of nonobviousness to rebut any *prima facie* case of obviousness that is alleged by Teva.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents supporting objective indicia of nonobviousness of the claimed inventions of the asserted claims of the patents-in-suit to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 32:**

All documents, communications, and things supporting, refuting, or otherwise relating to any skepticism in the art relating to the subject matter disclosed in the Asserted Patents.

**RESPONSE TO REQUEST NO. 32:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports. Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs further object to this Request as premature, and as improper in its attempt to impose obligations beyond those set forth under the Local Civil Rules and/or the Court's Scheduling Order, to the extent that the Request seeks discovery of documents or information prior to the deadlines set forth in the Court's Scheduling Order. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests. (*See, e.g.*, Request No. 25.)

Teva bears the burden of proving its allegations of obviousness by clear and convincing evidence, and has not articulated any contention that would establish obviousness of the asserted

claims of the patents-in-suit. Therefore, Plaintiffs object to this Request as improper because the patents-in-suit are presumed valid, *see* 35 U.S.C. § 282, and Teva has not carried its burden of proving invalidity. Plaintiffs are not required to search for and provide documentary evidence of validity. Plaintiffs, however, reserve the right to rely upon evidence of objective indicia of nonobviousness to rebut any *prima facie* case of obviousness that is alleged by Teva.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents supporting objective indicia of nonobviousness of the claimed inventions of the asserted claims of the patents-in-suit to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 33:**

All documents, communications, and things supporting, refuting, or otherwise relating to any alleged teaching away from the subject matter disclosed in the Asserted Patents.

**RESPONSE TO REQUEST NO. 33:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports. Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for

information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs further object to this Request as premature, and as improper in its attempt to impose obligations beyond those set forth under the Local Civil Rules and/or the Court's Scheduling Order, to the extent that the Request seeks discovery of documents or information prior to the deadlines set forth in the Court's Scheduling Order.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.  Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests.  (*See, e.g.*, Request No. 25.)

Teva bears the burden of proving its allegations of obviousness by clear and convincing evidence, and has not articulated any contention that would establish obviousness of the asserted claims of the patents-in-suit.  Therefore, Plaintiffs object to this Request as improper because the patents-in-suit are presumed valid, *see* 35 U.S.C. § 282, and Teva has not carried its burden of proving invalidity.  Plaintiffs are not required to search for and provide documentary evidence of validity.  Plaintiffs, however, reserve the right to rely upon evidence of objective indicia of nonobviousness to rebut any *prima facie* case of obviousness that is alleged by Teva.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents supporting objective indicia of nonobviousness of the claimed inventions of the asserted claims of the patents-in-suit to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

## REQUEST NO. 34:

All publications and manuscripts submitted for publication (and published version if applicable) concerning fentanyl sublingual spray, whether such publications and/or manuscripts were submitted for publication in this or any other country.

**RESPONSE TO REQUEST NO. 34:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any other country" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product, responsive documents authored by an inventor of the patents-in-suit prior to filing of the patent to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 35:**

All communications between any of the Named Inventors and any person involved in the prosecution of the Asserted Patents.

**RESPONSE TO REQUEST NO. 35:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that

is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

**REQUEST NO. 36:**

All documents and communications relating to SUBSYS®, including all documents and communications relating to the research, development, and/or testing (including, but not limited to, testing related to in vitro, in vivo, ex vivo, pharmacokinetics, and dissolution) thereof, including all laboratory notebook entries, reports, memoranda, analyses, meeting minutes, and all test data, including preclinical and clinical testing data, animal modeling data, experimental results, and all conclusions reached therefrom.

**RESPONSE TO REQUEST NO. 36:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.  Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests.  (*See, e.g.*, Request Nos. 37 and 38.)

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from the prosecution files of the patents-in-suit and nonprivileged, non-work product documents reflecting the research and

discovery of the claimed inventions of the asserted claims of the patents-in-suit, to the extent

such documents exist within the possession, custody, or control of Plaintiffs, and can be located

after a reasonable search.

## REQUEST NO. 37:

All documents and communications concerning the research, development, and/or testing
(including, but not limited to, testing related to in vitro, in vivo, ex vivo, pharmacokinetics, and
dissolution) of any product allegedly covered by or described in the Asserted Patents, including
all laboratory notebook entries, reports, memoranda, analyses, meeting minutes, and all test data,
including preclinical and clinical testing data, animal modeling data, experimental results, and all
conclusions reached therefrom.

## RESPONSE TO REQUEST NO. 37:

Plaintiffs object to this Request on the grounds set forth in their general objections.

Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome,

not relevant to Teva's claims or defenses, and not proportional to the needs of the case.

Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome,

and not proportional to the needs of the case.  Plaintiffs also object to this Request to the extent it

seeks documents and things that are not within Plaintiffs' possession, custody, or control, or

which are publicly accessible such that it is equally convenient for Teva to obtain such

information.  Plaintiffs also object to this Request to the extent it seeks documents protected by

the attorney-client privilege, the work product doctrine, or any other applicable privilege or

immunity.  Plaintiffs further object to this Request to the extent it calls for documents that are

duplicative of other Requests.  (*See, e.g.*, Request Nos. 36 and 38.)

Subject to and without waiver of the foregoing objections and their General Objections,

Plaintiffs will produce nonprivileged, non-work product documents from the prosecution files of

the patents-in-suit and nonprivileged, non-work product documents reflecting the research and

discovery of the claimed inventions of the asserted claims of the patents-in-suit, to the extent

such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 38:**

All documents and communications concerning the development, in this or any other country, of any fentanyl sublingual spray product.

**RESPONSE TO REQUEST NO. 38:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any other country" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests. (*See, e.g.*, Request Nos. 36 and 37.)

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents reflecting the research and discovery of the claimed inventions of the asserted claims of the patents-in-suit, to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 39:**

All documents and communications concerning any comparison of the similarities or differences between SUBSYS® and any other fentanyl formulation.

**RESPONSE TO REQUEST NO. 39:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports. Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs object this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

**REQUEST NO. 40:**

All documents and communications concerning the benefits of a fentanyl sublingual spray formulation over other formulations of fentanyl.

**RESPONSE TO REQUEST NO. 40:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case.

Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports. Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs object this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests. (*See, e.g.*, Request Nos. 41 and 66.)

## REQUEST NO. 41:

All documents and communications concerning the motivation for researching or producing a sublingual spray formulation of fentanyl in this or any other country.

## RESPONSE TO REQUEST NO. 41:

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any other country" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it seeks documents

protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.   Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests.  (*See, e.g.*, Request Nos. 40 and 66.)

**REQUEST NO. 42:**

All documents and communications concerning any attempts to sell, assign, and/or license any of the Asserted Patents or the subject matter disclosed in any of the Asserted Patents.

**RESPONSE TO REQUEST NO. 42:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  To the extent Plaintiffs understand this Request, Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from which the ownership of the patents-in-suit may be determined.

**REQUEST NO. 43:**

All documents and communications concerning any licensing negotiations for any of the Asserted Patents or the subject matter disclosed in any of the Asserted Patents.

**RESPONSE TO REQUEST NO. 43:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. To the extent Plaintiffs understand this Request, Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

**REQUEST NO. 44:**

All documents and communications concerning any actual or potential purchase, license, and/or acquisition of any ownership interest in any of the Asserted Patents or the subject matter disclosed in any of the Asserted Patents.

**RESPONSE TO REQUEST NO. 44:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. To the extent Plaintiffs understand this Request, Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and

defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from which the ownership of the patents-in-suit may be determined.

## REQUEST NO. 45:

All documents and communications relating to any contemplated, proposed, or actual contract, license, agreement, settlement, understanding, or other relationship between Insys and any third party relating to any Orange Book Listed Patent, including all proposed and actual contracts or agreements, and all documents and communications relating to any negotiations of such contracts or agreements.

## RESPONSE TO REQUEST NO. 45:

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  To the extent Plaintiffs understand this Request, Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or

immunity.  Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests.  (*See, e.g.*, Request No. 42.)

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from which the ownership of the patents-in-suit may be determined.

## REQUEST NO. 46:

All documents and communications relating to the first sale, first offer for sale, and first publication of any fentanyl sublingual spray product or the subject matter of any of the asserted claims in the Asserted Patents before the effective filing date of the Asserted Patents.

## RESPONSE TO REQUEST NO. 46:

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs object to this Request to the extent it calls for documents relating to products offered for sale or sold outside of the United States.  Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

This action concerns Teva's infringement of the asserted claims of the patents-in-suit and alleged invalidity of the asserted claims of the patents-in-suit.  None of these issues confer an obligation on Plaintiffs to search for or produce documents sought by this Request, and

accordingly, Plaintiffs further object to this Request as an unfocused fishing expedition that, among other things, would impose an undue burden on Plaintiffs.  As phrased, this Request is unworkable, unduly burdensome, and not proportional to the needs of the case, but, subject to and without waiver of the foregoing objections and its General Objections, Plaintiffs would be willing to consider a more appropriately framed request.

**REQUEST NO. 47:**

All press releases, publications, advertising, marketing, and promotional materials relating to the Asserted Patents, the Related Patents, and/or SUBSYS®.

**RESPONSE TO REQUEST NO. 47:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product, representative documents reflecting the marketing of SUBSYS®.

**REQUEST NO. 48:**

All documents and communications relating to the release or plans to release any authorized generic version of SUBSYS® or fentanyl sublingual spray product, including, but not limited to, any draft or final agreements regarding same.

**RESPONSE TO REQUEST NO. 48:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

This action concerns Teva's infringement of the asserted claims of the patents-in-suit and alleged invalidity of the asserted claims of the patents-in-suit. None of these issues confer an obligation on Plaintiffs to search for or produce documents sought by this Request, and accordingly, Plaintiffs further object to this Request as an unfocused fishing expedition that, among other things, would impose an undue burden on Plaintiffs.

**REQUEST NO. 49:**

Documents sufficient to show the forecast or projection for sales, revenue, and profit for SUBSYS® in the United States from launch to present.

**RESPONSE TO REQUEST NO. 49:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce non-privileged, non-work product, representative documents reflecting the sales, costs, and profits of SUBSYS® in the United States since launch.

**REQUEST NO. 50:**

All documents that Insys intends to rely upon for purposes of claim construction in this action.

**RESPONSE TO REQUEST NO. 50:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request as premature to the extent it seeks documents or information that Teva has not yet produced in response to Plaintiffs' discovery requests. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law. Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports. Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs further object to this Request as premature to the deadlines set forth in the Court's Local Civil Rules, the Federal

Rules of Civil Procedure, and/or the operative Scheduling Order in this litigation.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.  Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests. (*See, e.g.*, Request No. 69.)

**REQUEST NO. 51:**

All documents that Insys intends to offer or introduce at trial or any hearing in this action.

**RESPONSE TO REQUEST NO. 51:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs further object to this Request as premature to the extent it seeks documents or information that Teva has not yet produced in response to Plaintiffs' discovery requests.  Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information.  Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law.  Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports.  Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be

the subject of, and produced in the course of, expert discovery. Plaintiffs further object to this Request as premature to the deadlines set forth in the Court's Local Civil Rules, the Federal Rules of Civil Procedure, and/or the operative Scheduling Order in this litigation. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

**REQUEST NO. 52:**

All documents referred to in any Rule 26(a) disclosure served by Insys in connection with this action.

**RESPONSE TO REQUEST NO. 52:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents in Teva's possession or that are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs further object to this Request as premature to the deadlines set forth in the Court's Local Civil Rules, the Federal Rules of Civil Procedure, and/or the operative Scheduling Order in this litigation. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce documents identified in its Rule 26 Initial Disclosures pursuant to the

deadlines set forth in the operative Scheduling Order for this litigation and the Court's Local Civil Rules to the extent any such documents exist within the possession, custody, or control of Plaintiffs and can be located after a reasonable search.

**REQUEST NO. 53:**

All documents supporting Insys's claim for any injunctive relief in this suit.

**RESPONSE TO REQUEST NO. 53:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request as premature to the extent it seeks documents or information that Teva has not yet produced in response to Plaintiffs' discovery requests. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law. Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports. Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs further object to this Request as premature to the deadlines set forth in the Court's Local Civil Rules, the Federal

Rules of Civil Procedure, and/or the operative Scheduling Order in this litigation.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

**REQUEST NO. 54:**

All documents and communications related to insurance companies, agreements with insurance companies, reimbursement programs, or authorization from insurance companies concerning any fentanyl product, including but not limited to SUBSYS®.

**RESPONSE TO REQUEST NO. 54:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law.  Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

This action concerns Teva's infringement of the asserted claims of the patents-in-suit and alleged invalidity of the asserted claims of the patents-in-suit.  None of these issues confer an obligation on Plaintiffs to search for or produce documents sought by this Request, and

accordingly, Plaintiffs further object to this Request as an unfocused fishing expedition that, among other things, would impose an undue burden on Plaintiffs.

**REQUEST NO. 55:**

All documents and communications concerning any valuation of any of the Asserted Patents or any of the Related Patents.

**RESPONSE TO REQUEST NO. 55:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law. Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

This action concerns Teva's infringement of the asserted claims of the patents-in-suit and alleged invalidity of the asserted claims of the patents-in-suit. None of these issues confer an

obligation on Plaintiffs to search for or produce documents sought by this Request, and accordingly, Plaintiffs further object to this Request as an unfocused fishing expedition that, among other things, would impose an undue burden on Plaintiffs.

**REQUEST NO. 56:**

All documents and communications concerning pricing or pricing strategy for a fentanyl sublingual spray.

**RESPONSE TO REQUEST NO. 56:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product, representative documents reflecting the marketing of SUBSYS®.

**REQUEST NO. 57:**

Documents and communications sufficient to show the abuse of any fentanyl drug product, including but not limited to SUBSYS®.

**RESPONSE TO REQUEST NO. 57:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case.

Plaintiffs object to the use of the term "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law. Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

This action concerns Teva's infringement of the asserted claims of the patents-in-suit and alleged invalidity of the asserted claims of the patents-in-suit. None of these issues confer an obligation on Plaintiffs to search for or produce documents sought by this Request, and accordingly, Plaintiffs further object to this Request as an unfocused fishing expedition that, among other things, would impose an undue burden on Plaintiffs.

## REQUEST NO. 58:

Documents and communications sufficient to show marketing, advertising, or promotion of any fentanyl drug product, including sufficient to show each non-FDA-approved or "off-label" use.

## RESPONSE TO REQUEST NO. 58:

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome,

not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law. Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

This action concerns Teva's infringement of the asserted claims of the patents-in-suit and alleged invalidity of the asserted claims of the patents-in-suit. None of these issues confer an obligation on Plaintiffs to search for or produce documents sought by this Request, and accordingly, Plaintiffs further object to this Request as an unfocused fishing expedition that, among other things, would impose an undue burden on Plaintiffs.

**REQUEST NO. 59:**

All documents and communications concerning non-FDA-approved or "off-label" use of any fentanyl drug product, including but not limited to SUBSYS®.

**RESPONSE TO REQUEST NO. 59:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome,

not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law. Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

This action concerns Teva's infringement of the asserted claims of the patents-in-suit and alleged invalidity of the asserted claims of the patents-in-suit. None of these issues confer an obligation on Plaintiffs to search for or produce documents sought by this Request, and accordingly, Plaintiffs further object to this Request as an unfocused fishing expedition that, among other things, would impose an undue burden on Plaintiffs.

**REQUEST NO. 60:**

All deposition transcripts, declarations, and reports involving any individual You plan to call as a witness at any trial or hearing in this action referring or relating to fentanyl or the subject of their anticipated testimony in this action.

**RESPONSE TO REQUEST NO. 60:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law. Plaintiffs also object to this Request to the extent it seeks documents in Teva's possession or that are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs further object to this Request to the extent Teva seeks deposition discovery beyond the limits set forth in the Federal Rules of Civil Procedure. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

**REQUEST NO. 61:**

All documents and communications concerning any of the examples in any of the Asserted Patents or any of the Related Patents.

**RESPONSE TO REQUEST NO. 61:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession,

custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.  Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests.  (*See, e.g.*, Request No. 13.)

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from the prosecution files of the file histories of the patents-in-suit and nonprivileged, non-work product documents reflecting the research and discovery of the claimed inventions of the asserted claims of the patents-in-suit, to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 62:**

All documents and communications concerning any pharmacodynamic or pharmacokinetic properties of any fentanyl product, including, without limitation, all laboratory notebook entries, reports, memoranda, analyses, meeting minutes, and test data related thereto.

**RESPONSE TO REQUEST NO. 62:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation.  Plaintiffs also object to this

Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will nonprivileged, non-work product documents from the prosecution files of the file histories of the patents-in-suit and nonprivileged, non-work product documents reflecting the research and discovery of the claimed inventions of the asserted claims of the patents-in-suit, to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 63:**

All documents and communications concerning droplet size distribution for any fentanyl product, including, without limitation, all laboratory notebook entries, reports, memoranda, analyses, meeting minutes, and test data related thereto.

**RESPONSE TO REQUEST NO. 63:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from the prosecution files of the file histories of the patents-in-suit and nonprivileged, non-work product documents reflecting the research and discovery of the claimed inventions of the asserted claims of the patents-in-suit, to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 64:**

All documents and communications relating to programs or strategies for promoting or encouraging healthcare providers to prescribe a fentanyl sublingual spray.

**RESPONSE TO REQUEST NO. 64:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law. Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also

object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product, representative documents reflecting the marketing of SUBSYS®.

**REQUEST NO. 65:**

All documents and communications concerning any spray characterization of any fentanyl drug product administered by sublingual spray, including, without limitation, all laboratory notebook entries, reports, memoranda, analyses, meeting minutes, and test data related thereto.

**RESPONSE TO REQUEST NO. 65:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from the prosecution files of the file histories of the patents-in-suit and nonprivileged, non-work product documents reflecting the research and discovery of the claimed inventions of the asserted claims of the patents-in-suit,

to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 66:**

All documents and communications concerning Your selection of a delivery mechanism for SUBSYS[®], including all considerations, comparisons, and factors considered, and including, without limitation, all laboratory notebook entries, reports, memoranda, analyses, meeting minutes, and test data related thereto.

**RESPONSE TO REQUEST NO. 66:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs object this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests. (*See, e.g.*, Request Nos. 40 and 41.)

**REQUEST NO. 67:**

All documents, communications, and things concerning the measurement of droplet size for a fentanyl drug product administered by sublingual spray, including, without limitation, all laboratory notebook entries, reports, memoranda, analyses, meeting minutes, test methods, and test data related thereto.

**RESPONSE TO REQUEST NO. 67:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests. (*See, e.g.*, Request No. 65.)

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product documents from the prosecution files of the file histories of the patents-in-suit and nonprivileged, non-work product documents reflecting the research and discovery of the claimed inventions of the asserted claims of the patents-in-suit, to the extent such documents exist within the possession, custody, or control of Plaintiffs, and can be located after a reasonable search.

**REQUEST NO. 68:**

All documents and communications concerning monetary or non-monetary gifts, payment, travel, or rewards provided to advisors or medical professionals related to the promotion, marketing, prescription, distribution, education, or sale of any fentanyl product.

**RESPONSE TO REQUEST NO. 68:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law. Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

**REQUEST NO. 69:**

All documents and things construing or otherwise giving meaning to any element or claim term in any of the Asserted Patents.

**RESPONSE TO REQUEST NO. 69:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome,

and not proportional to the needs of the case.  Plaintiffs further object to this Request as premature to the extent it seeks documents or information that Teva has not yet produced in response to Plaintiffs' discovery requests.  Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information.  Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law.  Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports.  Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery.  Plaintiffs further object to this Request as premature to the deadlines set forth in the Court's Local Civil Rules, the Federal Rules of Civil Procedure, and/or the operative Scheduling Order in this litigation.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.  Plaintiffs further object to this Request to the extent it calls for documents that are duplicative of other Requests. (*See, e.g.*, Request No. 50.)

**REQUEST NO. 70:**

All documents and things that compare the product of NDA 202788 to any claim of the Asserted Patents.

**RESPONSE TO REQUEST NO. 70:**

Plaintiffs object to this Request on the grounds set forth in their general objections.

Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome,

not relevant to Teva's claims or defenses, and not proportional to the needs of the case.

Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly

burdensome, and not proportional to the needs of the case.  Plaintiffs also object to this Request

to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or

control, or which are publicly accessible such that it is equally convenient for Teva to obtain

such information.  Plaintiffs also object to this Request to the extent it is more properly

addressed by other forms of discovery, including, for example, through expert reports.  Plaintiffs

further object to this Request as premature to the extent it seeks expert testimony or calls for

information that will be the subject of, and produced in the course of, expert discovery.

Plaintiffs object this Request to the extent it seeks documents protected by the attorney-client

privilege, the work product doctrine, or any other applicable privilege or immunity.

## REQUEST NO. 71:

All documents and communications supporting, refuting, or otherwise relating to Plaintiffs' allegations and causes of action set forth in the Plaintiffs' Complaint, including its infringement allegations.

## RESPONSE TO REQUEST NO. 71:

Plaintiffs object to this Request on the grounds set forth in their general objections.

Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome,

not relevant to Teva's claims or defenses, and not proportional to the needs of the case.

Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome,

and not proportional to the needs of the case.  Plaintiffs further object to this Request as vague,

ambiguous, overly broad, and premature to the extent it seeks documents and information that

Plaintiffs do not yet know if it will rely on in this action.  Plaintiffs also object to this Request as

premature to the extent it seeks documents or information that Teva has not yet produced in

response to Plaintiffs' discovery requests. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law. Plaintiffs also object to this Request to the extent it is more properly addressed by other forms of discovery, including, for example, through expert reports. Plaintiffs further object to this Request as premature to the extent it seeks expert testimony or calls for information that will be the subject of, and produced in the course of, expert discovery. Plaintiffs further object to this Request as premature, and as improper in its attempt to impose obligations beyond those set forth under the Local Civil Rules and/or the Court's Scheduling Order, to the extent that the Request seeks discovery of documents or information prior to the deadlines set forth in the Court's Scheduling Order. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

**REQUEST NO. 72:**

Documents sufficient to show the costs associated with marketing or promoting SUBSYS®, including the costs of the sales force, detailing, product sampling, and all other promotional costs associated with SUBSYS®.

**RESPONSE TO REQUEST NO. 72:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case.

Plaintiffs object to the use of the term "all" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

Subject to and without waiver of the foregoing objections and their General Objections, Plaintiffs will produce nonprivileged, non-work product, representative documents reflecting the marketing of SUBSYS®.

**REQUEST NO. 73:**

All documents and communications concerning the prescription or distribution of any fentanyl sublingual spray product, including but not limited to SUBSYS®.

**RESPONSE TO REQUEST NO. 73:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law.  Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation.  Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such

information.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

**REQUEST NO. 74:**

All documents and communications related to any speaking engagements concerning any fentanyl product.

**RESPONSE TO REQUEST NO. 74:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the terms "all" and "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.  Plaintiffs further object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law.  Plaintiffs object that the Request is overly broad and lacks any reasonable limitation, that Teva has not explained how such documents could be relevant to its claims and defenses, and that the Request is unduly burdensome and disproportionate to the needs of this litigation.  Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information.  Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

**REQUEST NO. 75:**

Documents sufficient to show any market analysis by or on behalf of Plaintiffs relating to any fentanyl product.

**RESPONSE TO REQUEST NO. 75:**

Plaintiffs object to this Request on the grounds set forth in their general objections. Plaintiffs further object to this Request as vague, ambiguous, overly broad, unduly burdensome, not relevant to Teva's claims or defenses, and not proportional to the needs of the case. Plaintiffs object to the use of the term "any" in this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Plaintiffs also object to this Request to the extent it seeks documents and things that are not within Plaintiffs' possession, custody, or control, or which are publicly accessible such that it is equally convenient for Teva to obtain such information. Plaintiffs object to this Request to the extent it calls for the production of confidential information of any third party that is in the possession of Plaintiffs pursuant to confidentiality and nondisclosure restrictions imposed by contract or applicable law. Plaintiffs also object to this Request to the extent it seeks documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Maryellen Noreika*

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Chad J. Peterman
Lucas L. Kressel
PAUL HASTINGS LLP
200 Park Avenue
New York, NY  10166
(212) 318-6000

Naveen Modi
Michael A. Stramiello, Ph.D.
PAUL HASTINGS LLP
875 15th Street, NW
Washington, DC  20008
(202) 551-1700

July 16, 2018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 16, 2018, copies of the foregoing were caused to be

served upon the following in the manner indicated:

John W. Shaw, Esquire                                    *VIA ELECTRONIC MAIL*
Karen E. Keller, Esquire
Nathan R. Hoeschen, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Defendant*

J.C. Rozendaal, Esquire                                  *VIA ELECTRONIC MAIL*
Paul A. Ainsworth, Esquire
Deirdre M. Wells, Esquire
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1100 New York Ave. NW, Suite 600
Washington, DC  20005
*Attorneys for Defendant*

*/s/ Maryellen Noreika*
_____
Maryellen Noreika (#3208)

# Exhibit E

US008486972B2

(12) **United States Patent** (10) **Patent No.:** **US 8,486,972 B2**
Kottayil et al. (45) **Date of Patent:** **Jul. 16, 2013**

(54) **SUBLINGUAL FENTANYL SPRAY**

(75) Inventors: **S. George Kottayil**, Long Grove, IL (US); **Venkat R. Goskonda**, Gurnee, IL (US); **Zhongyuan Zhu**, Vernon Hills, IL (US); **Neha Parikh**, Chicago, IL (US); **Linet Kattookaran**, Mount Prospect, IL (US)

(73) Assignee: **Insys Therapeutics, Inc.**, Phoenix, AZ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1188 days.

(21) Appl. No.: **11/698,739**

(22) Filed: **Jan. 25, 2007**

(65) **Prior Publication Data**

US 2007/0261695 A1 Nov. 15, 2007

**Related U.S. Application Data**

(60) Provisional application No. 60/762,057, filed on Jan. 25, 2006.

(51) **Int. Cl.**
| | |
|---|---|
| *A01N 43/40* | (2006.01) |
| *A01N 37/00* | (2006.01) |
| *A61K 31/445* | (2006.01) |
| *A61K 31/21* | (2006.01) |
| *A61M 11/00* | (2006.01) |
| *A61K 9/00* | (2006.01) |
| *A61B 19/00* | (2006.01) |

(52) **U.S. Cl.**
USPC ...... **514/329**; 128/200.14; 424/400; 514/506; 604/407

(58) **Field of Classification Search**
USPC ........................................ 514/329
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,244,478 | A | 1/1981 | Handman |
| 5,219,083 | A | 6/1993 | Liebert et al. |
| 5,958,379 | A | 9/1999 | Regenold et al. |
| 5,976,504 | A | 11/1999 | Russell |
| 6,759,059 | B1 | 7/2004 | Pettersson et al. |
| 2002/0055496 | A1 | 5/2002 | McCoy et al. |
| 2002/0160991 | A1 | 10/2002 | Shao |
| 2003/0039680 | A1 | 2/2003 | Dugger, III |
| 2003/0077228 | A1 | 4/2003 | Dugger, III |
| 2003/0077229 | A1 | 4/2003 | Dugger, III |
| 2003/0082107 | A1 | 5/2003 | Dugger, III |
| 2003/0095925 | A1 | 5/2003 | Dugger, III |
| 2003/0095926 | A1 | 5/2003 | Dugger, III |
| 2003/0095927 | A1 | 5/2003 | Dugger, III |
| 2003/0190286 | A1 | 10/2003 | Dugger, III |
| 2003/0190290 | A1* | 10/2003 | Ross ............................... 424/45 |
| 2004/0092428 | A1 | 5/2004 | Chen et al. |
| 2004/0120895 | A1 | 6/2004 | Dugger, III |
| 2004/0136913 | A1 | 7/2004 | Dugger, III et al. |
| 2004/0136914 | A1 | 7/2004 | Dugger, III et al. |
| 2004/0136915 | A1 | 7/2004 | Dugger, III et al. |
| 2004/0141923 | A1 | 7/2004 | Dugger, III et al. |
| 2004/0265239 | A1 | 12/2004 | Dugger, III et al. |
| 2005/0002867 | A1 | 1/2005 | Dugger, III et al. |
| 2005/0163719 | A1 | 7/2005 | Dugger, III et al. |
| 2005/0180923 | A1 | 8/2005 | Dugger, III et al. |
| 2005/0281752 | A1 | 12/2005 | Dugger, III |
| 2005/0281753 | A1 | 12/2005 | Dugger, III |
| 2005/0287075 | A1 | 12/2005 | Dugger, III |
| 2006/0062812 | A1* | 3/2006 | Ross et al. .................... 424/400 |
| 2009/0124554 | A1 | 5/2009 | Dugger, III |
| 2009/0162300 | A1 | 6/2009 | Dugger, III et al. |
| 2009/0176834 | A1* | 7/2009 | Kottayil et al. .............. 514/329 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| RU | 2156126 | 9/2000 |
| RU | 2232580 | 7/2004 |
| WO | WO 90/07333 | 7/1990 |
| WO | WO 00/47203 | 8/2000 |
| WO | WO 01/97780 A2 | 12/2001 |
| WO | WO 2004/016243 A2 | 2/2004 |
| WO | WO 2004/080382 | 9/2004 |
| WO | WO 2004/075877 | 10/2004 |
| WO | WO 2007-007059 | 1/2007 |

OTHER PUBLICATIONS

Smyth, et al, 2003, AAPS PharmSciTech 2003; 4 (3): 1-11.*
Smyth & Hickey (2003) Multimodal Particle Size Distributions Emitted From HFA-134a Solution Pressurized Metered-Dose Inhalers. AAPS PharmSciTech 2003; 4 (3) Article 38. pp. 1-11.*
International Search Report and Written Opinion dated Jul. 11, 2008 from corresponding Int'l Application No. PCT/US07/02163.
Mathar, L.E., et al. "Pulmonary administration of aerosolised fentanyl: pharmacokinetic analysis of systemic delivery" Br. J. Clin. Pharmacol. Jan. 1998, vol. 46, pp. 37-43.
Marier, J-F., et al. "Comparative bioequivalence study between a novel matrix transdermal delivery system of fentanyl and a commercially available reservoir formulation", Br. J. Clin. Pharmacol. Aug. 2006, vol. 63, No. 1, pp. 121-124, esp. p. 123, Figure 1.
International Preliminary Report on Patentability dated Sep. 4, 2008 from corresponding Int'l Application No. PCT/US07/02163.
Examination Report dated Aug. 6, 2009 from corresponding Australian Application No. 2007208229.
Examination Report dated May 5, 2010 from corresponding Canadian Application No. 2,637,672.
Examination Report dated Mar. 18, 2010 from corresponding New Zealand Application No. 569949.
An English translation of the Russian Examination Report dated Aug. 2009 from corresponding Russian Application No. 2008130763.
ISR and Written Opinion from related Int'l Application No. PCT/US08/09359 dated Jan. 9, 2009.
Int'l Preliminary Report on Patentability from related Int'l Application No. PCT/US08/09359 dated Feb. 2, 2010.

(Continued)

*Primary Examiner* — Robert Landsman
(74) *Attorney, Agent, or Firm* — Wood, Phillips, Katz, Clark & Mortimer

(57) **ABSTRACT**

The present invention is directed to sublingual formulations containing fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, suitable for administration to a patient, and methods for treatment with the formulations.

**3 Claims, 7 Drawing Sheets**

**US 8,486,972 B2**

Page 2

OTHER PUBLICATIONS

Lejus, et al., "Fentanyl versus sufentanil: plasma concentrations during continuous epidural postoperative infusion in children," British Journal of Anaesthesia, vol. 85, Issue 4, Oct. 2000, pp. 615-617.
Office Action on Patent Application No. 200780003555.X dated Jul. 9, 2010.

Examination Report for corresponding European Patent Application No. 07762549.9, mailed on Nov. 30, 2010.
Supplementary Search Report for corresponding European Patent Application No. 97762549.9, mailed on Nov. 30, 2010.

* cited by examiner

Plasma concentration-time curves after IV & SL doses of Fentanyl

Figure 1: Formula of Example 1, 50 µg IV dose



Mean (±S.E.) plasma concentration–time profiles following intravenous administration of Fentanyl (*n*=3).

Figure 2: Formula of Example 1, 50 µg Sublingual dose



Mean (±S.E.) plasma concentration–time profiles following sublingual administration of Fentanyl (*n*=3)

Figure 3: Formula of Example 2, 80 μg IV dose



Mean (±S.E.) plasma concentration–time profiles following intravenous administration of Fentanyl ($n$=3).

Figure 4: Formula of Example 2, 80 μg SL dose



Mean (±S.E.) plasma concentration–time profiles following sublingual administration of Fentanyl ($n$=3)

Figure 5: Formula of Example 3, 50 μg IV dose



Mean (±S.E.) plasma concentration–time profiles following intravenous administration of Fentanyl ($n$=3)

Figure 6: Formula of Example 3, 50 μg SL dose



Mean (±S.E.) plasma concentration–time profiles following sublingual administration of Fentanyl ($n$=3)

U.S. Patent          Jul. 16, 2013          Sheet 4 of 7          US 8,486,972 B2

Figure 7: Formula of Example 4, 50 µg IV dose



Mean (±S.E.) plasma concentration–time profiles following intravenous administration of Fentanyl ($n$=3)

Figure 8: Formula of Example 4, 50 µg SL dose



Mean (±S.E.) plasma concentration–time profiles following sublingual administration of Fentanyl ($n$=3)

Figure 9: Formula of Example 5, 50 µg IV dose



Mean (±S.E.) plasma concentration–time profiles following intravenous administration of Fentanyl ($n$=3)

Figure 10: Formula of Example 5, 50 µg SL dose



Mean (±S.E.) plasma concentration–time profiles following sublingual administration of Fentanyl ($n$=3)

U.S. Patent          Jul. 16, 2013          Sheet 6 of 7          US 8,486,972 B2

Figure 11: Vignetting Results Dv10, Dv50, Dv90 vs. Distance from Range Lens



Figure 12: Exhaust Results Dv10, Dv50, Dv90 vs. Distance to Exhaust at 4 cm Device to Laser Beam



Note: 10 cm distance used for plotting of results with no exhaust fan present.
Reference: Notebook 1, LDR 108

Figure 13: Exhaust Results Dv10, Dv50, Dv90 vs. Distance to Exhaust at 7 cm Device to Laser Beam



Note: 10 cm distance used for plotting of results with no exhaust fan present.
Reference: Notebook 1, LDR 108

Figure 14: Device to Laser Beam Placement Results, Dv10, Dv50, Dv90 vs. Distance to Laser Beam



US 8,486,972 B2

1

## SUBLINGUAL FENTANYL SPRAY

### FIELD OF THE INVENTION

The invention is directed to sublingual formulations containing fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, suitable for administration to humans, and methods for treatment with the sublingual formulations.

### BACKGROUND OF THE INVENTION

Fentanyl is a μ-opioid receptor agonist with analgesic potency approximately 80-100 times that of morphine. In clinical settings, fentanyl exerts its principal pharmacologic effects on the central nervous system. Its primary actions are analgesic and sedation.

The analgesic effects of fentanyl are related to the blood level of the drug. In general, the minimum effective concentration and the concentration at which toxicity occurs rise with increasing tolerance to any and all opioids. The rate of development of tolerance may vary widely among individuals. All opioid mu-receptor agonists, including fentanyl, produce dose dependent respiratory depression. The risk of respiratory depression is typically less in patients receiving chronic opioid therapy who develop tolerance to respiratory depression and other opioid effects. Serious or fatal respiratory depression can occur, even at recommended doses, in vulnerable individuals.

Orally administered fentanyl is subject to first pass effect metabolism as upwards of 50% or more of orally administered fentanyl is not absorbed. Other forms of delivery such a parenteral, buccal, and transdermal have been utilized to decrease or avoid this first pass effect for fentanyl.

Fentanyl is currently available in injectable form, as a lozenge (e.g. Actiq®), and as a transdermal system (e.g., Duragesic® 25, 50, 75, and 100 μg of fentanyl per hour). Duragesic® provides continuous systemic delivery of fentanyl for approximately 72 hours. Duragesic® is indicated in the management of chronic pain in patients requiring continuous opioid analgesia for pain that is not optimally managed with lesser means such as acetaminophen-opioid combinations, non-steroidal analgesics, or prn (as needed) dosing with short-acting opioids. Duragesic® is typically not suitable for patients experiencing acute pain due to the delay in absorption of the fentanyl through the patch, or postoperative pain because serious or life-threatening hypoventilation could result.

Actiq® is a solid formulation of fentanyl citrate, intended for oral transmucosal administration. Actiq® is a lozenge attached to a handle similar in shape to a lollipop. The handle is purportedly to allow the Actiq® unit to be removed from the mouth if signs of excessive opioid effects appear during administration. Actiq® is indicated for the management for breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain. Actiq® is contraindicated in the management of acute or postoperative pain.

Sublingual tablets and lozenges (e.g., Actiq®) which may be used for acute pain or breakthrough pain have certain disadvantages. A disadvantage, amongst others, is that after intake the active agent in these pharmaceutical agents must first be released and dispersed prior to being available for resorption in dissolved form. In addition, the absorption pharmacokinetics of fentanyl from Actiq® may vary depending on the fraction of the dose that is absorbed through the oral mucosa and the fraction swallowed. Further, certain lozenges

2

may be in the form of a candy which require medical supervision and may be socially questionable.

There exists a need in art for a sublingual formulation including fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, which is suitable for effective pain management.

### SUMMARY AND OBJECTS OF THE INVENTION

It is an object of the invention to provide a fentanyl formulation suitable for sublingual administration for effective pain management.

It is an object of certain embodiments of the invention to provide methods and compositions capable of rapidly inducing a state of sedation, analgesia, and/or anesthesia.

It is a further object of certain embodiments of the invention to provide methods and compositions for fentanyl administration which minimize the underdosing and/or overdosing of a patient in need of fentanyl therapy.

It is a further object of certain embodiments of the invention to provide methods and compositions suitable for the treatment of breakthrough pain in patients receiving chronic pain treatment.

It is a further object of certain embodiments of the present invention to provide a method for sublingual administration of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, in a controlled amount for the treatment of pain.

It is a further object of certain embodiments of the present invention to provide a dosage form of an opioid analgesic which can be administered sublingually in a manner which will cause substantial sublingual absorption without substantial risk of the dose passing into the lungs of the recipient.

The above-mentioned objects and others are achieved by virtue of the present invention, which is directed in part to a method for sublingually administering fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, to provide fast-acting relief in a formulation in which a substantial portion of the fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof will not be passed into the lungs of the patient.

In certain embodiments the present invention is directed to a sublingual fentanyl formulation comprising discrete liquid droplets comprising an effective amount of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, said droplets having a mean diameter of at least about 10 microns, preferably at least about 20 microns, more preferably a mean diameter of from about 20 to about 200 microns.

In certain embodiments, the present invention is directed to a sublingual fentanyl formulation comprising discrete liquid droplets of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof; in a pharmaceutically acceptable liquid carrier; said droplets having a size distribution of from about 5 microns to about 500 microns, preferably from about 10 microns to about 200 microns, preferably from about 20 microns to about 100 microns, more preferably from about 30 microns to about 70 microns.

In certain preferred embodiments, none of the particles have a diameter which would allow the fentanyl, pharmaceutically acceptable salt thereof, or derivative thereof to be delivered to the lung upon sublingual administration.

In certain embodiments, the present invention is directed to a unit dose of a sublingual fentanyl formulation, said unit dose comprising discrete liquid droplets of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof; and a pharmaceutically acceptable liquid carrier; said drop-

US 8,486,972 B2

**3**

lets having a mean diameter of at least about 10 microns, preferably at least about 20 microns, more preferably a mean diameter of from about 20 to about 200 microns.

In certain embodiments, the present invention is directed to a unit dose of a sublingual fentanyl formulation, said unit dose comprising discrete liquid droplets of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof; and a pharmaceutically acceptable liquid carrier; said droplets having a size distribution of from about 5 microns to about 500 microns, preferably from about 10 microns to about 200 microns, preferably from about 20 microns to about 100 microns, more preferably from about 30 microns to about 70 microns.

In certain embodiments, the present invention is directed to a method of treating pain comprising sublingually administering a liquid spray formulation in the form of discrete liquid droplets having a mean diameter of at least about 10 microns, preferably at least about 20 microns, more preferably a mean diameter of from about 20 to about 200 microns, to a human patient experiencing pain, said liquid spray formulation comprising an effective amount of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, dispersed in a pharmaceutically acceptable liquid carrier.

In certain embodiments, the present invention is directed to a method of treating pain comprising sublingually administering a liquid spray formulation in the form of discrete liquid droplets having a size distribution of from about 5 microns to about 500 microns, preferably from about 10 microns to about 200 microns, preferably from about 20 microns to about 100 microns, more preferably from about 30 microns to about 70 microns to a human patient experiencing pain; said liquid spray formulation comprising an effective amount of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, dispersed in a pharmaceutically acceptable liquid carrier.

In certain embodiments, the present invention is directed to a device which includes a reservoir containing a unit dose of a liquid formulation comprising an effective amount of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof in a pharmaceutically acceptable liquid carrier; the device having an actuator which when actuated delivers the unit dose of the liquid formulation in the form of liquid droplets having a mean diameter of at least about 10 microns, preferably at least about 20 microns, more preferably a mean diameter of from about 20 to about 200 microns. Preferably, the device delivers a therapeutically effective dose of the liquid formulation in the form of liquid droplets having a size distribution of from about 5 microns to about 500 microns, preferably from about 10 microns to about 200 microns, preferably from about 20 microns to about 100 microns, more preferably from about 30 microns to about 70 microns.

In certain embodiments, the present invention is directed to a multi-dose device which includes a reservoir containing a liquid formulation comprising fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof in a pharmaceutically acceptable liquid carrier; the device having an actuator which when actuated delivers a therapeutically effective dose of the liquid formulation in the form of liquid droplets having a mean diameter of at least about 10 microns, preferably at least about 20 microns, more preferably a mean diameter of from about 20 to about 200 microns. Preferably, the device delivers a therapeutically effective dose of the liquid formulation in the form of liquid droplets having a size distribution of from about 5 microns to about 500 microns, preferably from about 10 microns to about 200 microns, preferably from about 20 microns to about 100 microns, more preferably from about 30 microns to about 70 microns.

**4**

In certain embodiments, the present invention is directed to a method of treating pain comprising utilizing a spray device which includes a reservoir including a liquid formulation comprising fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof in a pharmaceutically acceptable liquid carrier; and an actuator which upon actuation delivers a therapeutically effective amount of liquid droplets to be sprayed from the device having a mean diameter of at least about 10 microns, preferably at least about 20 microns, more preferably a mean diameter of from about 20 to about 200 microns.

In certain embodiments, the present invention is directed to a method of treating pain comprising utilizing a spray device which includes a reservoir including a liquid formulation comprising fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof; and a pharmaceutically acceptable liquid carrier; and an actuator which upon actuation delivers a therapeutically effective amount of liquid droplets having a size distribution of from about 5 microns to about 500 microns, preferably from about 10 microns to about 200 microns, preferably from about 20 microns to about 100 microns, more preferably from about 30 microns to about 70 microns.

In certain embodiments, the present invention is directed to a method of treating breakthrough pain comprising sublingually administering a liquid spray formulation comprising an effective amount of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, dispersed in a pharmaceutically acceptable liquid carrier to a human patient to treat breakthrough pain experienced by said human patient.

In certain embodiments, the present invention is directed to a method of treating breakthrough pain comprising sublingually administering a liquid spray formulation comprising an effective amount of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, dispersed in a pharmaceutically acceptable liquid carrier to a human patient who is receiving chronic pain treatment, and is experiencing breakthrough pain.

In certain embodiments, the present invention is directed to a method of reducing patient to patient variability for the treatment of breakthrough pain, comprising sublingually administering to a human patient experiencing breakthrough pain a dose of fentanyl in a liquid spray formulation comprising fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, and a pharmaceutically acceptable liquid carrier said liquid spray formulation being administered as discrete liquid droplets having a mean diameter of at least about 10 microns, preferably at least about 20 microns, more preferably a mean diameter of from about 20 to about 200 microns.

In certain embodiments, the present invention is directed to a method of reducing patient to patient variability for the treatment of breakthrough pain, comprising sublingually administering to a human patient experiencing breakthrough pain a dose of fentanyl in a liquid spray formulation comprising fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, and a pharmaceutically acceptable liquid carrier said liquid spray formulation being administered as discrete liquid droplets having a size distribution of from about 5 microns to about 500 microns, preferably from about 10 microns to about 200 microns.

In certain preferred embodiments, the liquid spray formulation further includes a pharmaceutically acceptable solvent. Preferably the pharmaceutically acceptable solvent is an organic solvent which is included in an amount suitable for dissolving the fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof.

US 8,486,972 B2

5

In certain preferred embodiments the formulations of the present invention provide a mean time to maximum plasma concentration ($T_{max}$) of fentanyl at from about 5 minutes to about 120 minutes, after sublingual administration to humans.

In certain preferred embodiments the formulations of the present invention provide a mean maximum plasma concentration ($C_{max}$) of fentanyl of about 127 pg/ml to about 213 pg/ml per 100 µg fentanyl after sublingual administration to humans.

In certain preferred embodiments of the present invention the formulations of the present invention do not include a propellant.

In certain embodiments, the formulations of the present invention are suitable for transmucosal administration, including, for example, buccal administration.

In certain embodiments, the present invention is further directed to a method of transmucosally administering fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, to a human to provide fast-acting relief in a formulation in which a substantial portion of the fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof will not be passed into the lungs of the patient. In certain preferred embodiments, the transmucosal area is the buccal area of a human.

In certain embodiments, the present invention is further directed to the use of a formulation as defined above for the manufacture of a medicament for use as an analgesic, for the treatment of acute pain and/or breakthrough pain, as an anesthetic premedication, for the induction of anesthesia, as a sedative and/or for the treatment of anxiety.

The invention is also directed to a sublingual fentanyl formulation comprising discrete liquid droplets of an effective amount of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof; in a pharmaceutically acceptable liquid carrier; said droplets having a mean diameter of at least about 10 microns, and upon administration to a human patient, at least about 90% of the discrete liquid droplets have a mean diameter equal or greater than about 9 µm. In other embodiments, not more than about 5% of the discrete liquid droplets have a mean diameter less than 9 µm. In still other embodiments, the formulation provides a respirable dose of not more than about 5% of the total fentanyl dose contained.

The invention is also directed to a method of treating pain comprising sublingually administering a liquid spray formulation in the form of discrete liquid droplets having a mean diameter of at least about 10 microns to a human patient experiencing pain and at least about 90% of the discrete liquid droplets have a mean diameter equal or greater than about 9 µm upon administration to a human patient, said liquid spray formulation comprising an effective amount of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, dispersed in a pharmaceutically acceptable liquid carrier. In certain other embodiments, not more than about 5% of the discrete liquid droplets have a mean diameter less than 9 µm. In other embodiments, the formulation provides a respirable dose of not more than about 5% of the total fentanyl dose contained.

The invention is also directed to a unit dose or bi-dose device for sublingual administration of a drug comprising:

a reservoir containing a unit dose or a bi-dose of a liquid formulation comprising an effective amount of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof in a pharmaceutically acceptable liquid carrier; and

the device having an actuator which when actuated delivers the unit dose of the liquid formulation in the form of liquid droplets having a mean diameter of at least about 10 microns,

6

and wherein upon administration to a human patient, at least about 90% of the discrete liquid droplets have a mean diameter equal or greater than about 9 µm.

In other embodiments, not more than about 5% of the discrete liquid droplets have a mean diameter less than 9 µm. In still other embodiments, the formulation provides a respirable dose of not more than about 5% of the total fentanyl dose contained.

Many patients with e.g., cancer, typically continue to experience moderate to severe pain despite chronic analgesic therapy and this can occur as intermittent breakthrough pain, often due to increases in a patient's activity level. Attempts to counteract this type of pain by increasing the dose of long-acting formulations of analgesics often produce slow onset of analgesia and unwanted side-effects of sedation, constipation or nausea and vomiting. However, in certain embodiments the present invention is directed to a formulation which preferably provides a rapidly acting, potent analgesic which reduces the pain, such as breakthrough pain, for the required time and then preferably wears off fairly quickly thereby minimizing the side-effects of the fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof.

For purposes of the present invention, derivatives of fentanyl include sufentanil, carfentanil, lofentanil, alfentanil, or the like.

For purposes of the present invention, "breakthrough pain" refers to a pain that exceeds a threshold in a patient which causes cognizable discomfort wherein the pain experienced by the patient is otherwise typically controlled e.g., by chronic analgesic therapy, and tolerated. For example, pain related to medical illnesses, such as cancer, typically fluctuates, and patients often report the experience of cognizable discomfort (e.g., breakthrough pain). Typically breakthrough pain is currently treated with immediate release oral dosage forms which may take up to about 45 minutes or longer for the drug to be absorbed and may result in a delay of the relief of breakthrough pain, as opposed to a liquid spray formulation of the present invention which begins to provide relief of the breakthrough pain almost immediately after administration.

For purposes of the present invention, "chronic pain treatment" refers to a daily or round-the-clock pain treatment. Chronic pain treatment can be oral, parenteral, transdermal, or other suitable means of administration.

For purposes of the present invention, "sublingual" is defined herein as beneath or concerning the area under the tongue.

For purposes of the present invention the term "sublingual administration" is defined herein as the therapeutic administration of a pharmaceutical composition under the tongue.

For purposes of the present invention an "effective amount" of a drug is an amount effective to demonstrate a desired activity of the drug. According to the instant invention, a therapeutically effective amount of fentanyl, pharmaceutically acceptable salt thereof, or derivative thereof, is an amount effective to treat, e.g., noticeably reduce, pain in a patient.

For purposes of the present invention the terms droplets and particles may be used interchangeably.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** depicts the mean (±S.E.) plasma concentration-time profiles following intravenous administration of Fentanyl of Example 1 (n=3) in the study of Example 6.

FIG. **2** depicts the mean (±S.E.) plasma concentration-time profiles following sublingual administration of Fentanyl of Example 1 (n=3) in the study of Example 6.

7

FIG. **3** depicts the mean (±S.E.) plasma concentration-time profiles following intravenous administration of Fentanyl of Example 2 (n=3) in the study of Example 6.

FIG. **4** depicts the mean (±S.E.) plasma concentration-time profiles following sublingual administration of Fentanyl of Example 2 (n=3) in the study of Example 6.

FIG. **5** depicts the mean (±S.E.) plasma concentration-time profiles following intravenous administration of Fentanyl of Example 3 (n=3) in the study of Example 6.

FIG. **6** depicts the mean (±S.E.) plasma concentration-time profiles following sublingual administration of Fentanyl of Example 3 (n=3) in the study of Example 6.

FIG. **7** depicts the mean (±S.E.) plasma concentration-time profiles following intravenous administration of Fentanyl of Example 4 (n=3) in the study of Example 6.

FIG. **8** depicts the mean (±S.E.) plasma concentration-time profiles following sublingual administration of Fentanyl of Example 4 (n=3) in the study of Example 6.

FIG. **9** depicts the mean (±S.E.) plasma concentration-time profiles following intravenous administration of Fentanyl of Example 5 (n=3) in the study of Example 6.

FIG. **10** depicts the mean (±S.E.) plasma concentration-time profiles following sublingual administration of Fentanyl of Example 5 (n=3) in the study of Example 6.

FIG. **11** depicts a graphical summary of the Dv10, Dv50, Dv90, and plume records values versus placement distance for vignetting results.

FIG. **12** depicts a graphical summary of Dv10, Dv50, and Dv90 values versus placement at 4 cm device to laser beam for exhaust results.

FIG. **13** depicts a graphical summary of Dv10, Dv50, and Dv90 values versus placement at 7 cm device to laser beam for exhaust results.

FIG. **14** depicts a graphical summary of device to laser beam placement results for Dv10, Dv50, and Dv90 values versus distance to device to laser beam.

### DETAILED DESCRIPTION OF THE INVENTION

The simplest and most prevalent administration route for pharmacologic agents is by mouth. To use this method, a pharmacological agent is typically incorporated into a tablet, a capsule, or into a liquid base. Oral administration of a drug is extremely convenient, and for many drugs, it will continue to be the method of choice.

Absorption of a drug into the bloodstream after swallowing a tablet may vary from patient to patient. The absorption of the drug is typically dependent upon the movement from the stomach to the small and large intestines and the effects of secretions from these organs. Further, with the oral administration of a drug such as fentanyl to a patient, as the fentanyl enters the patient's bloodstream through the intestines and passes through the patient's liver before distribution throughout the body, upwards of fifty percent or more of the fentanyl may be removed from the patient's bloodstream. This "first pass effect" results in the oral route of administration being impractical for fentanyl.

Absorption of fentanyl or a pharmaceutically acceptable salt thereof into the bloodstream following oral administration is significantly reduced by the first pass effect. Therefore, the oral route of administration is impractical for fentanyl. Other forms of delivery such a parenteral, buccal, and transdermal delivery have been utilized to decrease or avoid this first pass effect for fentanyl. However, these other forms of delivery have certain disadvantages associated with them. For example, parenteral administration requires injection using a syringe and needle, and may lead to necrosis that can accom-

8

pany i.m. administration of drugs; Actiq®, a transmucosal fentanyl citrate lozenge formulation requires the patient to constantly suck on the lozenge which is attached to a handle (similar to a lollipop) in order to obtain effective pain relief; and Duragesic®, a transdermal fentanyl delivery device, is suitable for the management of chronic pain, but is not indicated for acute or breakthrough pain.

The oral cavity offers a simple, painless method of opioid analgesic administration. Within the oral cavity, there are three generally recognized routes of administration of an active agent, namely local, buccal and sublingual.

Local delivery is mainly limited to applications regarding disruptions occurring within the oral cavity itself, such as a canker sore.

The buccal mucosa area encompasses the mucosal membranes of the inner lining of the cheeks. The buccal mucosa is however, less permeable than the sublingual area. One of the major disadvantages associated with buccal mucosa delivery of an active agent has been the relatively low passage of active agents across the mucosal epithelium, thereby resulting in low agent bioavailability, which translates into a substantial loss of usable active agent within each dosage.

Sublingual delivery is achieved through the mucosal membranes lining the floor of the mouth. Because of the high permeability and the rich blood supply, transport via the sublingual route results in a rapid onset of action, providing a delivery route appropriate for highly permeable drugs with short delivery period requirements and an infrequent dosing regimen.

The sublingual formulations of the present invention are useful in the treatment of moderate to severe pain. Preferably the sublingual formulations of the present invention are useful for the treatment of breakthrough pain. For example, the formulations of the present invention are preferably suitable for a patient receiving chronic pain therapy who experiences breakthrough pain and is in need of acute pain relief.

The sublingual formulations of the present invention may be used to alleviate pain from many causes, including but not limited to shock, limb amputation, severe chemical or thermal burn injury, sprains, ligament tears, fractures, wounds and other tissue injuries, dental surgery, procedures and maladies, labor and delivery, during physical therapy, post operative pain, radiation poisoning, cancer, acquired immunodeficiency syndrome (AIDS), epidural (or peridural) fibrosis, back surgery and laminectomy, sciatica, painful sickle cell crisis, arthritis, autoimmune disease, intractable bladder pain, and the like. Sublingual administration of the formulations of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, of the present invention is also preferably amenable to hospice use, particularly hospices that specialize in the care of cancer and AIDS patients.

In certain preferred embodiments, the sublingual administration of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, can relieve or alleviate episodes of acute breakthrough pain that can occur in a chronic pain condition. In a further embodiment, sublingual administration of fentanyl, pharmaceutically acceptable salt thereof, or derivative thereof can be used as an adjunct therapy to a conventional treatment regimen for a chronic pain condition to alleviate breakthrough pain. In certain embodiments, the invention also provides a formulation for use as an anesthetic premedication, for the induction of anesthesia, for use as a sedative and/or for the treatment of anxiety.

Sublingual administration of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, in accordance with the present invention may be particularly beneficial in the patient with cancer who is unable to tolerate oral admin-

US 8,486,972 B2

9

istration because of nausea and vomiting, dysphagia as a result of disease, or parenteral administration because of decreased venous access, emaciation, or coagulation defects. Sublingual administration of fentanyl in accordance with the present invention preferably has potential advantages of even greater ease of use and rapid onset of pain relief action. Furthermore, because sublingual venous drainage is systemic rather than portal, hepatic first-pass elimination may be avoided. The present invention preferably provides therapeutic formulations and methods for solutions of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof to be delivered by sublingual spray pumps.

In certain preferred embodiments, the sublingual administration of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, is advantageous over other forms of administration in that it does not require injection using a syringe and needle, it avoids necrosis that can accompany i.m. administration of drugs, and it avoids the need to constantly suck on a lozenge or lollipop. Preferably the sublingual administration of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, in accordance with the present invention is suitable for self administration.

In preferred embodiments certain embodiments, the formulations of the present invention are advantageous in that propellants such as hydrofluorocarbon propellants such as volatile chlorofluorocarbons (e.g. propellant 12), volatile hydrofluoroalkanes (e.g. 1,1,1,2-tetrafluoroethane and 1,1,1, 2,3,3,3-heptafluoro-n-propane) and volatile alkanes (e.g. propane, butane) are not required to deliver the fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, sublingually to the patient.

Preferably the formulations of the present invention are delivered as liquid droplets having a mean diameter of at least about 10 microns, preferably at least about 20 microns, more preferably a mean diameter of from about 20 to about 200 microns. Most preferably the formulations are delivered as liquid droplets have a size distribution of from about 5 microns to about 500 microns, preferably from about 10 microns to about 200 microns, preferably from about 20 microns to about 100 microns, more preferably from about 30 microns to about 70 microns.

Preferably the delivery of the formulation of the present invention to the sublingual mucosa via spray results in a rapid onset of the therapeutic effect of the fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof. For example, in certain embodiments the formulations of the present invention provide a mean time to maximum plasma concentration ($T_{max}$) of fentanyl at from about 5 minutes to about 120 minutes, preferably at from about 10 to about 60 minutes, and more preferably at from about 15 to about 35 minutes after sublingual administration to humans.

In certain further embodiments the formulations of the present invention provide a mean maximum plasma concentration ($C_{max}$) of fentanyl of about 127 pg/ml to about 213 pg/ml per 100 µg fentanyl, preferably about 142 pg/ml to about 195 pg/ml per 100 µg fentanyl, more preferably about 158 pg/ml to about 177 pg/ml per 100 µg fentanyl after sublingual administration to humans.

In certain further embodiments the formulations of the present invention provide a mean maximum plasma concentration ($C_{max}$) of fentanyl of about 137 pg/ml to about 207 pg/ml based on a 100 µg fentanyl dose, preferably about 154 pg/ml to about 190 pg/ml based on a 100 µg fentanyl dose, more preferably about 163 pg/ml to about 181 pg/ml based on a 100 µg fentanyl dose after sublingual administration to humans.

10

In certain further embodiments the formulations of the present invention provide a mean maximum plasma concentration ($C_{max}$) of fentanyl of about 566 pg/ml to about 850 pg/ml based on a 400 µg fentanyl dose, preferably about 637 pg/ml to about 779 pg/ml based on a 400 µg fentanyl dose, more preferably about 672 pg/ml to about 744 pg/ml based on a 400 µg fentanyl dose after sublingual administration to humans.

In certain further embodiments the formulations of the present invention provide a mean maximum plasma concentration ($C_{max}$) of fentanyl of about 1016 pg/ml to about 1525 pg/ml based on a 800 µg fentanyl dose, preferably about 1143 pg/ml to about 1398 pg/ml based on a 800 µg fentanyl dose, more preferably about 1206 pg/ml to about 1334 pg/ml based on a 800 µg fentanyl dose after sublingual administration to humans.

In certain further embodiments the formulations of the present invention provide an area under the plasma concentration time curve to infinity ($AUC_\infty$) of fentanyl of about 572 pg·h/ml to about 1273 pg·h/ml per 100 µg fentanyl, preferably about 644 pg·h/ml to about 1167 pg·h/ml per 100 µg fentanyl, more preferably about 715 pg·h/ml to about 1061 pg·h/ml per 100 µg fentanyl after sublingual administration to humans.

In certain further embodiments the formulations of the present invention provide an area under the plasma concentration time curve to infinity ($AUC_\infty$) of fentanyl of about 654 pg·h/ml to about 982 pg·h/ml based on a 100 µg fentanyl dose, preferably about 736 pg·h/ml to about 900 pg·h/ml based on a 100 µg fentanyl dose, more preferably about 777 pg·h/ml to about 859 pg·h/ml based on a 100 µg fentanyl dose after sublingual administration to humans.

In certain further embodiments the formulations of the present invention provide an area under the plasma concentration time curve to infinity ($AUC_\infty$) of fentanyl of about 3394 pg·h/ml to about 5092 pg·h/ml based on a 400 µg fentanyl dose, preferably about 3818 pg·h/ml to about 4667 pg·h/ml based on a 400 µg fentanyl dose, more preferably about 4030 pg·h/ml to about 4455 pg·h/ml based on a 400 µg fentanyl dose after sublingual administration to humans.

In certain further embodiments the formulations of the present invention provide an area under the plasma concentration time curve to infinity ($AUC_\infty$) of fentanyl of about 4581 pg·h/ml to about 6873 pg·h/ml based on a 800 µg fentanyl dose, preferably about 5154 pg·h/ml to about 6300 pg·h/ml based on a 800 µg fentanyl dose, more preferably about 5440 pg·h/ml to about 6014 pg·h/ml based on a 800 µg fentanyl dose after sublingual administration to humans.

In certain further embodiments the formulations of the present invention provide an area under the plasma concentration time curve from zero to the time of the last quantifiable plasma concentration ($AUC_T$) of fentanyl of about 378 pg·h/ml to about 1067 pg·h/ml per 100 µg fentanyl, preferably about 425 pg·h/ml to about 978 pg·h/ml per 100 µg fentanyl, more preferably about 472 pg·h/ml to about 889 pg·h/ml per 100 µg fentanyl after sublingual administration to humans.

In certain further embodiments the formulations of the present invention provide an area under the plasma concentration time curve from zero to the time of the last quantifiable plasma concentration ($AUC_T$) of fentanyl of about 378 pg·h/ml to about 568 pg·h/ml based on a 100 µg fentanyl dose, preferably about 425 pg·h/ml to about 520 pg·h/ml based on a 100 µg fentanyl dose, more preferably about 448 pg·h/ml to about 497 pg·h/ml based on a 100 µg fentanyl dose after sublingual administration to humans.

In certain further embodiments the formulations of the present invention provide an area under the plasma concentration time curve from zero to the time of the last quantifiable

US 8,486,972 B2

11

plasma concentration (AUC$_T$) of fentanyl of about 2844 pg·h/ml to about 4268 pg·h/ml based on a 400 μg fentanyl dose, preferably about 3200 pg·h/ml to about 3912 pg·h/ml based on a 400 μg fentanyl dose, more preferably about 3378 pg·h/ml to about 3734 pg·h/ml based on a 400 μg fentanyl dose after sublingual administration to humans.

In certain further embodiments the formulations of the present invention provide an area under the plasma concentration time curve from zero to the time of the last quantifiable plasma concentration (AUC$_T$) of fentanyl of about 4333 pg·h/ml to about 6501 pg·h/ml based on a 800 μg fentanyl dose, preferably about 4875 pg·h/ml to about 5960 pg·h/ml based on a 800 μg fentanyl dose, more preferably about 5146 pg·h/ml to about 5689 pg·h/ml based on a 800 μg fentanyl dose after sublingual administration to humans.

Preferably the fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, is dissolved in an organic solvent. Examples of organic solvents that may be used to enhance the solubility of fentanyl, or the pharmaceutically acceptable salt thereof in a carrier such as e.g., water, include for example and without limitation: lower alcohols (e.g. C$_{1-4}$ alcohols) such as methanol, ethanol, propyl alcohol, or butyl alcohol; C$_{2-8}$ alcohols having two or three hydroxyl groups, preferably glycerol, propylene glycol or butylene glycol; and polyethylene glycols such as PEG$_{200}$ and PEG$_{400}$ and the like. Mixtures of any of the aforementioned solvents may be used. In certain embodiments, the solvent is a non-polar hydrocarbon, preferably a C$_{7-18}$ hydrocarbon of a linear or branched configuration, its alcohols, fatty acid esters, and triglycerides, such as miglyol. In certain preferred embodiments the organic solvent is ethanol, propylene glycol, polyethylene glycol, or combination thereof.

Preferably the amount of organic solvent for inclusion in the formulation is at least an amount of organic solvent necessary to adequately solubilize the fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, such that the fentanyl remains in solution and does not precipitate out.

In certain embodiments, the organic solvent is included in the formulation in an amount of from about 0% to about 99.9% by weight of the formulation, preferably from about 10% to about 80% by weight of the formulation, more preferably from about 20% to about 60% by weight of the formulation.

In certain embodiments, the compositions comprise a C$_{2-8}$ alcohol such as propylene glycol, or a polyethylene glycol and/or polypropylene glycol of an average molar weight of 200 to 4000, or a mixture thereof, in addition to the organic solvent described above. The C$_{2-8}$ alcohol may act as a cosolvent in combination with the organic solvent. Polyethylene glycols commercially available as Carbowax® (e.g., Carbowax 300 of a molar weight of 300), can be used.

In certain embodiments, the solvent is a cosolvent which includes any of the solvents mentioned herein. In certain preferred embodiments, the cosolvent includes ethanol, propylene glycol, polyethylene glycol, labrosol, labrafil, transcutol, or combination thereof.

In certain preferred embodiments, the composition according to the invention comprises from about 0.0001% to about 20% by weight of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof; from about 1% to about 99% by weight of organic solvent; and from about 0.01% to about 50% by weight of C$_{2-8}$ alcohol.

In certain preferred embodiments, the composition according to the invention comprises from about 0.001% to about 15% by weight of fentanyl, a pharmaceutically acceptable

12

salt thereof, or derivative thereof; from about 5% to 90% by weight of ethanol; and from about 0.1% to 40% by weight of propylene glycol.

In certain preferred embodiments, the composition according to the invention comprises from about 0.01% to about 10% by weight of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof; from about 10% to about 80% by weight of ethanol; and from about 1% to about 30% by weight of propylene glycol.

In certain preferred embodiments, the composition according to the invention comprises from about 0.1% to about 0.8% by weight of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof; from about 20% to about 60% by weight of ethanol; and from about 4% to about 6% by weight of propylene glycol.

In certain preferred embodiments, the composition according to the invention comprises in a 1 ml volume: from about 100 μg/ml to about 800 μg/ml fentanyl base, about 50% ethanol, about 5.2% propylene glycol, and water qs to 1 ml.

In certain embodiments the fentanyl is employed in the form of a pharmaceutically acceptable salt. Examples of suitable salt forms of fentanyl for use in accordance with the present invention include for example and without limitation, the hydrochloride, chloride, sulphate, tartrate, or citrate salt forms. In certain preferred embodiments, the fentanyl is employed as the free base in the formulations of the present invention.

In certain preferred embodiments, the fentanyl, pharmaceutically acceptable salt thereof, or derivative thereof, will be employed in the formulation at a concentration of from about 0.05 mg/ml to about 15 mg/ml, preferably from about 0.1 mg/ml to about 10 mg/ml, more preferably from about 1 mg/ml to about 8 mg/ml (where weight is expressed as weight of fentanyl free base).

In certain preferred embodiments, the amount of fentanyl, pharmaceutically acceptable salt thereof, or derivative thereof; delivered per unit dose is about 10 μg to about 10 mg, preferably from about 25 μg to about 5 mg, more preferably from about 50 μg to about 1600 μg.

In preferred embodiments of the present invention, the formulation is a solution. In certain alternate embodiments, the formulation is a suspension. When the formulation of the present invention is a suspension, it may be necessary to shake the composition prior to spraying.

In certain preferred embodiments, after the fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, is dissolved in the organic solvent, the formulation is preferably included into a liquid carrier for the delivery of the fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, via a spray device.

Pharmaceutically acceptable carriers include but are not limited to water, buffer, saline, buffered saline, dextrose solution, propylene glycol, polyethylene glycols, miglyol, and the like. In a specific embodiment, a carrier that may be used in the pharmaceutical formulation of the present invention is phosphate buffered saline, or a buffered saline. In certain preferred embodiments the carrier is water. In certain embodiments, the water in the formulation is present in the form of an aqueous buffer. The buffer is preferably adapted to stabilize the pH of the formulation at pH of about 5 to about 12, preferably at pH of about 6 to about 10, more preferably from about 8 to about 9.5. Buffer systems for use in accordance with the present invention include for example and without limitation sodium acetate/acetic acid, ammonium acetate/disodium edentate, boric acid/sodium hydroxide,

US 8,486,972 B2

13

orthophosphoric acid/sodium hydroxide, sodium hydrogen carbonate/sodium carbonate, disodium hydrogen orthophosphate/citric acid, and the like.

Other components such as preservatives, antioxidants, surfactants, absorption enhancers, viscosity enhancers or film forming polymers, bulking agents, diluents, coloring agents, flavoring agents, pH modifiers, sweeteners or taste-masking agents may also be incorporated into the composition. Suitable coloring agents include red, black and yellow iron oxides and FD&C dyes such as FD&C Blue No. 2, FD&C Red No. 40, and the like. Suitable flavoring agents include mint, raspberry, licorice, orange, lemon, grapefruit, caramel, vanilla, cherry grape flavors, combinations thereof, and the like. Suitable pH modifiers include citric acid, tartaric acid, phosphoric acid, hydrochloric acid, maleic acid, sodium hydroxide, and the like. Suitable sweeteners include aspartame, acesulfame K, thaumatic, and the like. Suitable taste-masking agents include sodium bicarbonate, ion-exchange resins, cyclodextrin inclusion compounds, adsorbates, and the like.

Absorption enhancers for use in accordance with the present invention include, for example, polysorbates, sorbitan esters, poloxamer block copolymers, PEG-35 castor oil, PEG-40 hydrogenated castor oil, caprylocaproyl macrogol-8 glycerides, PEG-8 caprylic/capric glycerides, sodium lauryl sulfate, dioctyl sulfosuccinate, polyethylene lauryl ether, ethoxydiglycol, propylene glycol mono-di-caprylate, glycerol monocaprylate, glyceryl fatty acids ($C_8$-$C_{18}$) ethoxylated, oleic acid, linoleic acid, glyceryl caprylate/caprate, glyceryl monooleate, glyceryl monolaurate, caprylic/capric triglycerides, ethoxylated nonylphenols, PEG-(8-50) stearates, olive oil PEG-6 esters, triolein PEG-6 esters, lecithin, d-alpha tocopheryl polyethylene glycol 1000 succinate, polycarbonate, sodium glycocholate, sodium taurocholate, cyclodextrins, citric acid, sodium citrate, triacetin, combinations thereof, and the like. In certain preferred embodiments, the absorption enhancer is triacetin. In certain preferred embodiments wherein an absorption enhancer is included in the formulation, the absorption enhancer is included in an amount of from about 0.001% to about 10% by weight of the formulation, preferably in an amount of about 0.01% to about 5% by weight of the formulation.

Bulking agents for use in accordance with the present invention include for example, microcrystalline cellulose, mannitol, xylitol, starches and the like. In certain preferred embodiments, the bulking agent is mannitol. In certain preferred embodiments wherein bulking agent is included in the formulation, the bulking agent is included in an amount of from about 0.001% to about 10% by weight of the formulation, preferably in an amount of about 0.01% to about 5% by weight of the formulation.

Film-forming polymers for use in accordance with the present invention may serve for decreasing the fineness of the spray, the spraying angle and preferably the spreading by increasing the viscosity of the composition. As film-forming polymer, gellan gum, xantham gum, carboxymethyl cellulose, hydroxypropyl cellulose, hydroxyethyl cellulose, hydroxypropyl methylcellulose, methylcellulose, ethylcellulose, gelucire, poloxamers, alginic acid, propyleneglycol ester, polyvinyl alcohol (PVA), polyvinylpyrrolidone (PVP), PVP/PVA copolymer, lubrajel, carboxyvinyl polymer, acrylic acid polymers and copolymers, methacrylic acid, methyl acrylate, ethyl acrylate, methyl methacrylate, ethyl methacrylate, combinations thereof and the like can be used. In certain embodiments, an increase in the viscosity of the solution using film-forming polymers or the like provides an increase in the droplet size when administered from the spray

14

device. The chemistry of the polymer and the molecular weight of the polymer may also influence the diameter of the droplets.

In certain embodiments, the formulations according to the invention are preferably packaged as a bulk solution containing multiple doses in a pump spray system comprising a sealed container fitted with a metering pump.

In certain alternate embodiments the formulations according to the invention are preferably package as a single unit dose solution in a single unit dose pump spray system comprising a sealed container fitted with a pump.

Typically a patient is treated by administration sublingually of 1 to 2 actuations, from the spray pump. Another advantage of sublingual spray delivery is the ability to easily titrate patients by 1 or 2 doses as required by a single actuation. This is typically not the case with other forms of drug delivery (patches, lozenges, tablets, suppositories).

Pump action sprays are characterized in requiring the application of external pressure for actuation, for example, external manual, mechanical or electrically initiated pressure. This is in contrast to pressurized systems, e.g., propellant-driven aerosol sprays, where actuation is typically achieved by controlled release of pressure e.g., by controlled opening of a valve.

In certain embodiments the pump sprays are preferred as the use of a pump spray with the formulation of the present invention allows for the administration of droplets or particles having a mean diameter of at least about 10 microns, preferably at least about 20 microns, more preferably a mean diameter of from about 20 to about 200 microns, and/or preferably having a size distribution of from about 5 microns to about 500 microns, preferably from about 10 microns to about 200 microns, preferably from about 20 microns to about 100 microns, more preferably from about 30 microns to about 70 microns. This is in contrast to a pressurized system which may result in particles less than 5 microns. Liquid droplets or particles having a diameter of less than about 5 microns have the potential to enter into the lungs of a human upon administration. Such entry into the lungs could lead to an increase in patient to patient variability in absorption of the fentanyl. Further, absorption of fentanyl in the lungs could lead to an increased absorption and increased side effects, including respiratory depression which may be fatal.

In certain preferred embodiments, the droplet size of the delivered formulations further provides for an increase in surface area by being sprayed sublingually as opposed to being placed under the tongue with e.g., a dropper.

In certain preferred embodiments, the delivery device is a device such as those described in U.S. Pat. Nos. 6,866,566; 6,877,672; 6,772,915; 6,725,857; 6,705,493; 6,679,248; 6,578,741; 6,527,144; 6,484,715; 6,478,196; 6,461,322; 6,446,839; 6,427,878; 6,367,473; 6,364,166; 6,321,942; 6,234,366; 6,227,413; 6,059,151; 6,059,150; 6,055,979; 5,944,222; 5,901,883; 5,813,570; 4,565,302; 4,532,967; 6,964,381; 6,860,411; 6,824,020; 6,817,490; 6,585,172; 6,443,370; 6,427,680; 6,425,499; 6,401,987; 6,398,074; 6,264,065; 5,950,877; 5,328,099; 5,301,846; and the like which are described in certain embodiments as being suitable for nasal administration.

Other devices suitable for use in accordance with the formulations of the present invention are described in U.S. Pat. Nos. 6,808,085; 6,736,293; 6,732,955; 6,708,846; 6,626,379; 6,626,330; 6,626,328; 6,454,185; 6,427,876; 6,427,684; 6,419,167; 6,405,903; 6,352,181; 6,308,867; 6,257,461; 6,257,454; 6,250,509; 6,227,415; 6,209,760; 6,179,164; 6,109,547; 6,062,430; 6,026,992; 5,992,704; 5,992,703; 5,988,449; 5,967,369; 5,964,417; 5,950,879; 5,938,125;

15

5,927,559; 5,921,444; 5,893,484; 5,875,938; 5,862,962;
5,860,567; 5,816,504; 5,813,570; 5,803,311; 5,791,518;
5,692,650; 5,655,689; 5,584,417; 5,520,337; 5,519,980;
5,482,193; 5,469,989; 5,443,185; 5,439,177; 5,437,398;
5,427,280; 5,395,032; 5,375,745; 5,368,201; 5,366,122;
5,366,122; 5,335,823; 5,326,000; 5,323,936; 5,316,198;
5,301,841; 5,295,628; 5,289,946; 5,277,334; 5,257,726;
5,228,586; 5,209,375; 5,203,840; 5,147,087; 5,115,980;
5,110,052; 5,011,046; 4,958,752; 4,946,069; 4,944,430;
4,934,568; 4,921,142; 4,871,092; 4,830,284; 4,826,048;
4,823,991; 4,821,923; 4,817,829; 4,776,498; 4,762,475;
4,728,008; 4,726,747; 4,694,977; 4,694,976; 4,566,611;
6,851,583; 6,824,021; 6,779,690; 6,776,312; 6,971,559;
6,948,640; 6,945,473; 6,938,802; 6,933,850; 6,929,156;
6,918,514; 6,913,205; 6,866,168; 6,832,072; 6,830,163;
6,817,490; 6,817,489; 6,811,060; 6,811,057; 6,805,301;
6,805,263; 6,789,750; 6,789,706; 6,786,369; 6,783,035;
6,772,913; 6,769,579; 6,758,371; 6,752,298; 6,742,677;
6,705,062; 6,698,627; 6,698,623; 6,663,019; 6,659,314;
6,659,307; 6,655,550; 6,655,549; 6,651,846; 6,601,735;
6,595,395; 6,592,010; 6,588,629; 6,581,852; 6,571,991;
6,554,160; 6,536,635; 6,527,149; 6,527,148; 6,488,185;
6,471,097; 6,460,781; 6,460,740; 6,460,738; 6,446,841;
6,422,429; 6,409,049; 6,398,079; 6,360,919; 6,349,856;
6,345,737; 6,343,722; 6,662,561; 6,315,169; 6,273,303;
6,273,300; 6,261,274; 6,257,457; 6,234,363; 6,234,168;
6,221,054; 6,209,759; 6,189,741; 6,186,371; 6,155,496;
6,119,897; 6,105,826; 6,021,930; 6,012,615; 5,988,496;
5,950,871; 5,931,386; 5,850,948; 5,803,318; 5,799,810;
5,769,325; RE35,683; 5,692,492; 5,568,884; 5,566,865;
5,511,698; 5,482,188; 5,476,198; 5,366,115; 5,337,923;
5,249,713; 5,237,797; 5,234,135; 5,226,563; 5,190,192;
5,176,296; 5,127,548; 4,966,313; 4,91,840; 4,245,967;
4,030,667; and the like.

All of the patents recited herein are hereby incorporated by reference in their entireties. Although the delivery devices disclosed in the patents described above may be suitable for nasal or inhalation administration, in accordance with certain embodiments of the present invention the delivery devices are specifically adapted to be suitable for sublingual administration of a liquid formulation. In certain embodiments, the devices utilized to practice the present invention include components made from Pfeiffer of America, Inc., for example, Pfeiffer of America, Inc. sublingual unit dose device article reference number 72772. In other embodiments, the device is Pfeiffer of America, Inc., sublingual unit dose applicator assembly.

Preferably the device in accordance with the present invention is adapted to sublingually deliver the sublingual formulation in a controlled manner preferably such that only droplets having a mean diameter of at least about 10 microns, preferably at least about 20 microns, more preferably a mean diameter of from about 20 to about 200 microns are delivered to the patient. More preferably only droplets having a size distribution in the range of from about 5 microns to about 500 microns, preferably from about 10 microns to about 200 microns, preferably from about 20 microns to about 100 microns, more preferably from about 30 microns to about 70 microns.

Preferably the dispenser is constructed in such a way that it can be carried and simultaneously reliably operated with the fingers, or with three fingers of one hand, and can be used, for example, in the manner of a sublingual spray. The dispenser can be constructed as a disposable dispenser which, following the emptying of the medium chamber, does not have to be refilled and can therefore be constructed as a simple standard component, which receives the pump, the formulation, the

16

channels and optionally, valves or closures within an outer casing, which in side view can be roughly T-shaped or Y-shaped.

If the dispenser is to be emptied in a single pump stroke in successive portions or in one complete pump stroke, and is not to be refilled, then the dispenser can be substantially tightly closed with respect to the outside in the starting position

In certain preferred embodiments, the delivery device (e.g., such as a spray pump device) includes a lock-out mechanism. Preferably the lock-out mechanism allows for administration of only one unit dose, and preferably prevents abuse of the fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, by only allowing for the administration of one dose and locking out of further administration for a certain and/or predetermined period of time. In certain embodiments, after one or more actuating cycles the actuator can be automatically transferred into the locking position, so that for performing a following actuating cycle automatically or deliberately a release must take place. Locking can take place in the starting position, actuating position and/or an intermediate position and can act both against actuation and against return or against one of these movements alone and several locking positions with the same or different locking action are possible.

In certain embodiments, the device may be premetered or alternatively, the device may be device-metered. Premetered devices preferably contain previously measured doses or a dose fraction in some type of units (e.g., single unit dose amount of solution, single or multiple blisters or other cavities) that may be included in the device during manufacture or by the patient before use. Typical device-metered units have a reservoir containing formulation sufficient for multiple doses that are delivered as metered sprays by the device itself when activated by the patient.

Important factors to consider with manufacture of the device are the reproducibility of the dose, the spray plume, and the particle/droplet size distribution, which can affect the delivery of the fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, under the tongue. Maintaining the reproducibility of these parameters through the expiration dating period and ensuring the functionality of the device (e.g., spray mechanism, electronic features, sensors) through its lifetime under patient-use conditions is important as any alteration in these parameters could lead to variability in dosing and absorption, which could lead to potential side effects.

The administered dose of spray drug formulation may be dependent on the design, reproducibility, and performance characteristics of the container closure system. A suitable device which provides the desired droplet/particle size distribution is an important factor for the correct performance of the fentanyl product. Actuation parameters (e.g., force, speed, hold and return times) should also be considered with respect to the device. Moreover, the device should be compatible with formulation components. Further, the device should be designed to prevent partial metering of the fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, formulation when used according to the patient instructions for use.

A typical device includes a base unit, a discharge actuator, an orifice for the formulation to be release from the device, and a medium reservoir. Preferably a reservoir is provided which as a dispensing chamber is filled already on production of the device. The medium reservoir preferably defines a

**17**

measured content of fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, to be discharged upon a single activation.

In accordance with certain embodiments of the invention, a reservoir, or a space thereof receiving the medium is preferably an elongated shape preferably having a wall thickness which is constant over the circumference and length of the reservoir body. The reservoir body may be formed simply by a section of a cylindrical hollow of a plastics, steel, such as stainless steel, transparent material, such as glass, or the like so that its production is very simple.

Preferably an actuator body is provided on a unit of the device, which is movable relative to the orifice for activating discharge. This body, in the course of the actuating movement, opens a closure of a chamber, e.g. by puncturing. The space within this chamber may directly adjoin the medium in the reservoir, accommodate the opening body or the reservoir at least in part and configured as a pressure space which prior to being opened is at an elevated pressure. The opening body may be formed directly by the reservoir.

Preferably during a part of the actuating travel following the starting position an elevated pressure is built up. In a subsequent portion of the actuating movement continuing in the same direction, the medium is relieved of the pressure at one of the sides and communicated to the medium orifice on this side. As such, due to the pressure acting on the side, the medium is pushed from the reservoir and through the orifice.

Typically as the liquid formulation leaves the orifice, the liquid droplets follow a trajectory which is influenced by the orifice shape of the device. In certain embodiments, the droplet size, spray geometry, and the spray pattern are dependent on the design of the pump and/or the properties of the formulation. In certain embodiments, the orientation of the actuator, pump design, and the properties of the formulation will influence the spray symmetry and the shape.

In certain embodiments, the device of the present invention further includes a stopper. Preferably the stopper comprises a material which precludes or substantially precludes the absorption of the fentanyl, pharmaceutically acceptable salt thereof, or derivative thereof. A suitable stopper for use in accordance with the device of the present invention is, for example, a stopper marketed by West Pharmaceutical Services, Inc. In certain preferred embodiments, the stopper has the following composition and characteristic: 1) elastomer: bromobutyl and/or chlorobutyl; 2) reinforcement: inert material; and 3) curing system: unconventional.

In certain embodiments, the device further includes a gasket. Preferably the gasket comprises a material which precludes or substantially precludes the absorption of the fentanyl, pharmaceutically acceptable salt thereof, or derivative thereof. A suitable gasket for use in accordance with the device of the present invention is, for example, a stopper marketed by West Pharmaceutical Services, Inc. In certain preferred embodiments, the gasket has the following composition and characteristic: 1) elastomer: bromobutyl and/or chlorobutyl; 2) reinforcement: inert material; and 3) curing system: unconventional.

Droplet size distribution can be determined by utilizing any reliable method known to one of skill in the art. One such method uses laser diffraction devices, such as, for example, the Malvern Spraytec® with RT Sizer software. A Malvern Mastersizer S, by Malvern Instruments Limited (U.K.), device may also be used to determine size distribution. A Malvern Mastersizer S is a modular particle size analyzer offering measurement versatility. It can measure spray drop-

**18**

let size as well as wet and dry samples. Particles from submicron to a few millimeters may be measured with the Malvern Mastersizer S.

Further, automated actuation stations for comparative in vitro bioequivalence tests or other testing to decrease the variability associated with manual actuation may also be used when determining the droplet size distribution. Any such automated actuation stations known to one of skill may be applicable in practicing the present invention. An example of one such device is the MightyRunt Actuation Station by Innova Systems, Inc. In a preferred embodiment, a MightyRunt is equipped with an exhaust fan attachment. In a further embodiment, the MightyRunt is further equipped with a Mettler Toledo balance Model AT201.

Other Active Agents

Although the invention described herein has been described with respect to fentanyl, a pharmaceutically acceptable salt thereof, or derivative thereof, it is contemplated that other active pharmaceutical agents, particularly those suitable for sublingual administration, may be used in accordance with the present invention. For example, in certain embodiments, other opioid analgesics which are suitable for sublingual administration may be used in place of the fentanyl, pharmaceutically acceptable salt thereof, or derivative thereof. Certain opioid analgesics for use in accordance with the present invention include, for example and without limitation, alfentanil, sufentanil, buprenorphine, butorphanol, codeine, hydrocodone, hydromorphone, levorphanol, meperidine, methadone, morphine, nalbuphine, oxycodone, oxymorphone, propoxyphene, tramadol, and the like.

In certain embodiments the active compound is an analgesic, opioid antagonist, anti-migraine agent, anti-emetic agent, anti-epileptic agent, anti-hypertensive agent, anesthetic agent, cannabinoid, cannabinoid antagonist, inverse agonist of cannabinoid, endocannabinoid, enkephalin, analogues or derivatives thereof, or mixtures thereof.

Analgesics useful in the present invention include, but are not limited to, alfentanil, buprenorphine, butorphanol, codeine, fenpipramide, hydrocodone, hydromorphone, levorphanol, meperidine, methadone, morphine, nalbuphine, oxycodone, oxymorphone, pentazocine, piritramide, propoxyphene, sufentanil, tilidine, tramadol, analogues or derivatives thereof, or mixtures thereof.

Opioid antagonists useful in the present invention include, but are not limited to, naloxone, naltrexone, nalmefene, analogues or derivatives thereof, or mixtures thereof.

Anti-migraine agents useful in the present invention include, but are not limited to, almotriptan, eletriptan, frovatriptan, naratriptan, rizatriptan, sumatriptan, zolmitriptan, ergot alkaloids, proxibarbal, lisuride, methysergide, clonidine, pizotifene, analogues or derivatives thereof, and mixtures thereof.

Anti-emetic agents useful in the present invention include, but are not limited to bromopride, domperidone, granisetron, ondansetron, tropisetron, metoclopramide, pyridoxine, scopolamine, thiethylperazine, analogues or derivatives thereof, or mixtures thereof.

Anti-epileptic agents useful in the present invention include, but are not limited to barbiturates, carbamazepine, ethosuximide, mesuximide, phenyloin, primidone, sultiam, valproic acid, vigabatrine, analogues or derivatives thereof, or mixtures thereof.

Anti-hypertensive agents useful in the present invention include, but are not limited to diltiazem, clonidine, nifedipine, verapamil, isosorbide-5-mononitrate, organic nitrates, agents used in treatment of heart disorders, analogues or derivatives thereof, or mixtures thereof.

US 8,486,972 B2

**19**

Anesthetics useful in the present invention include, but are not limited to benzocaine, bupivacaine, dibucaine, etidocaine, levobupivacaine, lidocaine, mepivacaine, oxybuprocaine, piperocaine, prilocaine, procaine, proparacaine, ropivacaine, tetracaine, xylocaine, desflurane, enflurane, isoflurane, sevoflurane, benzonatate, dyclonine, ketamine, phenol, propofol, analogues or derivatives thereof, or mixtures thereof.

Cannabinoids useful in the present invention include, but are not limited to delta-9-tetrahydrocannabinol, delta-9-tetrahydrocannabinol, cannabidol, olivetol, cannabinol, cannabigerol, nabilone, delta-9-tetrahydro cannabinotic acid, the non-psychotropic cannabinoid 3-dimethylnepty 11 carboxylic acid homologine 8, delta-8-tetrahydrocannabinol, pharmaceutically acceptable salts thereof, complexes thereof, derivatives thereof, or mixtures thereof. A particularly preferred cannabinoid is delta-9-tetrahydrocannabinol, also known as dronabinol.

Further, active agents having a narrow therapeutic index or range (e.g., wherein small variances in blood levels of the drug causes changes in the effectiveness or toxicity of that drug) could be particularly suitable for use in accordance with the present invention. Such active agents include for example and without limitation, digoxin, levothyroxine, aminoglycosides (e.g., gentamycin, tobramycin), antiarrythimics (e.g., procainamide, quinidine), theophylline, antineoplastics, busulfan, methotrexate, 6-MP, carboplatinum, antidepressants (e.g., lithium), anticonvulsants (e.g., phenyloin, carbamazepine, valproate sodium, valproic acid), antipsychotics, anticoagulants (e.g., warfarin), cyclosporine, and the like.

The present invention will now be more fully described with reference to the accompanying examples. It should be understood, however, that the following description is illustrative only and should not be taken in any way as a restriction on the generality of the invention specified above.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

### EXAMPLE 1

In Example 1, a fentanyl sublingual formulation was prepared having a concentration of 0.5 mg/ml. The formulation is listed in Table 1 below:

TABLE 1

| Ingredient | Percent |
|---|---|
| Concentration of Fentanyl Base | percent to make 0.5 mg/ml |
| Ethanol % (v) | 20 |
| Propylene glycol % (v) | 5 |
| DI Water % (v) | QS |

### EXAMPLE 2

In Example 2, a fentanyl sublingual formulation was prepared having a concentration of 0.5 mg/ml. The formulation is listed in Table 2 below:

TABLE 2

| Ingredient | Percent |
|---|---|
| Concentration of Fentanyl Base* | percent to make 0.5 mg/ml |

**20**

TABLE 2-continued

| Ingredient | Percent |
|---|---|
| Ethanol % (v) | 20 |
| Propylene glycol % (v) | 5 |
| DI Water % (v) | QS |

Contains fentanyl citrate equivalent to 0.5 mg/ml of fentanyl base

### EXAMPLE 3

In Example 3, a fentanyl sublingual formulation was prepared having a concentration of 0.5 mg/ml. The formulation is listed in Table 3 below:

TABLE 3

| Ingredient | Percent |
|---|---|
| Concentration of Fentanyl Base | percent to make 0.5 mg/ml |
| Ethanol % (v) | 20 |
| Propylene glycol % (v) | 5 |
| DI Water % (v) | QS |
| Mannitol % (wt) | 0.3 |
| Tween 80% (wt) | 0.2 |

### EXAMPLE 4

In Example 4, a fentanyl sublingual formulation was prepared having a concentration of 0.5 mg/ml. The formulation is listed in Table 4 below:

TABLE 4

| Ingredient | Percent |
|---|---|
| Triacetin % (wt) | 0.5 |
| Concentration of Fentanyl Base | percent to make 0.5 mg/ml |
| Ethanol % (v) | 20 |
| Propylene glycol % (v) | 5 |
| Buffer % (v) | QS |

### EXAMPLE 5

In Example 5, a fentanyl sublingual formulation was prepared having a concentration of 0.5 mg/ml. The formulation is listed in Table 5 below:

TABLE 5

| Ingredient | Percent |
|---|---|
| Concentration of Fentanyl Base | percent to make 0.5 mg/ml |
| Ethanol % (v) | QS |
| Propylene glycol % (v) | 5 |
| Miglyol % (v) | 50% |

Preparation of Formulations (Examples 1-5)

1. Calculated amount of Fentanyl base or Fentanyl citrate was weighed in a tared glass container.
2. Calculated amount of alcohol was added to the container and mixed to dissolve fentanyl.
3. Propylene glycol was weighed and added to the fentanyl solution.

US 8,486,972 B2

**21**

4. Water or Buffer or Miglyol was weighed, added to the fentanyl solution and mixed for 2 mm.
5. Inactive ingredients (Mannitol, Triacetin, or TW80) were added at the end and mixed well.
6. The final solution was vortexed for 3 min. After mixing, the formulations were stored in refrigerator for further studies.

### EXAMPLE 6

In Example 6, three rabbits weighing 2-3 kg were used to study the bioavailability of sublingual administration of Examples 1-5 in comparison to the IV injection of the formulation as a reference. Rabbits were first anesthetized by Isoflurane gas as needed to keep the rabbits immobilized for approximately 15-20 min.

For each formulation, study rabbits received a single dose of 0.1 ml (equivalent to 50 μg of fentanyl base) by sublingual and IV administration. For the sublingual studies, the dose of liquid formulation was administered underneath the tongue using a spray bottle. Blood samples (1 ml per sample) were obtained through a catheter installed inside the ear vein.

Blood samples were collected at zero time baselines and at 5, 10, 20, 45, 60 and 120 min after the single dose. Samples were immediately cooled and plasma was separated by centrifugation within 2-3 hrs of blood collection. Samples were stored at −20° C. until assayed. After recovering from anesthesia, animals were returned to their cages. These animals were rested in cages for at least 5-7 days before they could be reused for further testing.

Plasma Collection & Separation

Blood was collected from rabbits in 3 ml tubes containing 7.5% EDTA and centrifuged at 3,000 RPM for 15 min to remove blood cells and other insoluble material. The plasma was decanted into a silanized tube and kept frozen at −20° C. until assay.

Plasma Extraction

For each plasma sample (0.5 ml), 100 μl of Sufentanil (IS) and 100 μL 5M NaOH (for protein denaturation) were added. The Fentanyl was extracted with 1 ml of 1-chlorobutane by vortex mixing for 15 min. After centrifuging at 12000 RPM for 5 min and freeze-drying for 10 min (to break up any emulsion), the upper organic layer was decanted and evaporated to dryness using a gentle stream of nitrogen. The extraction residue was reconstituted with 100 μl methanol followed by vortex mixing for 5 min and sonicating for 3 min, then a 3 μl volume was injected into the GC-MS system.

Results and Discussion

Plasma Concentration vs Time Profiles

Plasma concentration-time profiles of Fentanyl in rabbits following IV and sublingual administration of 0.1 ml (equivalent to 50 μg of fentanyl base) are given in the following tables (Tables 6A-10B).

Tables 6A and 6B provide the plasma concentration-time profiles for Example 1.

### TABLE 6A

| | | (Example 1 intravenous) | | | |
|---|---|---|---|---|---|
| TIME (min) | R1 (ng/ml) | R2 (ng/ml) | R3 (ng/ml) | GRAND AVG | STD DEV |
| 5 | | 785.8012 | 839.9696 | 812.885396 | 38.302813 |
| 10 | | 507.7546 | 715.6065 | 146.97351 | |
| 20 | 737.3449 | 423.5903 | 667.9939 | 609.643027 | 164.81539 |
| 45 | 701.5631 | 482.215 | 382.5801 | 522.119422 | 163.19256 |

**22**

### TABLE 6A-continued

| | | (Example 1 intravenous) | | | |
|---|---|---|---|---|---|
| TIME (min) | R1 (ng/ml) | R2 (ng/ml) | R3 (ng/ml) | GRAND AVG | STD DEV |
| 60 | 562.501 | 554.8479 | 475.4686 | 530.939148 | 48.191101 |
| 90 | 207.5541 | 492.4037 | 429.1217 | 376.359829 | 149.57498 |
| 120 | 214.0297 | | 196.9675 | 205.4986 | 12.064797 |

### TABLE 6B

| | | (Example 1 sublingual) | | | |
|---|---|---|---|---|---|
| TIME (min) | R1 (ng/ml) | R2 (ng/ml) | R3 (ng/ml) | GRAND AVG | STD DEV |
| 5 | | 412.1095 | 370.7992 | 391.454361 | 29.210825 |
| 10 | 205.5274 | 279.3298 | 755.3469 | 413.401352 | 52.186202 |
| 20 | 539.2677 | 627.0507 | 712.6511 | 626.323191 | 86.693973 |
| 45 | | 618.9493 | 387.7606 | 503.35497 | 163.47506 |
| 60 | 349.3563 | 218.14 | 498.3773 | 355.291188 | 140.2129 |
| 90 | 245.8519 | 249.5091 | 231.7688 | 242.376606 | 9.3668848 |
| 120 | 214.1339 | 162.9939 | 199.6146 | 192.247465 | 26.353936 |

In Table 7A and 7B are the plasma concentration-time profiles for Example 2.

### TABLE 7A

| | | (Example 2 intravenous) | | | |
|---|---|---|---|---|---|
| TIME (min) | R1 (ng/ml) | R2 (ng/ml) | R3 (ng/ml) | GRAND AVG | STD DEV |
| 5 | 671.5152 | 788.2252 | | 729.870183 | 58.35497 |
| 10 | 379.1866 | 617.5517 | 1102 | 699.579446 | 300.73378 |
| 20 | 603.9696 | 407.5375 | | 505.75355 | 98.216024 |
| 45 | 380.9878 | | 292.998 | 336.992901 | 43.994929 |
| 60 | 140.7566 | 266.3611 | 388.5314 | 265.216362 | 101.1569 |
| 90 | 81.06491 | 254.4848 | 334.8012 | 223.450304 | 105.88636 |
| 120 | 95.34888 | 278.7789 | 232.4037 | 202.177147 | 77.875432 |

### TABLE 7B

| | | (Example 2 sublingual) | | | |
|---|---|---|---|---|---|
| TIME (min) | R1 (ng/ml) | R2 (ng/ml) | R3 (ng/ml) | GRAND AVG | STD DEV |
| 5 | 350.2297 | 106.9249 | 337.6856 | 264.946755 | 136.99455 |
| 10 | 373.5822 | 115.1643 | 486.0254 | 324.923935 | 190.15835 |
| 20 | 285.5994 | 294.5517 | 518.5091 | 366.220081 | 131.96212 |
| 45 | 302.7099 | 52.78093 | 359.9483 | 238.479716 | 163.34652 |
| 60 | 118.3915 | 43.02434 | 314.9564 | 158.790737 | 140.39528 |
| 90 | 81.06491 | 43.39148 | | 62.2281947 | 26.639136 |
| 120 | 95.34888 | 35.34888 | 30.68154 | 53.7931034 | 36.063946 |

In Tables 8A and 8B are the plasma concentration-time profiles for Example 3.

US 8,486,972 B2

23 24

#### TABLE 8A

| | | (Example 3 intravenous) | | | |
|---|---|---|---|---|---|
| TIME (min) | R1 (ng/ml) | R2 (ng/ml) | R3 (ng/ml) | GRAND AVG | STD DEV |
| 5 | 903.4949 | 1000.205 | 882.0649 | 928.588235 | 51.390778 |
| 10 | 814.3834 | 557.9432 | 484.5233 | 618.949966 | 141.40552 |
| 20 | | 348.8641 | 309.1785 | 329.021298 | 19.842799 |
| 45 | 120.2677 | 169.7972 | 211.0669 | 167.043949 | 37.119701 |
| 60 | 160.3347 | 121.5882 | 128.9087 | 136.943881 | 16.807631 |
| 90 | 89.85598 | 85.70081 | 92.71197 | 89.4229209 | 2.8786265 |
| 120 | | | | | |

#### TABLE 8B

| | | (Example 3 sublingual) | | | |
|---|---|---|---|---|---|
| TIME (min) | R1 (ng/ml) | R2 (ng/ml) | R3 (ng/ml) | GRAND AVG | STD DEV |
| 5 | | 127.3124 | 269.1927 | 198.252535 | 100.32454 |
| 10 | 304.6288 | 589.1684 | 310.5953 | 401.464165 | 162.58397 |
| 20 | 349.3611 | 689.7999 | 281.5365 | 440.232477 | 218.77603 |
| 45 | 288.0639 | 418.1555 | 195.9391 | 300.719518 | 111.64744 |
| 60 | 173.0345 | 255.9016 | | 214.45 | 74.967507 |
| 90 | 224.432 | 87.7931 | 228.6156 | 180.280257 | 80.123534 |
| 120 | 96.5284 | 145.1907 | | 120.859533 | 34.409422 |

In Tables 9A and 9B are the plasma concentration-time profiles for Example 4.

#### TABLE 9A

| | | Example 4 intravenous) | | | |
|---|---|---|---|---|---|
| TIME (min) | R1 (ng/ml) | R2 (ng/ml) | R3 (ng/ml) | GRAND AVG | STD DEV |
| 5 | 740.3759 | 732.5855 | 717.8438 | 730.268425 | 11.443374 |
| 10 | 666.2644 | 671.4571 | 627.0568 | 654.926076 | 24.274753 |
| 20 | 713.355 | 592.5 | 638.7444 | 648.199797 | 60.979784 |
| 45 | 575.2667 | 557.7789 | 482.8316 | 538.625761 | 49.103907 |
| 60 | 409.8756 | 596.6278 | 548.1217 | 518.208362 | 96.903054 |
| 90 | 455.8567 | 484.928 | 430.5538 | 457.112801 | 27.208875 |
| 120 | 385.2982 | | 452.6998 | 418.998986 | 47.660144 |

#### TABLE 9B

| | | (Example 4 sublingual) | | | |
|---|---|---|---|---|---|
| TIME (min) | R1 (ng/ml) | R2 (ng/ml) | R3 (ng/ml) | GRAND AVG | STD DEV |
| 5 | 250.8854 | 481.6146 | 459.2779 | 397.259297 | 127.25455 |
| 10 | 478.074 | 577.9594 | 614.8479 | 556.960446 | 70.76361 |
| 20 | 587.8195 | 465.9229 | 518.4341 | 524.058824 | 61.142626 |

#### TABLE 9B-continued

| | | (Example 4 sublingual) | | | |
|---|---|---|---|---|---|
| TIME (min) | R1 (ng/ml) | R2 (ng/ml) | R3 (ng/ml) | GRAND AVG | STD DEV |
| 45 | 538.3245 | 499.217 | 449.574 | 495.705206 | 44.479353 |
| 60 | 367.4361 | 452.9817 | 442.7566 | 421.058147 | 46.718636 |
| 90 | 309.5538 | 571.0487 | 202.8722 | 361.158215 | 189.43533 |
| 120 | 205.6531 | 195.7282 | 427.1927 | 276.191346 | 130.86513 |

In Tables 10A and 10B are the plasma concentration-time profiles for Example 5.

#### TABLE 10A

| | | (Example 5 intravenous) | | | |
|---|---|---|---|---|---|
| TIME (min) | R1 (ng/ml) | R2 (ng/ml) | R3 (ng/ml) | GRAND AVG | STD DEV |
| 5 | 928.5193 | 1247.247 | 1123.335 | 1099.70047 | 160.67311 |
| 10 | 920.1521 | 1100.3 | 1103.844 | 1041.43205 | 105.04643 |
| 20 | 876.3793 | 966.998 | 972.8114 | 938.729547 | 54.075067 |
| 45 | 765.9696 | 938.3834 | 947.0609 | 883.804598 | 102.14032 |
| 60 | 645.6045 | 892.6836 | 482.2799 | 673.52265 | 206.62129 |
| 90 | 157.9533 | 418.6034 | 343.0811 | 306.545977 | 134.1109 |
| 120 | 58.43813 | 30.68154 | 30.68154 | 39.933739 | 16.025276 |

#### TABLE 10B

| | | (Example 5 sublingual) | | | |
|---|---|---|---|---|---|
| TIME (min) | R1 (ng/ml) | R2 (ng/ml) | R3 (ng/ml) | GRAND AVG | STD DEV |
| 5 | 140.7911 | 176.7338 | 127.357 | 148.293949 | 25.529127 |
| 10 | 239.712 | 191.2956 | 210.8458 | 213.951149 | 24.357082 |
| 20 | 409.5335 | 580.6095 | 540.5842 | 510.242394 | 89.483087 |
| 45 | 351.3955 | 500.9315 | 314.7343 | 389.020453 | 98.636103 |
| 60 | 364.9493 | 439.2885 | 280.645 | 361.62762 | 79.373899 |
| 90 | 245.2698 | 403.4255 | 30.68154 | 226.458925 | 187.08258 |
| 120 | 30.68154 | 119.7079 | 215.6552 | 122.014875 | 92.508392 |

#### Pharmacokinetic Parameters

The pharmacokinetic parameters Peak plasma concentration (Cmax), Time to reach Cmax (Tmax), Half-life ($t_{1/2}$), Area under the curve (AUC), and Total body clearance (CL) obtained after sublingual or IV drug administrations are tabulated in the following tables (Tables 11-15). Also, plasma concentration-time curves after administering IV and sublingual doses of Fentanyl are shown in FIGS. **1-10**.

US 8,486,972 B2

25                                                                    26

### TABLE 11

| | (Example 1 intravenous and sublingual) | | | | | |
| ROUTE OF ADMINISTRATION | AUC (min * ng/ml) | $T_{1/2}$ (min) | TMAX (min) | CMAX (ng/ml) | VD (ml) | Cl (ml/min) |
|---|---|---|---|---|---|---|
| IV | 71772.86 | 43.8141 | 0 | 812.8854 | 50.7843 | 0.6966 |
| SL | 59684.34 | 55.704 | 20 | 626.3232 | | |

### TABLE 12

| | (Example 2 intravenous and sublingual) | | | | | |
| ROUTE OF ADMINISTRATION | AUC (min * ng/ml) | $T_{1/2}$ (min) | TMAX (min) | CMAX (ng/ml) | VD (ml) | Cl (ml/min) |
|---|---|---|---|---|---|---|
| IV | 86790.18 | 153.2372 | 0 | 729.8702 | 181.8356 | 0.9218 |
| SL | 23759.14 | 33.1477 | 20 | 366.2201 | | |

### TABLE 13

| | (Example 3 intravenous and sublingual) | | | | | |
| ROUTE OF ADMINISTRATION | AUC (min * ng/ml) | $T_{1/2}$ (min) | TMAX (min) | CMAX (ng/ml) | VD (ml) | Cl (ml/min) |
|---|---|---|---|---|---|---|
| IV | 32707.76 | 49.7523 | 0 | 928.5882 | 78.4776 | 1.5287 |
| SL | 40623.13 | 57.6038 | 20 | 440.2325 | | |

### TABLE 14

| | (Example 4 intravenous and sublingual) | | | | | |
| ROUTE OF ADMINISTRATION | AUC (min * ng/ml) | $T_{1/2}$ (min) | TMAX (min) | CMAX (ng/ml) | VD (ml) | Cl (ml/min) |
|---|---|---|---|---|---|---|
| IV | 185485.6 | 200.3556 | 0 | 730.2684 | 77.036 | 0.2696 |
| SL | 86916.91 | 93.4018 | 10 | 556.9604 | | |

### TABLE 15

| | (Example 5 intravenous and sublingual) | | | | | |
| ROUTE OF ADMINISTRATION | AUC (min * ng/ml) | $T_{1/2}$ (min) | TMAX (min) | CMAX (ng/ml) | VD (ml) | Cl (ml/min) |
|---|---|---|---|---|---|---|
| IV | 76250.66 | 17.0944 | 0 | 1099.7005 | 27.3544 | 0.6557 |
| SL | 42554.59 | 38.2788 | 20 | 510.2424 | | |

The maximum concentrations were reached in about 20 minutes for all formulations after sublingual administration. There was considerable inter-individual variability by both routes of administration. Measurable plasma concentration after sublingual administration was demonstrable after 120 min in most formulation testing. In conclusion, sublingual fentanyl administration showed good absorption profile compared to IV.

### EXAMPLE 7

In Example 7, a study was conducted to determine the pharmacokinetics of a formulation prepared in accordance with Example 1 after increasing sublingual dose administration in healthy volunteers under fasting conditions. The study was also conducted to determine the safety and tolerability of a fentanyl sublingual spray prepared in accordance with Example 1 in humans.

The study was a single center, single dose, single-blinded, sequential ascending dose and repeated design in healthy male subjects. The following treatments were to be administered under fasting conditions:

Treatment A (Test 1): One Fentanyl 1 mg/ml sublingual spray (1×100 µg dose)

US 8,486,972 B2

27

Treatment B (Test 2): One Fentanyl 4 mg/ml sublingual spray (1×400 μg dose)

Treatment C (Test 2): Two Fentanyl 4 mg/ml sublingual spray (1×800 μg dose)

Treatment D (Placebo-Test 1): One Placebo 1 mg/ml sublingual spray (1×100 μg dose)

Treatment E (Placebo-Test 2): One Placebo 4 mg/ml sublingual spray (1×400 μg dose)

Treatment F (Placebo-Test 2): Two Placebo 4 mg/ml sublingual spray (1×800 μg dose)

The products were to be administered to nine (9) healthy male volunteers according to the following design in Table 16 below:

TABLE 16

|  | Period 1 | Period 2 | Period 3 |
|---|---|---|---|
| Sequence 1 (n = 6) | 100 μg | 400 μg | 800 μg |
| Sequence 2 (n = 3) | Placebo | Placebo | Placebo |

In each period, subjects were to arrive at the clinical site at least 10 hours before dosing. After a supervised overnight fast, a single oral dose of the assigned formulation was to be orally administered in the morning. Subjects were allowed to leave the clinical site after the 24-hour blood draw. The wash-out period was to be of at least 14 days; the duration of this study was expected to be approximately 5-6 weeks. As per

28

protocol, each sequential dose was to be separated by a wash-out of at least 14 days, which corresponds to more than 10 time the expected half life of the moiety to be measured. However, during the study periods 1 and 2 were separated by a wash-out of 15 days and periods of 2 and 3 were separated by a wash-out of 13 days. As fentanyl's expected half life is reported to be approximately 6.4 hours, it is judged that these wash-out deviations should not affect the conclusion of the study. Furthermore, no carry-over was observed at the beginning of the second and third periods.

Pharmacokinetic Assessments

Blood samples for pharmacokinetic measurements were collected prior to and up to 24 hours (serial samplings) after each drug administration. The drug concentrations produced by the administration of the studied formulations were used to derive the pharmacokinetic parameters listed in Tables 17 and 18 below.

Six (6) subjects were included in the statistical analysis. A summary of the non-normalized pharmacokinetic parameters is presented in Table 17 and a summary of the normalized pharmacokinetic parameters is presented in Table 18. The mean measured plasma concentrations versus time profile, produced by the administration of the Test products, is depicted in FIG. **11**, whereas the ln-transformed mean concentrations versus time profile is presented in FIG. **12**.

The pharmacokinetic parameters of interest for this study were $C_{max}$, $AUC_\infty$, $AUC_T$, $AUC_{T/\infty}$, $K_{el}$, $T_{max}$, $T_{1/2el}$, Cl/F and $V_Z$/F.

TABLE 17

| | | | | | | |
|---|---|---|---|---|---|---|
| Pharmacokinetic Parameters Fentanyl (n = 6) Non-normalized Data | | | | | | |
| | TEST 1 (100 μg) n = 6 | | TEST 2 (400 μg) n = 6 | | TEST 2 (800 μg) N = 2 | |
| PARAMETER | MEAN | C.V. (%) | MEAN | C.V. (%) | MEAN | C.V. (%) |
| $C_{max}$ (pg/ml) | 172.0 | 27.1 | 708.0 | 50.2 | 1270.4 | 37.7 |
| ln ($C_{max}$) (pg/ml) | 5.1207 | 4.8 | 6.4509 | 8.2 | 7.1102 | 5.4 |
| $T_{max}$ (hours) | 0.50 | 29.7 | 0.50 | 61.3 | 0.75 | 0.0 |
| $AUC_T$ (pg · h/ml) | 472.6 | 66.2 | 3556.1 | 63.0 | 5417.3 | 30.6 |
| ln ($AUC_T$) (pg · h/ml) | 6.0271 | 8.6 | 8.0208 | 7.5 | 8.5734 | 3.6 |
| $AUC_\infty$ (pg · h/ml) | 817.9 | 36.1 | 4242.6 | 57.6 | 5726.8 | 28.8 |
| ln ($AUC_\infty$) (pg · h/ml) | 6.6607 | 4.8 | 8.2303 | 6.4 | 8.6317 | 3.4 |
| $AUC_{T/\infty}$ (%) | 54.90 | 28.7 | 81.48 | 10.6 | 94.35 | 1.8 |
| $K_{el}$ (hour$^{-1}$) | 0.2008 | 27.4 | 0.1593 | 44.9 | 0.1782 | 0.9 |
| $T_{1/2\ el}$ (hours) | 3.70 | 30.4 | 5.20 | 45.8 | 3.89 | 0.9 |
| Cl/F (ml/h/kg) | 1718.8 | 27.7 | 1532.2 | 49.7 | 1837.3 | 13.1 |
| $V_Z$/F (ml/kg) | 9070.2 | 34.7 | 10470.4 | 47.1 | 10307.7 | 12.2 |

For $T_{max}$, the median is presented and the statistical analysis is based on ranks.

TABLE 18

| | | | | | | |
|---|---|---|---|---|---|---|
| Data Normalized to the 100 μg dose | | | | | | |
| | TEST 1 (100 μg) n = 6 | | TEST 2 (400 μg) n = 6 | | TEST 2 (800 μg) N = 2 | |
| PARAMETER | MEAN | C.V. (%) | MEAN | C.V. (%) | MEAN | C.V. (%) |
| $C_{max}$ (pg/ml) | 172.0 | 27.1 | 177.0 | 50.2 | 158.8 | 37.7 |
| ln ($C_{max}$) (pg/ml) | 5.1207 | 4.8 | 5.0646 | 10.4 | 5.0307 | 7.7 |
| $T_{max}$ (hours) | 0.50 | 29.7 | 0.50 | 61.3 | 0.75 | 0.0 |
| $AUC_T$ (pg · h/ml) | 472.6 | 66.2 | 889.0[1] | 63.0 | 677.2 | 30.6 |
| ln ($AUC_T$) (pg · h/ml) | 6.0271 | 8.6 | 6.6346[1] | 9.1 | 6.4940 | 4.8 |
| $AUC_\infty$ (pg · h/ml) | 817.9 | 36.1 | 1060.7 | 57.6 | 715.9 | 28.8 |
| ln ($AUC_\infty$) (pg · h/ml) | 6.6607 | 4.8 | 6.8440 | 7.7 | 6.5523 | 4.5 |
| $AUC_{T/\infty}$ (%) | 54.90 | 28.7 | 81.48[2] | 10.6 | 94.35[2] | 1.8 |
| $K_{el}$ (hour$^{-1}$) | 0.2008 | 27.4 | 0.1593 | 44.9 | 0.1782 | 0.9 |
| $T_{1/2\ el}$ (hours) | 3.70 | 30.4 | 5.20 | 45.8 | 3.89 | 0.9 |

US 8,486,972 B2

29    30

TABLE 18-continued

| | | Data Normalized to the 100 µg dose | | | |
|---|---|---|---|---|---|
| | TEST 1 (100 µg) n = 6 | | TEST 2 (400 µg) n = 6 | | TEST 2 (800 µg) N = 2 | |
| PARAMETER | MEAN | C.V. (%) | MEAN | C.V. (%) | MEAN | C.V. (%) |
| Cl/F (ml/h/kg) | 1718.8 | 27.7 | 1532.2 | 49.7 | 1837.3 | 13.1 |
| $V_Z$/F (ml/kg) | 9070.2 | 34.7 | 10470.4 | 47.1 | 10307.7 | 12.2 |

For $T_{max}$, the median is presented and the statistical analysis is based on ranks.
[1]= Different than Test - 1 (p < 0.05)
[2]= Different than Test - 1 (p < 0.01)
N.S. = Not Significant (p > 0.05)

Definition of the Pharmacokinetic Parameters

$C_{max}$: Maximum plasma concentration (ng/ml).

$T_{max}$: Time of maximum measured plasma concentration; if it occurs at more than one time point, $T_{max}$ is defined as the first time point with this value (hour).

$C_{LQC}$: Last quantifiable concentration (ng/ml).

$T_{LQC}$: Time of last quantifiable plasma concentration (hour).

$AUC_T$: Cumulative Area Under the plasma concentration time Curve calculated from 0 to $T_{LQC}$ using the Trapezoidal method (ng·h/ml), and calculated according to the following equation:

$$AUC_T = \sum_{2}^{N_{TLQC}} \left[ \left( \frac{C_{n-1} + C_n}{2} \right) \times (T_n - T_{n-1}) \right]$$

Where $N_{TLQC}$ is the number of the sample related to the $T_{LQC}$.

$AUC_\infty$: Extrapolated Area Under the plasma concentration time Curve to infinity (ng·h/ml).

$$AUC_\infty = AUC_T + \left( \frac{C_{LQC}}{K_{el}} \right)$$

$AUC_{T/\infty}$: Relative percentage of $AUC_T$ with respect to $AUC_\infty$ (%).

$$AUC_{T/\infty} = \left( \frac{AUC_T}{AUC_\infty} \right) \times 100$$

$T_{LIN}$: Time point where log-linear elimination begins (hour).

$K_{el}$: Apparent mean elimination rate constant estimated by a non-linear least-squares regression analysis; a minimum of three values are required at the end of the concentration-time curve (hour$^{-1}$).

$T_{1/2el}$: Half-life of elimination (hour).

$$T_{1/2el} = \frac{\ln(2)}{K_{el}}$$

Cl/F: Apparent clearance (ml/h/kg).

$$Cl/F = \frac{Dose^*}{AUC_\infty}$$

$V_Z$/F: Apparent volume of distribution (ml/kg)

$$V_Z/F = \frac{Dose^*}{K_{el} \cdot AUC_\infty}$$

*Dose expressed per weight (kg)

As noted in Table 11, the parameters for which a statistically significant difference was observed between the 100 µg dose and the normalized 400 µg dose was $AUC_T$, ln($AUC_T$) and $AUC_{T/\infty}$ and the parameter for which a statistically significant difference was observed between the 100 µg dose and the normalized 800 µg dose was $AUC_{T/\infty}$. No statistically significant differences were observed for any of the other pharmacokinetic parameters under study.

The mean $C_{max}$ value of the 100 µg dose was 172.0 pg/ml while for the 400 µg dose, it was 708.0 pg/ml and for the 800 µg dose, it was 1270.4 pg/ml. Once normalized to the 100 µg dose, the mean $C_{max}$ value of the 400 µg dose was 177.0 pg/ml and for the 800 µg dose, it was 158.8 pg/ml.

The median $T_{max}$ was 0.50 hour for the 100 µg dose and the 400 µg dose, and 0.75 hour for the 800 µg dose.

The mean $AUC_T$ value of the 100 µg dose was 472.6 pg·h/ml while for the 400 µg dose, it was 3556.1 pg·h/ml and for the 800 µg dose, it was 5417.3 pg·h/ml. Once normalized to the 100 µg dose, the mean $AUC_T$ value of the 400 µg dose was 889.0 pg·h/ml and for the 800 µg dose, it was 677.2 pg·h/ml.

The mean $AUC_\infty$ value of the 100 µg dose was 817.9 pg·h/ml while for the 400 µg dose, it was 4242.6 pg·h/ml and for the 800 µg dose, it was 5726.8 pg·h/ml. Once normalized to the 100 µg dose, the mean $AUC_\infty$ value of the 400 µg dose was 1060.7 pg·h/ml and for the 800 µg dose, it was 715.9 pg·h/ml.

The $AUC_{T/\infty}$ ratio was approximately 55% for the 100 pg dose, 81% for the 400 µg dose and 94% for the 800 µg dose.

The mean $K_{el}$ was 0.2008 hour$^{-1}$ for the 100 µg dose, 0.1593 hour$^{-1}$ for the 400 µg dose and 0.1782 hour$^{-1}$ for the 800 µg dose, while the mean $T_{1/2el}$ value was 3.70 hours, 5.20 hours and 3.89 hours following the same order.

The mean Cl/F was 1718.8 ml/h/kg for the 100 µg dose, 1532.2 ml/h/kg for the 400 µg dose and 1837.3 ml/h/kg for the 800 µg dose, while the mean $V_Z$/F was 9070.2 ml/kg for the 100 µg dose, was 10470.4 ml/kg for the 400 µg dose and was 10307.7 ml/kg for the 800 µg dose.

The intra-subject variation was 36.79%, 37.05% and 28.88% for $C_{max}$, $AUC_T$, and $AUC_\infty$, respectively.

Safety Evaluation

The safety parameters included the occurrence of adverse effects, measurements of vital signs, respiratory rate, oxygen saturation of blood by finger pulse oximetry, ECG and clinical laboratory parameters.

All adverse events were spontaneously reported by the volunteer, observed by the Clinical Investigator (or delegates)

US 8,486,972 B2

**31**

or elicited by general questioning by the clinical staff. Adverse events were also reported upon completion of the form "Taste of Medication Questionnaire to Subject", which was filled right after dosing. For the purposes of the study, the period of observation for each individual subject extended from the time the subject gave informed consent to within 7 days following the last drug administration.

Safety Results:

All nine subjects experienced a total of one-hundred-twenty-seven (127) adverse events during the study. No serious adverse events were recorded in this study. Twenty adverse events (8 different types) were reported after the single dose administration of the Test 1 (A) product, fifty-six adverse events (26 different types) were reported after the single dose administration of the Test 2 (B) product, twenty-two adverse events (19 different types) were reported after the single dose administration of the Test 2 (C) product, ten adverse events (8 different types) were reported after the single dose administration of the Placebo-Test 1 (D) product, eleven adverse events (9 different types) were reported after the single dose administration of the Placebo-Test 2 (E) product and twelve adverse events (8 different types) were reported after the single dose administration of the Placebo-Test 2 (F) product. Two (2) adverse events associated with post-study laboratory test results were imputed to three formulations.

**32**

Six subjects (100%) reported adverse events after the administration of the Test 1 (A) formulation, six subjects (100%) reported adverse events after the administration of the Test 2 (B) formulation, two subjects (100%) reported adverse events after the administration of the Test 2 (C) formulation, three subjects (100%) reported adverse events after the administration of the Placebo-Test 1 (D) formulation, three subjects (100%) reported adverse events after the administration of the Placebo-Test 2 (E) formulation and three subjects (100%) reported adverse events after the administration of the Placebo-Test 2 (F) formulation. The adverse events by system Organ Class are listed in Table 19.

The events abdominal distension, abdominal pain, abdominal pain upper, anxiety, depressed mood, diarrhea, disturbance in attention, dizziness (10 episodes out of 11), dry mouth, dry skin, dysgeusia, headache, fatigue (6 episodes out of 7), feeling cold, feeling drunk, feeling hot, feeling of relaxation, hot flush, hyperhidrosis, hypoaesthesia oral, hypoaesthesia, nasal congestion, nausea, oral discomfort, pallor, paresthesia oral, pruritus, sensation of heaviness, somnolence, speech disorder, tongue coated and vomiting were assessed to be possibly related to the drugs. The other events cough, dizziness (1 episode out of 11), fatigue (1 episode out of 7), musculoskeletal pain, rhinorrhoea and throat irritation were assessed to be not related to the study drugs. The other event nasopharyngitis was assessed to be unlikely related to the study drugs.

TABLE 19

| Summary of Adverse Events by System Organ Class | | | | | |
|---|---|---|---|---|---|
| | Period 1 | | Period 2 | | Period 3 | |
| Parameter | Fentanyl 100 µg | Placebo | Fentanyl 400 µg | Placebo | Fentanyl 800 µg | Placebo |
| Number of subjects exposed | 6 | 3 | 6 | 3 | 2 | 3 |
| Number of subjects reporting at least one adverse event | 6 | 3 | 6 | 3 | 2 | 3 |
| Total number of withdrawals | 0 | 0 | 4 | 0 | 0 | 0 |
| Withdrawals due to adverse event (not related to tested drug) | 0 | 0 | 1 | 0 | 0 | 0 |
| Withdrawals due to adverse event (related to tested drug) | 0 | 0 | 2 | 0 | 0 | 0 |
| Total number of adverse events* | 20 | 10 | 56 | 11 | 22 | 12 |
| Adverse events at least possibly drug related* | 18 | 8 | 53 | 11 | 22 | 12 |

| Nature of adverse events | Number of subjects | % of subjects exposed | Number of subjects | % of subjects exposed | Number of subjects | % of subjects exposed | Number of subjects | % of subjects exposed | Number of subjects | % of subjects exposed | Number of subjects | % of subjects exposed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gastrointestinal disorders | | | | | | | | | | | | |
| Abdominal distension | 0 | 0 | 0 | 0 | 1 | 17 | 0 | 0 | 0 | 0 | 0 | 0 |
| Abdominal pain | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 33 | 0 | 0 | 1 | 33 |
| Abdominal pain upper | 0 | 0 | 0 | 0 | 1 | 17 | 0 | 0 | 0 | 0 | 0 | 0 |
| Diarrhoea | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 33 | 0 | 0 | 1 | 33 |
| Dry mouth | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 50 | 0 | 0 |
| Dysgeusia | 6 | 100 | 3 | 100 | 6 | 100 | 3 | 100 | 2 | 100 | 3 | 100 |
| Hypoaesthesia oral | 4 | 67 | 1 | 33 | 3 | 50 | 1 | 33 | 1 | 50 | 0 | 0 |
| Nausea | 0 | 0 | 0 | 0 | 4 | 67 | 0 | 0 | 1 | 50 | 0 | 0 |
| Oral discomfort | 1 | 17 | 0 | 0 | 1 | 17 | 1 | 33 | 1 | 50 | 0 | 0 |
| Tongue coated | 0 | 0 | 0 | 0 | 1 | 17 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vomiting | 0 | 0 | 0 | 0 | 1 | 17 | 0 | 0 | 1 | 50 | 0 | 0 |
| General disorders and administration site conditions | | | | | | | | | | | | |
| Fatigue | 3 | 50 | 1 | 33 | 2 | 33 | 0 | 0 | 1 | 50 | 0 | 0 |
| Feeling cold | 0 | 0 | 0 | 0 | 1 | 17 | 0 | 0 | 1 | 50 | 0 | 0 |
| Feeling drunk | 0 | 0 | 0 | 0 | 6 | 100 | 0 | 0 | 0 | 0 | 0 | 0 |
| Feeling hot | 0 | 0 | 0 | 0 | 1 | 17 | 0 | 0 | 1 | 50 | 0 | 0 |
| Feeling of relaxation | 3 | 50 | 0 | 0 | 1 | 17 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hyperhidrosis | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 50 | 0 | 0 |

US 8,486,972 B2

33    34

TABLE 19-continued

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Summary of Adverse Events by System Organ Class | | | | | | | | | | | | |
| | Period 1 | | | | Period 2 | | | | Period 3 | | | |
| Parameter | Fentanyl 100 μg | | Placebo | | Fentanyl 400 μg | | Placebo | | Fentanyl 800 μg | | Placebo | |
| Investigations* | | | | | | | | | | | | |
| Alanine aminotransferase increased | 0 | 0 | 1 | 33 | 0 | 0 | 1 | 33 | 0 | 0 | 1 | 33 |
| Aspartate aminotransferase increased | 0 | 0 | 1 | 33 | 0 | 0 | 1 | 33 | 0 | 0 | 1 | 33 |
| Musculoskeletal and connective tissue disorders | | | | | | | | | | | | |
| Sensation of heaviness | 0 | 0 | 0 | 0 | 1 | 17 | 0 | 0 | 0 | 0 | 0 | 0 |
| Musculoskeletal pain | 0 | 0 | 0 | 0 | 1 | 17 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nervous system disorders | | | | | | | | | | | | |
| Dizziness | 0 | 0 | 0 | 0 | 6 | 100 | 0 | 0 | 2 | 100 | 0 | 0 |
| Disturbance in attention | 0 | 0 | 0 | 0 | 2 | 33 | 0 | 0 | 1 | 50 | 0 | 0 |
| Headache | 0 | 0 | 0 | 0 | 1 | 17 | 0 | 0 | 0 | 0 | 1 | 33 |
| Hypoaesthesia | 0 | 0 | 0 | 0 | 4 | 67 | 0 | 0 | 1 | 50 | 0 | 0 |
| Paresthesia oral | 0 | 0 | 1 | 33 | 3 | 50 | 1 | 33 | 0 | 0 | 3 | 100 |
| Somnolence | 0 | 0 | 1 | 33 | 1 | 17 | 0 | 0 | 2 | 100 | 1 | 33 |
| Speech disorder | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 50 | 0 | 0 |
| Psychiatric disorders | | | | | | | | | | | | |
| Anxiety | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 33 | 0 | 0 | 0 | 0 |
| Depressed mood | 0 | 0 | 0 | 0 | 1 | 17 | 0 | 0 | 0 | 0 | 0 | 0 |
| Respiratory, thoracic and mediastinal disorders | | | | | | | | | | | | |
| Cough | 1 | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nasal congestion | 1 | 17 | 0 | 0 | 1 | 17 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nasopharyngitis | 0 | 0 | 1 | 33 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rhinorrhoea | 1 | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Throat irritation | 0 | 0 | 0 | 0 | 1 | 17 | 0 | 0 | 0 | 0 | 0 | 0 |
| Skin and subcutaneous tissue disorders | | | | | | | | | | | | |
| Dry skin | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 50 | 0 | 0 |
| Pallor | 0 | 0 | 0 | 0 | 1 | 17 | 0 | 0 | 1 | 50 | 0 | 0 |
| Pruritus | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 50 | 0 | 0 |
| Vascular disorders | | | | | | | | | | | | |
| Hot flush | 0 | 0 | 0 | 0 | 3 | 50 | 0 | 0 | 1 | 50 | 0 | 0 |

*= Two (2) adverse events were associated with post-study laboratory test results and have been assigned to each period.

Conclusions

The pharmacokinetic parameters were well defined for the three doses (100 μg, 400 μg and 800 μg) administered in this study. $C_{max}$ and $AUC_\infty$ seem to be proportional, $AUC_T$ is consistent with dose-proportionality between the 400 μg and 800 μg. Furthermore, the two formulations of fentanyl (1 mg/ml and 4 mg/ml sublingual spray in doses of 100 μg, 400 μg and 800 μg) administered during the study were well tolerated in most of the subjects. No subject participating in the trial reported serious adverse events during the course of this study.

EXAMPLES 8-12

In-vitro Permeation Experiments

The permeation characteristics of fentanyl formulations were studied using EpiOral tissues (ORL-100). MatTek Corp's EpiOral is used as model for screening sublingual drug absorption of pharmaceutical formulations. MatTek's EpiOral tissue consists of normal, human-derived epithelial cells. The cells have been cultured to form multilayered, highly differentiated models of the human buccal (EpiOral) phenotypes. The EpiOral tissue model exhibits in vivo-like morphological and growth characteristics which are uniform and highly reproducible. Morphologically, the tissue model

closely parallels native human tissue, thus providing a useful in-vitro means to assess in-vivo permeability of pharmaceutical formulations across sublingual mucosa.

The EpiOral tissues, grown on cell culture inserts with Teflon backing membrane, were shipped by MatTek Corp on Monday for delivery on Tuesday morning. All the tissues were used in the permeability experiments within 72 hours of shipment. The inserts containing the tissues were rinsed with distilled water before the start of permeation experiments. The tissue area for the ORL-100 is 0.6 cm².

The receiver compartment (wells) received 0.3 ml of phosphate citrate buffer of pH 6.6 (receiver solution). The donor compartments (tissue inserts) were placed in the wells and filled with 0.5 ml of drug solution (donor solution).

The inserts were moved from well to well containing fresh receiver fluid at pre-determined intervals (2, 5, 7, 9, 11, 13, 15, 30, 45, 60, 90, and 120 min). After permeation studies both donor and receiver fluids were collected in vials for analysis by HPLC. The receiver and donor solution concentrations and the flux over each permeation time interval were determined.

EXAMPLE 8

In Example 8, the permeation of fentanyl base was compared to the permeation of fentanyl citrate. The formulations and percent permeated in 2 hours is listed in the table below:

US 8,486,972 B2

35

36

TABLE 20

| | EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | MIGLYOL % (V) | % PERMEATED IN 2 HOURS |
|---|---|---|---|---|---|---|
| Fentanyl Base | 8-a (b) | 1 mg/ml | 20 | 5 | — | 17.33 |
| Fentanyl Base | 8-b (w) | 1 mg/ml | 20 | 5 | — | 17.18 |
| Fentanyl Citrate | 8-c (b) | 0.646 mg/ml | 20 | 5 | — | 1.81 |
| Fentanyl Base | 8-d | 1 mg/ml | 20 | 5 | 79.3 | 1.64 |

(b)—buffer,
(w)—water

### EXAMPLE 9

In Example 9, Effect of Alcohol on the Permeation of Fentanyl Base Formulations was tested. The formulations and percent permeated in 2 hours are listed in the Table below:

TABLE 21

| EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | % PERMEATED IN 2 HOURS |
|---|---|---|---|---|
| 9-a (w) (Control) | 1 mg/ml | 20 | 5 | 17.18 |
| 9-b (w) | 1 mg/ml | 28 | 5 | 13.45 |
| 9-c (w) | 1 mg/ml | 40 | 5 | 10.95 |
| 9-c (w) | 1 mg/ml | 50 | 5 | 9.18 |

(b)—buffer,
(w)—water

### EXAMPLE 10

In Example 10, the effects of PG (propylene glycol) on Fentanyl Formulations was tested. The formulations and percent permeated in 2 hours are listed in the table below:

TABLE 22

| EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | % PERMEATED IN 2 HOURS |
|---|---|---|---|---|
| 10-a (w) (Control) | 1 mg/ml | 20 | 5 | 17.18 |
| 10-b (w) | 1 mg/ml | 20 | 25 | 14.518 |

(b)—buffer,
(w)—water

### EXAMPLE 11

In Example 11, the effect of pH on Fentanyl Formulations was tested. The formulations and percent permeated in 2 hours are listed in the table below. As indicated in the table, the permeation of fentanyl across buccal tissue was dependent on the pH of the formulation. Because fentanyl has pKa value (7.3 and 8.4) within the pH range studied, its degree of ionization changed as the pH of the formulation was altered. The results in the table below indicate that that formulations adjusted to pH between 8 and 9 were showing better permeability and physical stability.

TABLE 23

| EXAMPLE #* | CONC. OF FENTANYL BASE | BUFFER PH | ALCOHOL % (V) | PG % (V) | % PERMEATED IN 2 HOURS |
|---|---|---|---|---|---|
| 11-a (w) (Control) | 2 mg/ml | Water | 30 | 5 | 17.83 |
| 11-b (b) | 2 mg/ml | 5.5 | 30 | 4 | 5.33 |
| 11-c (b) | 2 mg/ml | 6.6 | 29 | 4 | 10.62 |
| 11-d (b) | 2 mg/ml | 8.6 | 29 | 4 | 13.48 |
| 11-e (b) | 2 mg/ml | 9.6 | 29 | 4 | 11.8 |

(b)—buffer,
(w)—water

### EXAMPLE 12

In Example 12, several ingredients including hydroxypropyl beta cyclodextrin (HPBCD), mannitol, polyvinyl pyrrolidone (PVP), propylene carbonate (PC), sodium glycocholate (SG), sodium lauryl sulphate (SLS), triacetin, triethyl citrate and tween 80 (TW 80) were added to the formulations either individually or in combination and studied for their effect on permeability and solution stability. Table 24 to 36 summarizes the formulations and permeation results of buffered and water formulations containing the above excipients.

TABLE 24

Results of the effects of Buffer and Water on Fentanyl Formulations.

| | CONC. OF | | | | INACTIVE INGREDIENTS | | | |
|---|---|---|---|---|---|---|---|---|
| EXAMPLE #* | FENTANYL BASE | BUFFER OR WATER | ALCOHOL % (V) | PG % (V) | Mannitol % (wt) | Triacetin % (wt) | TW80 % (wt) | % PERMEATED IN 2 HOUR |
| 12-a (b) (Control) | 1 mg/ml | B | 20 | 5 | — | — | — | 17.33 |
| 12-b (w) (Control) | 1 mg/ml | W | 20 | 5 | — | — | — | 17.18 |
| 12-c (b) | 1 mg/ml | B | 20 | 5 | 0.1 | 0.15 | — | 16.14 |
| 12-d (w) | 1 mg/ml | W | 20 | 5 | 0.1 | 0.15 | — | 12.10 |
| 12-e (b) | 1 mg/ml | B | 20 | 5 | 0.3 | — | 0.2 | 16.02 |

US 8,486,972 B2

37

38

TABLE 24-continued

Results of the effects of Buffer and Water on Fentanyl Formulations.

| | CONC. OF | | | | INACTIVE INGREDIENTS | | | |
|---|---|---|---|---|---|---|---|---|
| EXAMPLE #* | FENTANYL BASE | BUFFER OR WATER | ALCOHOL % (V) | PG % (V) | Mannitol % (wt) | Triacetin % (wt) | TW80 % (wt) | % PERMEATED IN 2 HOUR |
| 12-f (w) | 1 mg/ml | W | 20 | 5 | 0.3 | — | 0.2 | 12.35 |
| 12-g (b) | 1 mg/ml | B | 20 | 5 | 0.15 | 0.3 | 0.1 | 16.43 |
| 12-h (w) | 1 mg/ml | W | 20 | 5 | 0.15 | 0.3 | 0.1 | 9.76 |
| 12-i (b) | 1 mg/ml | B | 20 | 5 | 0.2 | — | 0.2 | 18.74 |
| 12-j (w) | | W | 20 | 5 | 0.2 | — | 0.2 | 13.19 |
| 12-k (b) | 1 mg/ml | B | 20 | 5 | — | — | 0.3 | 14.73 |
| 12-l (w) | 1 mg/ml | W | 20 | 5 | — | — | 0.3 | 13.76 |

(b)—buffer,
(w)—water

The results in Table 24 indicate that all the buffered formulations had similar permeability characteristics as that of control formulations except the buffered formulation containing 0.3% Tween 80 which showed lower permeability. All water formulations exhibited lower permeability than buffered formulations.

TABLE 25

Effect of HPBCD on Fentanyl Formulations

| EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | HPBCD (MOLECULAR RATIO TO API) | % PERMEATED IN 2 HOURS |
|---|---|---|---|---|---|
| 12-m (w) (Control) | 1 mg/ml | 20 | 5 | — | 17.18 |
| 12-n (w) | 1 mg/ml | 20 | 5 | 1:1 (0.413%) | 14.28 |
| 12-o (w) | 1 mg/ml | 20 | 5 | 1:2 (0.826%) | 13.50 |

(b)—buffer,
(w)—water

TABLE 26

Effect of Mannitol on Fentanyl Formulations

| EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | MANNITOL % (WT) | % PERMEATED IN 2 HOURS |
|---|---|---|---|---|---|
| 12-p (b) (Control) | 1 mg/ml | 20 | 5 | — | 17.33 |
| 12-q (b) | 1 mg/ml | 20 | 5 | 0.3 | 17.71 |
| 12-r (b) | 1 mg/ml | 20 | 5 | 0.4 | 16.86 |
| 12-s (b) | 1 mg/ml | 20 | 5 | 0.5 | 15.41 |
| 12-t (b) | 1 mg/ml | 20 | 5 | 0.8 | 14.81 |

(b)—buffer,
(w)—water

TABLE 27

Effect of Polyvinyl Pyrrolidone (PVP) on Fentanyl Formulations

| EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | PVP % (WT) | % PERMEATED IN 2 HOURS |
|---|---|---|---|---|---|
| 12-u (w) (Control) | 1 mg/ml | 20 | 5 | — | 17.18 |
| 12-v (w) | 1 mg/ml | 20 | 5 | 0.1 | 16.73 |
| 12-w (w) | 1 mg/ml | 20 | 5 | 0.5 | 14.68 |
| 12-x (w) | 1 mg/ml | 20 | 5 | 1 | 14.52 |
| 12-y (w) | 1 mg/ml | 25 | 5 | 3 | 10.75 |

(b)—buffer,
(w)—water

US 8,486,972 B2

**39**

**40**

TABLE 28

| | | | | | |
|---|---|---|---|---|---|
| Effect of Propylene Carbonate (PC) on Fentanyl Formulations | | | | | |
| EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | PC % (WT) | % PERMEATED IN 2 HOURS |
| 12-z (w) (Control) | 1 mg/ml | 20 | 5 | — | 17.18 |
| 12-aa (w) | 1 mg/ml | 20 | 5 | 1 | 14.39 |
| 12-bb (w) | 1 mg/ml | 20 | 5 | 1.5 | 14.43 |

(b)—buffer,
(w)—water

TABLE 29

| | | | | | |
|---|---|---|---|---|---|
| Effect of Sodium Glycocholate (SG) on Fentanyl Formulations | | | | | |
| EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | SG % (WT) | % PERMEATED IN 2 HOURS |
| 12-cc (w) (Control) | 1 mg/ml | 20 | 5 | — | 17.18 |
| 12-dd (w) | 1 mg/ml | 20 | 5 | 0.5 | 18.30 |
| 12-ee (w) | 1 mg/ml | 20 | 5 | 1 | 19.78 |

(b)—buffer,
(w)—water

TABLE 30

| | | | | | |
|---|---|---|---|---|---|
| Effect of Triacetin on Fentanyl Formulations | | | | | |
| EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | TRIACETIN % (WT) | % PERMEATED IN 2 HOURS |
| 12-ff (b) (Control) | 1 mg/ml | 20 | 5 | — | 17.33 |
| 12-gg (b) | 1 mg/ml | 20 | 5 | 0.5 | 17.71 |
| 12-hh (b) | 1 mg/ml | 20 | 5 | 2 | 14.56 |

(b)—buffer,
(w)—water

TABLE 31

| | | | | | |
|---|---|---|---|---|---|
| Effect of Triethyl Citrate on Fentanyl Formulations | | | | | |
| EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | TRIETHYL CITRATE % (WT) | % PERMEATED IN 2 HOURS |
| 12-ii (w) (Control) | 1 mg/ml | 20 | 5 | — | 17.18 |
| 12-jj (b) | 1 mg/ml | 20 | 5 | 0.5 | 15.81 |
| 12-kk (b) | 1 mg/ml | 20 | 5 | 2 | 10.02 |

(b)—buffer,
(w)—water

TABLE 32

| | | | | | |
|---|---|---|---|---|---|
| Effect of Tween 80 (TW 80) on Fentanyl Formulations | | | | | |
| EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | TW80 % (WT) | % PERMEATED IN 2 HOURS |
| 12-ll (b) (Control) | 1 mg/ml | 20 | 5 | — | 17.33 |

US 8,486,972 B2

**41**                                                                       **42**

TABLE 32-continued

| | Effect of Tween 80 (TW 80) on Fentanyl Formulations | | | | |
|---|---|---|---|---|---|
| EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | TW80 % (WT) | % PERMEATED IN 2 HOURS |
| 12-mm (b) | 1 mg/ml | 20 | 5 | 0.3 | 14.73 |
| 12-nn (b) | 1 mg/ml | 20 | 5 | 0.6 | 13.72 |

(b)—buffer,
(w)—water

TABLE 33

| | Effect of Labrasol & SLS on Fentanyl Formulations | | | | | |
|---|---|---|---|---|---|---|
| EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | LABRASOL % (WT) | SLS % (WT) | % PERMEATED IN 2 HOURS |
| 12-oo (w) (Control) | 1 mg/ml | 20 | 5 | — | — | 17.18 |
| 12-pp (w) | 1 mg/ml | 20 | 5 | 6.5 | | 8.25 |
| 12-qq (w) | 1 mg/ml | 20 | 5 | 3.0 | 0.5 | 9.31 |
| 12-rr (w) | 1 mg/ml | 20 | 5 | 6.5 | 0.5 | 8.63 |

(b)—buffer,
(w)—water

TABLE 34

| | Effect of Mannitol & Triacetin on Fentanyl Formulations | | | | | |
|---|---|---|---|---|---|---|
| EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | MANNITOL % (WT) | TRIACETIN % (WT) | % PERMEATED IN 2 HOURS |
| 12-ss (b) (Control) | 1 mg/ml | 20 | 5 | — | — | 17.33 |
| 12-tt (b) | 1 mg/ml | 20 | 5 | 0.1 | 0.15 | 16.14 |
| 12-uu (b) | 1 mg/ml | 20 | 5 | 0.15 | 0.4 | 18.33 |
| 12-vv (b) | 1 mg/ml | 20 | 5 | 0.15 | 0.5 | 17.14 |
| 12-ww (b) | 1 mg/ml | 20 | 5 | 0.2 | 0.3 | 16.73 |
| 12-xx (b) | 1 mg/ml | 20 | 5 | 0.25 | 0.5 | 16.31 |
| 12-yy (b) | 1 mg/ml | 20 | 5 | 0.3 | 0.2 | 17.70 |
| 12-zz (b) | 1 mg/ml | 20 | 5 | 0.4 | 0.2 | 16.88 |

(b)—buffer,
(w)—water

TABLE 35

| | Effect of Mannitol & TW 80 on Fentanyl Formulations | | | | | |
|---|---|---|---|---|---|---|
| EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | MANNITOL % (WT) | TW80 % (WT) | % PERMEATED IN 2 HOURS |
| 12-aaa (b) (Control) | 1 mg/ml | 20 | 5 | — | — | 17.33 |
| 12-bbb (b) | 1 mg/ml | 20 | 5 | 0.2 | 0.2 | 18.74 |
| 12-ccc (b) | 1 mg/ml | 20 | 5 | 0.3 | 0.1 | 16.53 |
| 12-ddd (b) | 1 mg/ml | 20 | 5 | 0.3 | 0.2 | 16.02 |

(b)—buffer,
(w)—water

US 8,486,972 B2

43

44

TABLE 36

| | Effect of Triacetin & TW 80 on Fentanyl Formulations | | | | | |
|---|---|---|---|---|---|---|
| EXAMPLE #* | CONC. OF FENTANYL BASE | ALCOHOL % (V) | PG % (V) | TW 80 % (WT) | TRIACETIN % (WT) | % PERMEATED IN 2 HOURS |
| 12-eee (b) (Control) | 1 mg/ml | 20 | 5 | — | — | 17.33 |
| 12-fff (b) | 1 mg/ml | 20 | 5 | 0.1 | 0.2 | 16.99 |
| 12-ggg (b) | 1 mg/ml | 20 | 5 | 0.1 | 0.3 | 16.63 |

(b)—buffer,
(w)—water

The results indicate that addition of individual excipients including HPBCD (Table 25), PVP (Table 27), PC (Table 28), Triethyl citrate (Table 31) and Tween 80 (Table 32) to the formulation decreased the permeability of fentanyl across MatTek buccal membranes irrespective of excipient concentration. As shown in Table 26 and Table 30, formulations containing 0.3% Mannitol and 0.5% Triacetin showed similar permeability characterisitics as that of control formulation but the permeability decreased as the concentrations of these individual excipients were increased in the formulations. Stability studies indicated that a minimum of 0.45% and 0.5% mannitol concentration should be added to buffer and water formulations, respectively, to keep them stable. In case of Triacetin, formulations containing 0.5% or higher concentrations of triacetin were found to be stable.

Permeation of fentanyl from formulations containing SG was greater than that of control formulations (Table 29). Also, we observed that fentanyl permeation increased with the increase of SG concentration in the formulation.

The results of fentanyl permeation across MatTek-buccal tissues from formulations containing combination of excipients are shown in Tables 33-36. Addition of Labrasol to the formulation improved the stability but decreased fentanyl permeation across MatTek buccal tissues. Similar results were observed with formulations containing labrasol and SLS. Among all the formulations containing combination of excipients, two formulations, Example 12-uu (0.15% mannitol, 0.4% triacetin) and Example 12-bbb (0.2% mannitol, 0.2% TW80), showed higher permeability compared to control formulation. We observed that the presence of mannitol in triacetin formulations did not show any improvement in the permeation. Hence, the formulation containing 0.5% triacetin (Table 30) was selected for further studies. Though the formulation, Example 12-bbb, showed good permeability mannitol concentration was increased to 0.3% to improve the stability of the product.

Both fentanyl citrate and fentanyl base formulations were stable at all temperatures studied. The data from in-vitro tissue permeation studies, as shown in Table 3, showed that permeation of fentanyl from fentanyl base formulations was about 10-fold higher than from fentanyl citrate formulations. Water and buffer formulations did not show any significant difference in fentanyl base permeation across buccal tissue. Our studies also showed that fentanyl base formulation containing Miglyol had very low permeability. Among the excipients, triacetin at 0.5% and mannitol at 0.3% in combination with 0.2% TW 80 showed good permeability and stability.

The transport of fentanyl across buccal tissues was dependent on ethyl alcohol (ethanol) and propylene glycol (PG) concentrations in the formulation. Ethanol is used as a cosolvent to solubilize fentanyl base in aqueous based formulations. In this investigation, we observed that formulations (with 1 mg/ml of fentanyl base) containing less than 20% of ethanol were precipitating at refrigerated conditions. Also, we observed that permeation of fentanyl across buccal tissue was indirectly proportional to ethanol concentrations in the formulations (Table 21). Similar results were observed with PG (Table 22). PG was helpful in increasing the solubility of fentanyl base in aqueous solution and also in enhancing the permeation of the fentanyl base across buccal tissues. Formulations containing more than 5% PG did not show significant improvement in the permeation of fentanyl, however, the solution viscosities increased proportionally with PG concentrations. The formulations containing more than 5% PG did not show good spray characteristics.

EXAMPLE 13

In Example 13, a formulation having the following ingredients in Table 37 was tested. The formulation did not include fentanyl.

TABLE 37

| Ingredient | |
|---|---|
| Dehydrated Alcohol % (v/v) | 30% |
| Propylene glycol % (v/v) | 5% |
| Peppermint Oil % (v/v) | 0.2% |
| Borate buffer (pH 9) | QS |
| Hydroxy Propyl Beta Cyclodextrin (HPBCD) | 1:2 |

The formulation was sprayed using a 0.10 ml multidose nasal spray pump by Pfeiffer of America, Princeton, N.J. and the droplets were measured using a Malvern Mastersizer S device, by Malvern Instruments Ltd. A single depression of the sublingual spray pump generated a plume which was then analyzed for spray particles. The sample size for the dose volume, spray pattern, and droplet size distribution was 25 sprays.

Droplet Volume

In the droplet volume evaluation, 25 spray samples were evaluated using 5 different stroke numbers for each spray sample the following results were measured:

Overall mean=100.4 μl

Maximum single actual value=103.2 μl

Lowest single actual value=95.3 μl

Standard deviation=1.1

Range=7.9

Coefficient of variation=1.1%

Spray Pattern

In the spray pattern evaluation, 25 spray samples were evaluated using a manual actuation at 30 mm from the target. The formulation was dyed with methylene blue and the following spray pattern results were measured:

US 8,486,972 B2

45

Small Diameter [mm]
min: 35.4
mean: 50.6
max: 62
s: 7.00
Largest Diameter [mm]
min: 40
mean: 56.9
max: 67
s: 6.01
Spray Angle
min: 64°
mean: 83.3°
max: 94°
s: 7.03
Ratio (Largest/Smallest Diameter)
min: 1.04
mean: 1.13
max: 1.33
s: 0.073
Droplet Size Distribution

In the droplet size distribution evaluation, 25 spray samples were evaluated using a manual actuation at 30 mm from the target. The following droplet size distribution results were measured:

Percentage Share of Droplet Diameters at 10 μm [%]
min: 0.65
mean: 1.66
max: 2.70
s: 0.527
10% of the Droplet Diameters are Smaller than the Indicated
Value [μm]
min: 15
mean: 18.2
max: 23
s: 1.91
50% of the Droplet Diameters are Smaller than the Indicated
Value [μm]
min: 35
mean: 44.7
max: 65
s: 7.52
90% of the Droplet Diameters are Smaller than the Indicated
Value [μm]
min: 96
mean: 154.4
max: 349
s: 64.42

### EXAMPLE 14

In Example 14, a formulation having the following ingredients in Table 38 was tested. The formulation did not include fentanyl.

TABLE 38

| Ingredient | |
| --- | --- |
| Dehydrated Alcohol % (v/v) | 30% |
| Propylene glycol % (v/v) | 5% |
| Peppermint Oil % (v/v) | 0.2% |
| Borate buffer (pH 9) | QS |
| Hydroxy Propyl Beta Cyclodextrin (HPBCD) | 1:2 |
| Hydroxy Propyl Cellulose (HPC EP) % (v/v) | 1% |

46

The formulation was sprayed using a 0.10 ml multidose nasal spray pump by Pfeiffer of America, Princeton, N.J. and the droplets were measured using a Malvern Mastersizer S device, by Malvern Instruments Ltd. A single depression of the sublingual spray pump generated a plume which was then analyzed for spray particles. The sample size for the dose volume, spray pattern, and droplet size distribution was 25 sprays.
Droplet Volume

In the droplet volume evaluation, 25 spray samples were evaluated using 5 different stroke numbers the following results were measured:
Overall mean value=101.5 μl
Maximum single actual value=103.7 μl
Lowest single actual value=96.1 μl
Standard deviation=1.3
Range=7.6
Coefficient of variation=1.2%
Spray Pattern

In the spray pattern evaluation, 25 spray samples were evaluated using a manual actuation at 30 mm from the target. The formulation was dyed with methylene blue and the following spray pattern results were measured:
Small Diameter [mm]
min: 29
mean: 34.0
max: 46
s: 3.47
Largest Diameter
min: 35
mean: 40.8
max: 55
s: 4.13
Spray Angle
min: 58°
mean: 63.8°
max: 80°
s: 4.65
Ratio (Largest/Smallest Diameter)
min: 1.08
mean: 1.20
max: 1.50
s: 0.092
Droplet Size Distribution

In the droplet size distribution evaluation, 25 spray samples were evaluated using a manual actuation at 30 mm from the target. The following droplet size results were measured:
Percentage Share of Droplet Diameters at 10 μm [%]
min: 0.24
mean: 0.68
max: 1.28
s: 0.278
10% of the Droplet Diameters are Smaller than the Indicated
Value [μm]
min: 22
mean: 26.7
max: 35
s: 2.95
50% of the Droplet Diameters are Smaller than the Indicated
Value [μm]
min: 61
mean: 83.3
max: 114
s: 11.41
90% of the Droplet Diameters are Smaller than the Indicated
Value [μm]
min: 192

US 8,486,972 B2

47 48

mean: 294.6
max: 440
s: 53.32

### EXAMPLE 15

In Example 15, an assay procedure for fentanyl in 1, 2, 4, 6, and 8 mg/mL fentanyl sublingual spray samples with a working concentration of between 0.1 µg/mL and 5 µg/mL fentanyl in solution was performed. This method was developed and qualified in compliance with GMP requirements. The method was determined to be linear over the range of 0.05 µg/mL to 7.83 µg/mL fentanyl. The fentanyl working standard solution was stable over a seven day period in volumetric glassware and amber HPLC vials at refrigerated and ambient conditions.

The equipment and supplies utilized in this process included an HPLC system equipped with a pump, variable wavelength detector, and autosampler, or equivalent, a Waters Symmetry HPLC column (C18, 4.6×75 mm, 3.5 µm particle size), 0.45 µm, 47 mm nylon filters (Gelman Nylaflo® P/N 66608 or equivalent), acetonitrile (HPLC Grade), potassium phosphate monobasic (ACS Grade), phosphoric acid (ACS Grade), deionized water, alcohol (ethanol, absolute), and fentanyl base reference standard.

The solution preparations were prepared as described below and may be scaled as required.

For each liter of phosphate buffer solution (50 mM $KH_2PO_4$ pH 2.8), 6.8 g of potassium phosphate mono basic and 1 liter of water was combined in a suitable vessel and mixed well. The pH of the solution was adjusted to 2.8 with the drop-wise addition of phosphoric acid. The solution was filtered through 0.45 µm nylon. This solution expires after one month.

For each liter of mobile phase (25% ACN, 75% phosphate buffer) solution, 750 mL of phosphate buffer solution was combined with 250 mL of acetonitrile in a suitable vessel and mixed well. The system is degassed by an appropriate method before use if required. This solution expires after one month.

For each liter of stock diluent (95/5, Ethanol/Acetonitrile) solution, 950 mL ethanol and 50 mL acetonitrile was combined in a suitable container and mixed well. This solution expires after one month.

Stock standard I, 40 µg/mL, ("SSI"), was prepared by weighing approximately 10.0 mg of fentanyl reference standard and added to a 250 mL volumetric flask. Approximately 200 mL stock diluent was added and swirled to dissolve the solid material. The mixture was diluted to the desired volume with stock diluent and mixed well.

Stock standard II, 40 µg/mL, ("SSII"), was prepared by weighing approximately 10.0 mg of fentanyl reference standard and add to a 250 mL volumetric flask. Approximately 200 mL of stock diluent was added and swirled to dissolve solid material. The mixture was diluted to the desired volume with stock diluent and mixed well.

Working standard I, 2.4 µg/mL, ("WSI"), was prepared by transferring 3.0 mL of stock standard I to a 50 mL volumetric flask. The mixture was diluted to the desired volume with mobile phase solution and mixed well. This solution expires after seven days.

Working standard II, 2.4 µg/mL, ("WSII") was prepared by transferring 3.0 mL of stock standard II to a 50 mL volumetric flask. The mixture was diluted to the desired volume with mobile phase solution and mixed well. This solution expires after seven days.

The chromatographic conditions for the HPLC procedure are set forth below:

| Column: | HPLC Column Waters Symmetry C18, 4.6 × 75 mm, 3.5 µm particle size |
| --- | --- |
| UV Detection: | 214 nm |
| Flow Rate: | 2.0 mL/minute |
| Injection Volume: | 50 µL |
| Temperature: | Ambient (The temperature may be controlled at 25° C.) |
| Acquisition Time: | 13 minutes |

### HPLC Procedure

After the system suitability is established, a maximum of 12 sample solutions can be injected in between working standards. A typical sequence would be as follows:

2× Mobile Phase (Blank)
2× Working standard II
5× Working standard I
I× Sample (up to 12 injections)
I× Working standard I
I× Sample (up to 12 injections)
I× Working standard I

System Suitability

There should be no significant interfering peaks present at the retention time of fentanyl in the mobile phase blank injections. In terms of injection precision, the RSD of fentanyl for five replicate injections of working standard I should not exceed 2.0%. In terms of standard agreement, the agreement between the average peak response for the first five working standard I injections and the two working standard II injections should be between 98 to 102%. The agreement between working standards I and II need only be demonstrated once during the expiry of standards. The tailing factor at 5% peak height for fentanyl in the first working standard I injection should be between 0.8 and 1.5. In terms of standard precision over the run, the RSD of peak area for fentanyl in the working standard I injections over the run (OTR) should not exceed 2.0%.

Calculations are performed as set forth below.

Working standard concentration is calculated as follows:

$$\frac{\text{Mass of standard (mg)}}{250.0\ \text{mL}} * \frac{1000\ \mu g}{1\ \text{mg}} * \frac{3.0\ \text{ml}}{50.0\ \text{ml}} * \text{Purity of Standard} = \mu g/\text{mL Fentanyl}$$

Response Factor ($R_f$) is calculated as follows:

$$\frac{\text{Fentanyl Peak Area}}{\text{Fentanyl Concentration}\ (\mu g/\text{mL})} *= R_f$$

Standard Agreement is calculated as follows:

$$\frac{\text{Average } R_f\ WSII}{\text{Average } R_f\ WSI} * 100 = \%\ \text{Standard Agreement}$$

### EXAMPLE 16

In Example 16 the method for determination of droplet size distribution by laser diffraction for fentanyl sublingual spray using the Spraytec device by Malvern was performed.

US 8,486,972 B2

49

50

All data generated and described within this report were reviewed for compliance with Good Manufacturing Practices (21 CFR Parts 210 and 211).

The purpose of this project was to develop and validate a droplet size distribution method by laser diffraction for use with fentanyl sublingual spray product and placebo. The first portion of the project performed product evaluations to determine the proper automated actuation parameters to be used with the MightyRunt Actuation Station by Innova Systems, Inc. Using the automated actuation station, development of the droplet size distribution method for the sublingual product included vignetting studies, exhaust placement studies, and device placement studies.

The method validation evaluated intermediate precision between two analysts performing the developed method. All method development and qualification activities were performed using placebo.

Samples were prepared using Pfeiffer unit dose glass vials, Pfeiffer unit dose VI stoppers, Pfeiffer vial holder, and Pfeiffer unit dose applicator. The instrumentation utilized in the study include a Spraytec with 200 mm lens by Malvern Instruments, Inc, a MightyRunt Actuation Station by Innova Systems Inc. equipped with an exhaust fan attachment, and a Mettler Toledo balance Model AT201.

### Actuation Parameter Study

Using the Spraytec to track the plume duration and droplet size distribution, the actuation parameters for the MightyRunt Actuation Station (MightyRunt) were optimized to replicate the plume duration, droplet size distribution, and shot weight generated by manual actuation. Dv10 (10% of the droplet diameters are smaller that the indicated value), Dv50 (50% of the droplet diameters are smaller that the indicated value), and Dv90, (90% of the droplet diameters are smaller that the indicated value) results from six devices with manual actuations were compared with the results from the six devices with automated actuations.

### Acceptance Criteria

The individual shot weight results for the automated actuations should all fall within the range of 75%-125% of the average shot weight for the manual actuations. The average Dv10, Dv50 and Dv90 results of the automated actuations should be within 75% to 125% of the average Dv10, Dv50 and Dv90 results for the manual actuations.

Statistical analysis shall include performance of a students' t-test on the two sets of droplet size distribution results. The results of the students' t-test should indicate that the manual versus automated sets of data is statistically equivalent.

### Method Development

Method development involved a vignetting study and exhaust study utilizing the Spraytec. Actuations were performed using the MightyRunt and previously determined parameters. Vignetting occurs during laser diffraction analysis when the small droplets of a spray plume scatter the laser at an angle too steep to be captured by the range lens. Placement of the device close enough to the range lens to capture all of the scattered light without deposition on the range lens is critical. The vignetting study determined the appropriate range lens for analysis and the appropriate distance from device to range lens.

Exhaust placement affects plume travel. Plume velocity should not be accelerated by the draw of the exhaust and large droplets should not fall while traveling through the laser path. The exhaust study determined the appropriate position behind the plume of the spray to ensure proper plume capture after passing through the laser path. The method included two distances for analysis from the tip of the nozzle to the path of the laser for a more complete characterization of the droplet size distribution.

### Method Validation

Validation consisted of determining the precision and ruggedness of the method. A total of 24 devices from a single lot of placebo were used in the validation. One analyst tested 6 actuations at each distance. To demonstrate ruggedness, a second analyst repeated the analyses. Dv10, Dv50, and Dv90 results were compared.

### Acceptance Criteria

The individual shot weight results for analyst one should all fall within the range of 75%-125% of the average shot weight for analyst two. The average Dv10, Dv50 and Dv90 results for analyst one should be within 75% to 125% of the average Dv10, Dv50 and Dv90 results for analyst two.

The final experimental procedure is set forth below.

Prior to analysis, the background and scattering profiles were verified as appropriate for analysis.

The sample bottle is inserted into the nozzle holder. Coasters were used to raise the platform for minimal adjustment. The coaster attached to the device holder was placed on top of coasters used for adjustment.

The MightyRunt with bottle and exhaust fan was placed in the appropriate positions for analysis. The MightyRunt was raised with the nozzle centered in front of the laser path with a lab jack. It was ensured that the MightyRunt was level following adjustment. Two bottle-to-laser distances were be evaluated, 7 cm and 4 cm, measured from the pump tip to the center of the laser path. For all analyses, the bottle was placed 14 cm from the range lens support structure to the pump tip.

The exhaust fan was turned on and placed on a lab jack 3 cm behind the laser path, centered behind the device, measured from the center of the laser path to the front edge of the exhaust shield. The exhaust fan had an impaction surface for the droplets to adhere to, i.e. a cheesecloth placed in the path of the droplets. ⅛ sheet of 18×36 inch cheesecloth folded into approximately a 4.5-inch square (4 layers of cheesecloth) is a sufficient impaction surface and will not impede the flow of the fan.

The device was actuated using the MightyRunt station and droplet size distribution was collected for each individual shot at the appropriate distances for analysis.

A report was printed for the entire plume duration and the plume plateau.

### Data Reporting

The data for the D10, D50, D90, and Span values for each actuation are reported. The average and precision (% RSD) (percent relative standard deviation) were calculated for the D10, D50, and D90. Note: Span is defined as (D90–D10)/ D50. Individual droplet size distribution results (μm) and span values (unitless) were reported to X.XX. All average droplet size distribution results should be reported to X.X μm. All RSD values should be reported to X.X %.

Statistical analysis included performance of a students' t-test on the two sets of droplet size distribution results. The

US 8,486,972 B2

51                                                        52

results of the students' t-test should have indicated that the analysts sets of data is statistically equivalent.

### Results and Discussion

All spray plumes have three stages. The first stage, development, was characterized by variable droplets and decreasing transmission of the laser. The second stage, stable, was characterized by a stable droplet distribution and transmission. Variable droplets and increasing transmission characterize the final stage, dissipation. All comparisons of droplet size distribution used the stable stage of the plume.

### Actuation Parameter Study

During the optimization of the actuation parameters for the MightyRunt, the plumes from manual and automated actuations were measured using the Spraytec. Dv10, Dv50, and Dv90 results were compared to optimize the automated parameters. The type of device that was examined in this study was significantly different from typical nasal sprays. Rather than a spring requiring a consistent force to initiate actuation and deliver the drug, there was an amount of force that was required to break the tabs or actuate the device. This force was not the same amount of force required to deliver the drug from the device once the tabs are broken. Because this device did not contain a spring, the parameters of interest were actuation force, force rise time, and minimum travel distance. The finalized MightyRunt parameters are listed below in Table 39 and the utilized Spraytec settings are listed below in Table 40.

#### TABLE 39

Mighty Runt Actuation Parameters

| Parameter | Setting |
| --- | --- |
| Actuation Force | 4.0 kg |
| Force Rise Time | 0.2 sec |
| Hold Time | 1.0 sec |
| Force Fall Time | 1.0 sec |
| Spray Delay | 1 sec |
| Minimum Travel Distance | 10 mm |
| Maximum travel Time | 4.0 sec |
| Trigger Signal Delay | 0.0 sec |
| Stage | Yes |

#### TABLE 40

Spraytec Settings

| Option | Setting |
| --- | --- |
| Test Duration | 200 msec |
| Data Acquisition Rate | 1000 Hz |
| Acquisition Duty Cycle | 0% |
| Experimental Trigger | Transmission |
| Transmission Trigger | 98% |
| Range Lens | 200 mm |

The comparison of manual and automated actuations was performed using six devices with manual actuations and six devices with automated actuations. The droplet size distribution and shot weight results are summarized in Table 41 below.

#### TABLE 41

| Device | D10 (μm) | D50 (μm) | D90 (μm) | Shot Weight (mg) | % Average |
| --- | --- | --- | --- | --- | --- |
| Manual 1 | 19.0 | 44.5 | 76.8 | 89.1 | |
| Manual 2 | 18.1 | 42.7 | 84.9 | 86.9 | |
| Manual 3 | 33.3 | 58.7 | 108.4 | 90.4 | |
| Manual 4 | 20.8 | 44.6 | 81.2 | 87.0 | |
| Manual 5 | 18.3 | 42.7 | 80.7 | 87.8 | |
| Manual 6 | 19.0 | 44.3 | 81.5 | 84.9 | |
| Average | 21.4 | 46.3 | 85.6 | 87.7 | |
| % RSD | 27.5 | 13.3 | 13.4 | 2.2 | |
| Mighty Runt 1 | 17.3 | 37.5 | 65.1 | 83.8 | 96 |
| Mighty Runt 2 | 16.1 | 35.3 | 64.0 | 66.0 | 75 |
| Mighty Runt 3 | 18.8 | 38.9 | 66.2 | 84.2 | 96 |
| Mighty Runt 4 | 15.4 | 37.8 | 77.6 | 85.4 | 97 |
| Mighty Runt 5 | 17.6 | 38.6 | 67.1 | 82.4 | 94 |
| Mighty Runt 6 | 19.4 | 41.9 | 74.8 | 88.0 | 100 |
| Average | 17.4 | 38.3 | 69.1 | 81.6 | |
| % RSD | 8.8 | 5.6 | 8.2 | 9.7 | |
| Overall average | 19.43 | 42.30 | 77.36 | 84.7 | |
| Overall % RSD | 23.7 | 14.3 | 15.7 | 7.5 | |
| Automated Actuation Average as % of Manual Actuation Average | 81 | 83 | 81 | | |
| t-stat | 1.60 | 2.97 | 3.15 | | |
| t-critical | 1.94 | 1.94 | 1.81 | | |
| Result | Same population | Different population | Different population | | |

### Acceptance Criteria

Shot weight results for the automated actuations ranged from 75%-100% of the average for manual actuations, meeting the acceptance criteria of 75%-125% of the average shot weight for the manual actuations. The average Dv10 for automated actuations was 81% of the average Dv10 for manual actuations. The average Dv50 for automated actuations was 83% of the average Dv50 for manual actuations. The average Dv90 for automated actuations was 81% of the average Dv90 for manual actuations. Each of these parameters met acceptance criteria of 75%-125% of the average for manual actuations. Students' t-tests, while not necessarily appropriate for the small data sets, indicated that the data sets for manual actuations and automated actuations were equivalent for Dv10, but not for Dv50 or Dv90. It was not possible to accurately replicate the droplet size distribution from manual actuations with the MightyRunt. The force required to reliably break the tabs and actuate the devices produced a distribution with smaller droplets than that of the manual actuations. Less aggressive actuation parameters, which should produce larger droplet sizes, were not sufficient for consistent actuation of the devices. Spraytec method development proceeded with these parameters despite not meeting the acceptance criteria specified in the protocol.

### Method Development

Method development involved a vignetting study, device placement study and exhaust placement study utilizing the Spraytec. Actuations were performed using the MightyRunt and the previously qualified parameters. For all tests, the device was placed in front of the laser beam path, the plume traveled through the laser path, and the plume was collected in an exhaust manifold placed behind the laser beam.

US 8,486,972 B2

53

The vignetting experiments were performed with the device aligned with the front of the instrument (approximately 10 cm from the beam) and varying distances for the device-to-range lens placement. The results are summarized in Table 42.

TABLE 42

| Distance to Range Lens (cm) | Dv10 (µm) | Dv50 (µm) | Dv90 (µm) |
|---|---|---|---|
| 6 | 17.2 | 38.6 | 65.9 |
| | 16.1 | 36.5 | 63.0 |
| 8 | 18.6 | 41.3 | 71.6 |
| | 21.9 | 44.2 | 84.6 |
| 10 | 16.7 | 38.7 | 80.4 |
| | 16.9 | 39.8 | 68.0 |
| 12 | 22.1 | 46.1 | 89.8 |
| | 17.1 | 37.1 | 65.5 |
| | 15.6 | 35.7 | 62.7 |
| 14 | 17.4 | 42.3 | 72.5 |
| | 16.6 | 36.5 | 64.2 |

A plot of the Dv10, Dv50, Dv90, and plume records values versus placement is set forth in FIG. **11**. The data showed no significant trend over the entire range of placements. To minimize the possibility of deposition of droplets on the range lens during testing, the placement of 14 cm (approximately centered between the laser and range lens supports) was chosen and used for all further testing.

To evaluate exhaust placement on the plume during testing, PSD (particle size diameter) data was collected and evaluated at four distances for exhaust-to-laser beam. The data are summarized in Table 43 below.

TABLE 43

| Exhaust Height (cm) | Dv10 (µm) | Dv50 (µm) | Dv90 (µm) |
|---|---|---|---|
| 7 cm Device-to-Laser Beam Placement | | | |
| No exhaust | 14.4 | 28.1 | 51.7 |
| | 13.3 | 28.6 | 54.0 |
| 3 | 19.8 | 37.1 | 60.9 |
| | 18.1 | 36.3 | 61.0 |
| 4 cm Device-to-Laser Beam Placement | | | |
| No exhaust | 17.8 | 35.0 | 57.9 |
| | 18.7 | 36.3 | 60.5 |
| 1 | 14.6 | 29.4 | 51.0 |
| | 12.6 | 28.0 | 56.6 |
| 3 | 15.1 | 30.0 | 52.0 |
| | 13.6 | 27.6 | 49.0 |
| 5 | 14.3 | 32.8 | 79.8 |
| | 13.4 | 28.7 | 51.7 |
| 7 | 11.2 | 25.5 | 55.7 |
| | 15.9 | 30.0 | 50.8 |

A graphical summary of Dv10, Dv50, and Dv90 values versus placement is included in FIG. **12**. There were no significant changes in the Dv10, Dv50, Dv90 or plume duration values for plumes collected without exhaust, or with exhaust 1, 3, 5, or 7 cm behind the beam. The exhaust-behind-laser beam placement was chosen to be 3 cm to reduce the chance of deposition outside the fan housing of sprays performed at a device-to-beam distance of 7 cm.

The method was to include two distances for analysis from the tip of the device to the path of the laser for a more complete characterization of the droplet size distribution. Four distances were evaluated, and results are included in Table 44 below.

54

TABLE 44

| Distance (cm) | Dv10 (µm) | Dv50 (µm) | Dv90 (µm) |
|---|---|---|---|
| 7 | 16.7 | 34.5 | 67.8 |
| | 15.8 | 33.4 | 60.0 |
| 6 | 17.8 | 35.0 | 57.9 |
| | 18.7 | 36.3 | 60.5 |
| 5 | 19.1 | 35.5 | 58.5 |
| | 16.9 | 32.4 | 55.1 |
| 4 | 11.8 | 27.8 | 57.5 |
| | 13.0 | 28.1 | 50.3 |
| 3 | 14.4 | 28.1 | 51.7 |
| | 13.3 | 28.6 | 54.0 |

A graphical summary of Dv10, Dv50, and Dv90 values versus placement are included in FIG. **3**. There was no observable trend in the data from various heights. While there is no guidance document for sublingual sprays, the FDA Guidance Document "Bioequivalence and Bioavailability Studies for Nasal Aerosols and Nasal Sprays for Local Action", specifies two distances from 3-7 cm. The larger pair of distances (4 cm and 7 cm) from the beam was chosen in order to characterize a more fully developed plume.

Method Validation

An analyst tested six devices at both the 4 cm and 7 cm distances. A second analyst repeated the analyses at both distances with the next actuations after priming from each device on a second day. Validation results are summarized in Tables 45 and 46 below where the Dv10, Dv50, and Dv90 results were compared.

TABLE 45

| Validation PSD Results at 4 cm Device-to-Laser Beam Placement | | | | |
|---|---|---|---|---|
| Device | Dv10 (µm) | Dv50 (µm) | Dv90 (µm) | Shot Weight (mg) | % Average |
| Analyst 1 | | | | | |
| 1 | 18.9 | 31.2 | 52.3 | 60.4 | 76 |
| 2 | 16.4 | 30.8 | 52.6 | 78.8 | 100 |
| 3 | 17.2 | 29.8 | 51.3 | 65.0 | 82 |
| 4 | 18.3 | 31.6 | 54.2 | 80.1 | 101 |
| 5 | 13.5 | 28.5 | 51.7 | 81.6 | 103 |
| 6 | 15.0 | 30.1 | 52.3 | 77.2 | 98 |
| Average | 16.5 | 30.3 | 52.4 | 73.9 | |
| % RSD | 12.3 | 3.7 | 1.9 | 12.0 | |
| Analyst 2 | | | | | |
| 1 | 14.2 | 28.8 | 57.5 | 76.8 | |
| 2 | 11.3 | 26.8 | 54.9 | 76.9 | |
| 3 | 11.8 | 27.2 | 52.2 | 79.9 | |
| 4 | 15.4 | 29.2 | 52.6 | 80.0 | |
| 5 | 12.3 | 27.8 | 60.2 | 76.9 | |
| 6 | 11.8 | 26.8 | 52.2 | 84.5 | |
| Average | 12.8 | 27.8 | 54.9 | 79.2 | |
| % RSD | 12.8 | 3.7 | 6.0 | 3.8 | |
| Overall Average | 14.7 | 29.0 | 53.7 | 76.5 | |
| Overall % RSD | 17.9 | 5.8 | 5.0 | 9.0 | |
| Analyst 1 Average as % of Analyst 2 | 129 | 109 | 95 | | |
| t-stat | 3.50 | 4.20 | −1.80 | | |
| t-critical | 1.81 | 1.81 | 1.81 | | |
| Result | Different Population | Different Population | Same Population | | |

US 8,486,972 B2

<table>
<tr><td>55</td><td>56</td></tr>
</table>

**55**

TABLE 46

Validation PSD Results at 7 cm Device-to-Laser Beam Placement

| File | Dv10 (µm) | Dv50 (µm) | Dv90 (µm) | Shot Weight (mg) | % Average |
|---|---|---|---|---|---|
| | | Analyst 1-7 cm | | | |
| a009 | 23.3 | 37.0 | 58.8 | 80.1 | 104 |
| a010 | 16.1 | 34.0 | 57.3 | 76.9 | 99 |
| a011 | 16.0 | 34.9 | 59.7 | 79.0 | 102 |
| a012 | 17.6 | 34.0 | 57.1 | 80.7 | 104 |
| a013 | 20.0 | 35.5 | 58.0 | 82.3 | 106 |
| a014 | 19.6 | 36.1 | 57.2 | 80.6 | 104 |
| Average | 18.8 | 35.3 | 58.0 | 79.9 | |
| % RSD | 14.8 | 3.4 | 1.8 | 2.3 | |
| | | Analyst 2-7 cm | | | |
| b009 | 11.8 | 28.7 | 55.0 | 72.6 | |
| b010 | 17.0 | 33.9 | 61.7 | 79.8 | |
| b011 | 15.3 | 31.8 | 55.8 | 74.8 | |
| b012 | 13.8 | 31.1 | 54.6 | 79.7 | |
| b013 | 13.3 | 30.7 | 55.1 | 80.8 | |
| b015 | 16.6 | 32.8 | 56.7 | 76.3 | |
| Average | 14.6 | 31.5 | 56.5 | 77.3 | |
| % RSD | 13.8 | 5.8 | 4.7 | 4.2 | |
| Overall Average | 16.7 | 33.4 | 57.2 | 78.6 | |
| Overall % RSD | 18.9 | 7.3 | 3.6 | 3.6 | |
| Analyst 1 Average as % of Analyst 2 Average | 128 | 112 | 103 | | |
| t-stat | 2.93 | 4.25 | 1.32 | | |
| t-critical | 1.81 | 1.83 | 1.81 | | |
| Result | Different Population | Different Population | Same Population | | |

Acceptance Criteria

Analyst 1 shot weight results ranged from 76%-103% of analyst 2 average for the 4 cm distance, and 99%-106% for the 7 cm distance, meeting the acceptance criteria of 75%-125%. The average Dv10 for Analyst 1 was 129% of Analyst 2 for the 4 cm distance and 128% for the 7 cm distance. The average Dv50 for Analyst 1 was 109% of Analyst 2 for the 4 cm distance and 112% for the 7 cm distance. The average Dv90 Analyst 1 was 95% of Analyst 2 for the 4 cm distance and 103% for the 7 cm distance. While Dv10 did not meet acceptance criteria of 75%-125%, this is a measurement of the smallest droplets in the plume and a higher variability is not unexpected. Results for Dv50 and Dv90 met acceptance criteria of 75-125%. Students' t-tests, while not necessarily appropriate for the small data sets, indicated that the data sets for Analyst 1 and Analyst 2 were equivalent for Dv90 at both distances, but not for Dv10 or Dv50 at either distance.

Conclusion

A method for the droplet size distribution analysis by laser diffraction for use with fentanyl sublingual spray was developed and subsequently qualified. Acceptance criteria based on statistical analysis with students' t-test were deemed inappropriate for the small data sets. Method validation acceptance criteria for agreement of Analysts 1 and 2 were determined to be too narrow for the high variability associated with measurement of the smallest droplets in the plume (Dv10). While these criteria were not met, the method was deemed acceptable for use. The method is suitable for use within the operating parameters specified herein.

**56**

EXAMPLE 17

In Example 17, a study was performed to determine the respirable dose less than 9 µm for fentanyl in 1, 2, 4, 6, and 8 mg/mL fentanyl sublingual spray samples with a working concentration of between 0.1 µg/mL and 5 µg/mL fentanyl in solution. The method used was qualified in compliance with GMP requirements. The sample solutions were determined to be stable over a seven-day period in volumetric glassware and amber HPLC vials at refrigerated and ambient conditions.

The HPLC process was consistent with the process described in Example 15 above. The materials and supplies utilized in the study included acetonitrile (HPLC Grade), potassium phosphate monobasic (ACS Grade), phosphoric acid (ACS Grade), deionized water, alcohol (ethanol, absolute), Short Stack Andersen Cascade Impactor set-up consisting of a 5-liter expansion chamber, induction port, stages 0, 1, 2, and after filter, a vacuum source, in-line flow meter (Sierra Top-Track or equivalent), VWR Sterile sampling bags, glass fiber filter, 8.1 cm, external calibrated flow meter (Dry-Cal Flow Meter or equivalent), and a pneumatic actuator (Innova Systems Mighty Runt or equivalent).

Solution Preparation

Solution preparations were prepared according to the methods described in Example 15 above and may be scaled as required.

The extraction solution was 50:50 (95/5, Ethanol/Acetonitrile:Water). For every liter of prepared solution, 475 mL ethanol, 25 mL acetonitrile and 500 mL of water was combined in a suitable container and mixed well. This solution expires after one month.

The phosphate buffer solution was prepared in a concentration of 50 mM $KH_2PO_4$ with a pH 2.8. For every liter of prepared solution, 6.8 g potassium phosphate mono basic and 1 liter of water is combined in a suitable vessel and mixed well. The pH of the solution was adjusted to pH 2.8 with the drop-wise addition of phosphoric acid. The solution was filtered through 0.45 µm nylon. This solution expires after one month.

The impactor set-up will consist of a 5-liter expansion chamber, induction port, stages 0, 1, 2, and filter prepared according to the following procedure.

The filter stage was placed onto the impactor base.

An 8.1 cm glass fiber filter was placed into the after filter stage and secured with a clean rubber o-ring.

A solid plate was placed on top of the filter stage and then stage 2 was placed in position.

A plate with center hole cutout was placed on top of stage 2 and then stage 1 was placed in position.

A plate with center hole cutout was placed on top of stage 1 and then stage 0 was placed in position.

The cone was placed in position and the impactor was secured with the hold down clamps.

The induction port was affixed to the cone and the 5 L expansion chamber was placed on top of the induction port.

Testing Set-up

The testing instrumentation was set up by placing an in-line flow meter between the vacuum source and cascade impactor with appropriate tubing. A leak test was performed on the impactor. A flow through the impactor was started by opening the vacuum source and the flow was adjusted to approximately 28.3 L/min. A hand was placed over the spray actuation port on the expansion chamber. The flow rate as indicated on the in-line meter was expected to fall to zero. If a flow was still registered, the condition of the impactor a-rings was checked, and the test repeated. To set the flow rate, the expansion chamber was removed from the induction port and an

US 8,486,972 B2

57

58

external calibrated flow meter was attached to the induction port and the flow was started. The flow was adjusted to 28.3±1 L/min with the external calibrated flow meter and the measurement displayed on the in-line flow meter was recorded for using during the testing procedure.

### Testing Procedure

Two devices were actuated for the 1 mg/mL product strength for each assay result. One device was actuated for the 2, 4, 6, and 8 mg/mL product strength. With the expansion chamber in place, the vacuum was adjusted to the measurement obtained in during the testing set-up.

The pre-actuated weight of the device in grams to a minimum of 4 decimal places was recorded. The device was positioned so that the spray would travel directly toward the wall opposite the actuation port. The sublingual spray device was actuated into the expansion chamber with the automated pneumatic actuator method parameters listed in Table 47.

### TABLE 47

| Parameter | Setting |
|---|---|
| Actuation Force (kg) | 5.0 |
| Force Rise Time (s) | 0.1 |
| Hold Time (s) | 1.0 |
| Force Fall Time (s) | 1.0 |
| Spray Delays (s) | 1 |
| Minimum Travel Distance (mm) | 10.0 |
| Maximum Travel Time (s) | 4.0 |
| Trigger Signal Delay (s) | 0.0 |
| Stage | Yes |

The post actuated weight of the device in grams is recorded to a minimum of 4 decimal places.

### Extraction Procedure

Extraction was accomplished by breaking down the impactor set-up and extracting each component by the following procedures:

The plates and the filter were each extracted separately in bags with 10.0 mL of extraction solution. The sample was extracted by hand shaking and kneading for at least one minute. 6.0 mL of the extracted sample was transferred to a 10 mL volumetric flask and diluted to volume with phosphate buffer solution and mixed well. This is the sample solution. This solution expires after seven days.

The expansion chamber is inverted and place in a holder. The induction port and cone are inserted into the expansion chamber ground glass joint. Approximately 40 mL of extraction solution is rinsed through the cone and induction port into the expansion chamber. The solution is swirled in the expansion chamber in an effort to extract the entire interior surface. The solution is decanted into a 200 mL volumetric flask. The rinse is repeated two additional times for a total rinse volume of approximately 120 mL. The flask is brought to volume with phosphate buffer solution and mixed well. This is the sample solution. This solution expires after seven days.

### Assay

The sample solutions are assayed as per the procedure set forth in Example 15 above. Calculations are performed as follows.

$$\text{Response Factor } (Rf) = \frac{\text{Fentanyl Peak Area}}{\text{Fentanyl Concentration } (\mu g/mL)}$$

The fentanyl in the plate and filter samples were determined according to the following calculation:

$$\text{The amount of fentanyl in } \mu g = \frac{A_{samp} * D_f}{WSI \; R_f \; OTR}$$

$A_{samp}$=Area of fentanyl in sample preparation
$D_f$=Dilution factor of fentanyl sample solution preparation (10.0 mL×10.0 ml/6.0 mL)
WSI $R_f$ OTR=Working standard I response factor over the run

The fentanyl in the cone, induction port and expansion chamber is determined according to the following calculation:

$$\text{Amount of fentanyl in } \mu g = \frac{A_{samp} * V_{samp}}{WSI \; R_f \; OTR}$$

$A_{samp}$=Area of fentanyl in sample preparation
$V_{samp}$=Volume of fentanyl in sample solution preparation (200 mL)
WSI $R_f$ OTR=Working standard I response factor over the run

The respirable dose for 2, 4, 6, and 8 mg/mL is calculated as follows:

$$\text{Respirable dose in } \mu g = \text{Sum of the drug Mass in Particle Size Fraction Less Than 9 } \mu m \; (\mu g)$$

The respirable dose for 1 mg/mL is calculated as follows:

$$\text{Respirable dose } (\mu g) = \frac{\begin{array}{c}\text{Sum of the drug mass in}\\ \text{particle size fraction less}\\ \text{than 9 } \mu g \; (\mu g)\end{array}}{2 \; (\text{number of actuations})}$$

The respirable fraction is calculated as follows:

$$\begin{array}{c}\text{Percent (\%)}\\ \text{Respirable fraction}\end{array} = \frac{\begin{array}{c}\text{Drug mass in particle}\\ \text{size fraction less than 9 } \mu m \; (\mu g)\\ \text{(respirable dose)}\end{array}}{\text{Total Drug Mass } (\mu g)} \times 100$$

The particle size cutoff diameters for reporting is set forth in Table 48 below.

### TABLE 48

| Impactor Component | Particle Size Grouping |
|---|---|
| Expansion Chamber, Induction Port, and Cone Plate 0 | $\geqq 9 \mu m$ |
| Plate 1 | $9 \mu m > X \geqq 5.8 \mu m$ |
| Plate 2 F | $< 5.8 \mu m$ |

The results for the fentanyl sample assay results in μg, the respirable dose in the particle size fraction less than 9 μm (as per Table 48) in μg, and the percent respirable dose less than 9 μm in percent to one decimal place were reported.

The Certificate of Analysis for the determination of the respirable 1 mg/mL dose set forth in Table 49 below.

US 8,486,972 B2

59
60

TABLE 49

| Determination of Respirable Dose, 1 mg/mL Fentanyl | | |
|---|---|---|
| Test | Method | Specification |
| Assay of Fentanyl in sublingual spray samples | Described in Example 17 | Report Results |
| Determination of respirable dose in fentanyl sublingual spray by cascade impaction | | Report Results |

| CI Run | Sample | Fentanyl (µg/ dose) | Particle Size groupings | Groupings percent | Average Shot weight (mg) | Total Mass <9 µm (µg) | Respirable dose <9 µm (µg) |
|---|---|---|---|---|---|---|---|
| 1 | Globe | 76.5694 | $\geqq$9 µm | 96.4 | 85.4 | 2.9 | 3.6 |
| | Plate 0 | 0.5479 | | | | | |
| | Plate 1 | 0.6228 | 9 µm >X $\geqq$ 5.8 µm | 0.8 | | | |
| | Plate 2 | 0.4746 | <5.8 µm | 2.9 | | | |
| | Filter | 1.8149 | | | | | |
| 2 | Globe | 78.6941 | $\geqq$9 µm | 96.6 | 84.0 | 2.8 | 3.4 |
| | Plate 0 | 0.6746 | | | | | |
| | Plate 1 | 0.6217 | 9 µm > X $\geqq$ 5.8 µm | 0.8 | | | |
| | Plate 2 | 0.5000 | <5.8 µm | 2.6 | | | |
| | Filter | 1.6740 | | | | | |
| 3 | Globe | 78.0529 | $\geqq$9 µm | 97.1 | 85.3 | 2.3 | 2.9 |
| | Plate 0 | 0.5082 | | | | | |
| | Plate 1 | 0.5429 | 9 µm > X $\geqq$ 5.8 µm | 0.7 | | | |
| | Plate 2 | 0.4185 | <5.8 µm | 2.2 | | | |
| | Filter | 1.3596 | | | | | |
| | | | Average percent respirable dose | | | | 3.3 |

Many other variations of the present invention will be apparent to those skilled in the art and are meant to be within the scope of the claims appended hereto, including but not limited to the particular unit dose or bi-dose devices and the particle size range of fentanyl produced, as well as other numerical parameters described in the examples, and any combination thereof.

What is claimed is:

1. A unit dose of a non-propellant sublingual fentanyl formulation comprising discrete liquid droplets of an effective amount of fentanyl and a pharmaceutically acceptable liquid carrier, wherein the sublingual fentanyl formulation comprises:

from about 0.1% to about 0.8% by weight of fentanyl or a pharmaceutically acceptable salt thereof;

from about 20% to about 60% by weight of ethanol; and from about 4% to about 6% by weight of propylene glycol;

wherein after sublingual administration to a human, said sublingual fentanyl formulation provides a mean time to maximum plasma concentration ($T_{max}$) of fentanyl of from about 5 to about 120 minutes.

2. The unit dose of claim 1, wherein said discrete liquid droplets have a size distribution of from about 10 µm to about 200 µm.

3. The unit dose of claim 1 wherein after sublingual administration to a human, the sublingual fentanyl formulation provides a mean time to maximum plasma concentration ($T_{max}$) of fentanyl of from about 10 to about 60 minutes.

* * * * *

# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INSYS THERAPEUTICS, INC. and | ) | |
| INSYS DEVELOPMENT COMPANY, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 17-1303-CFC |
| v. | ) | CONSOLIDATED |
| | ) | |
| TEVA PHARMACEUTICALS USA, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES (NOS. 2-8)**

Pursuant to Rule 33, Fed. R. Civ. P., and Local Rule 26.1, Plaintiffs Insys Therapeutics, Inc. and Insys Development Company, Inc. (collectively, "Insys" or "Plaintiffs") hereby make the following objections and responses to Defendant Teva Pharmaceuticals USA, Inc.'s ("Teva's") First Set of Interrogatories (Nos. 2-8).

Pursuant to Rule 26(e), Fed. R. Civ. P., Plaintiffs reserve the right to supplement their responses as discovery progresses in this action.

## **GENERAL OBJECTIONS**

Plaintiffs incorporate herein by reference the General Objections set forth in Plaintiffs' Objections and Responses to Defendant's First Set of Interrogatories (Nos. 1-8) and Plaintiffs' Objections and Responses to Defendant's First Set of Requests for Production

## **DEFINITIONS**

Insys hereby incorporates by reference the Definitions set forth in Plaintiffs' September 28, 2018 First Set of Requests for the Production of Documents and Things as if fully set forth herein, except for the specific definitions set forth below.

1.      As used herein, "'403 patent" means Insys' United States Patent No. 10,016,403.

2.      As used herein, "patents-in-suit" means the '972 patent, the '973 patent, the '459 patent, the '460 patent, the '935 patent, the '387 patent, the '797 patent, the '844 patent, and the '403 patent.

## OBJECTIONS AND RESPONSES

### INTERROGATORY NO. 2:

Separately for each asserted claim of the Asserted Patents, describe the circumstances under which the subject matter of the claim was (i) first conceived, (ii) first observed experimentally, (iii) first recorded and/or described in writing, (iv) first reduced to practice, (v) and first disclosed to a person other than the Named Inventors in this and/or any other country; identify each person who undertook, contributed to, or participated in each of the aforementioned events and describe each such undertaking, contribution and/or participation; and identify all documents that demonstrate or concern each of the aforementioned events.

### RESPONSE TO INTERROGATORY NO. 2:

Plaintiffs object to this Interrogatory on the grounds set forth in their general objections. Plaintiffs further object to this Interrogatory as improper under Federal Rule of Civil Procedure 33(a) because it purports to be a single interrogatory but contains multiple subparts, which constitute multiple, discrete interrogatories. Plaintiffs further object to this Interrogatory as overly broad and unduly burdensome as to scope. Plaintiffs further object to this Interrogatory on the ground that phrases such as "first observed experimentally," "first recorded and/or described in writing," "first disclosed to a person other than the Named Inventors in this and/or any other country," "identify each person who undertook, contributed to, or participated in each of the aforementioned events," "describe each such undertaking, contribution and/or participation," and "all documents that demonstrate or concern each of the aforementioned events" are vague, ambiguous, overly broad, potentially subject to more than one meaning, and/or unduly burdensome. Plaintiffs further object to this Interrogatory because it relies upon the terms such as "conceived" and "reduced to practice," which embody or require legal conclusions.

Plaintiffs further object to this Interrogatory to the extent it calls for information that is duplicative of information sought by other Interrogatories. (*See, e.g.*, Interrogatory No. 4, 6.) Plaintiffs further object to this Interrogatory on the ground that it is more properly addressed

through other forms of discovery, including, for example, document production and/or fact depositions.

Plaintiffs further object to the Interrogatory as premature given that Plaintiffs have not yet identified asserted claims of the Asserted Patents.

Plaintiffs reserve the right to modify or further supplement this response upon, among other things, discovery of additional facts and materials and other developments in this proceeding.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

Plaintiffs incorporate their objections and responses as set forth in Plaintiffs' Response to Interrogatory No. 2. Subject to the foregoing objections and their General Objections, Plaintiffs further respond to this interrogatory as follows. The asserted claims of the patents-in-suit were conceived by or around July 16, 2003. Furthermore, the asserted claims of the '972, '460, '387, '797, and '403 patents were reduced to practice at least as of January 25, 2006, and the asserted claims of the '973, '459, '935, and '844 patents were reduced to practice at least as of August 2, 2007. Additionally, the specifications of the patents-in-suit contain examples of experimentation, testing, and research regarding the inventions of the patents-in-suit. Documents reflecting the aforementioned events include, by way of example: U.S. Provisional Application No. 60/762,057; U.S. Provisional Application No. 60/963,076; U.S. Provisional Application No. 60/963,253; INSYS-SUBTEVA_0005626 – INSYS-SUBTEVA_0005992; INSYS-SUBTEVA_0005993 – INSYS-SUBTEVA_0011761; INSYS-SUBTEVA_0011939 – INSYS-SUBTEVA_0012423; INSYS-SUBTEVA_0011939 – INSYS-SUBTEVA_0012423; INSYS-SUBTEVA_0013473 – INSYS-SUBTEVA_0013644; INSYS-SUBTEVA_0013859 – INSYS-SUBTEVA_0013870; INSYS-SUBTEVA_0013878 – INSYS-SUBTEVA_0013885; INSYS-

SUBTEVA_0013907 – INSYS-SUBTEVA_0013951; INSYS-SUBTEVA_0013952 – INSYS-SUBTEVA_0013983; INSYS-SUBTEVA_0013991 – INSYS-SUBTEVA_0014032; INSYS-SUBTEVA_0014033 – INSYS-SUBTEVA_0014076; INSYS-SUBTEVA_0014077 – INSYS-SUBTEVA_0014111; INSYS-SUBTEVA_0014112 – INSYS-SUBTEVA_0014300; INSYS-SUBTEVA_0014303 – INSYS-SUBTEVA_0014349; INSYS-SUBTEVA_0014350 – INSYS-SUBTEVA_0014355; INSYS-SUBTEVA_0014463 – INSYS-SUBTEVA_0014475; INSYS-SUBTEVA_0018692 – INSYS-SUBTEVA_0018696; INSYS-SUBTEVA_0018697 – INSYS-SUBTEVA_0020607; INSYS-SUBTEVA_0020609 – INSYS-SUBTEVA_0020954; INSYS-SUBTEVA_0021139 – INSYS-SUBTEVA_0024288; INSYS-SUBTEVA_0025228 – INSYS-SUBTEVA_0025624; INSYS-SUBTEVA_0027823 – INSYS-SUBTEVA_0027829; INSYS-SUBTEVA_0032247 – INSYS-SUBTEVA_0032282; INSYS-SUBTEVA_0032284 – INSYS-SUBTEVA_0035230.

Plaintiffs reserve the right to supplement their response to this interrogatory as discovery proceeds in this action.  Plaintiffs further reserve the right to rely on additional documents at trial that are responsive to arguments that Teva raises in expert discovery.

**INTERROGATORY NO. 3:**

Separately for each asserted claim of the Asserted Patents, describe the circumstances under which the subject matter of the claim was (i) first used, (ii) first sold, and (iii) first offered for sale in this and/or any other country; identify the date(s) upon which each of the aforementioned events occurred; identify each person who undertook, contributed to, or participated in each of the aforementioned events and describe each such undertaking, contribution and/or participation; and identify all documents that demonstrate or concern each of the aforementioned events.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiffs object to this Interrogatory on the grounds set forth in their general objections.

Plaintiffs further object to this Interrogatory as improper under Federal Rule of Civil Procedure

33(a) because it purports to be a single interrogatory but contains multiple subparts, which constitute multiple, discrete interrogatories. Plaintiffs further object to this Interrogatory as overly broad and unduly burdensome as to scope. Plaintiffs further object to this Interrogatory on the ground that phrases such as "identify each person who undertook, contributed to, or participated in each of the aforementioned events," "describe each such undertaking, contribution and/or participation," and "all documents that demonstrate or concern each of the aforementioned events" are vague, ambiguous, overly broad, potentially subject to more than one meaning, and/or unduly burdensome.

Plaintiffs further object to this Interrogatory on the ground that it is more properly addressed through other forms of discovery, including, for example, document production and/or fact depositions.

Plaintiffs further object to the Interrogatory as premature given that Plaintiffs have not yet identified asserted claims of the Asserted Patents.

Plaintiffs reserve the right to modify or further supplement this response upon, among other things, discovery of additional facts and materials and other developments in this proceeding.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:

Plaintiffs incorporate their objections and responses as set forth in Plaintiffs' Response to Interrogatory No. 3. Subject to the foregoing objections and their General Objections, Plaintiffs further respond to this interrogatory as follows. Subsys®, which is a commercial embodiment of the asserted claims of the patents-in-suit, was approved by the FDA for the management of breakthrough pain in adult cancer patients who are already receiving and who are tolerant to

around-the-clock opioid therapy for their underlying persistent cancer pain on January 2, 2012, and Subsys® was launched in the United States on March 26, 2012.

Plaintiffs reserve the right to supplement their response to this interrogatory as discovery proceeds in this action.  Plaintiffs further reserve the right to rely on additional documents at trial that are responsive to arguments that Teva raises in expert discovery.

**INTERROGATORY NO. 4:**

Separately for each asserted claim of the Asserted Patents, identify and describe each person who had (i) a role in the conception and reduction to practice of the claimed subject matter for each asserted claim, (ii) a contribution to the alleged invention described in each asserted claim, or (iii) a role in the prosecution of the application(s) that issued as each of the Asserted Patents.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiffs object to this Interrogatory on the grounds set forth in their general objections. Plaintiffs further object to this Interrogatory as improper under Federal Rule of Civil Procedure 33(a) because it purports to be a single interrogatory but contains multiple subparts, which constitute multiple, discrete interrogatories.  Plaintiffs further object to this Interrogatory as overly broad and unduly burdensome as to scope.  Plaintiffs further object to this Interrogatory on the ground that phrases such as "a role in the conception and reduction to practice of the claimed subject matter," "a contribution to the alleged invention described in each asserted claim," and "a role in the prosecution of the application(s) that issued" are vague, ambiguous, overly broad, potentially subject to more than one meaning, and/or unduly burdensome. Plaintiffs further object to this Interrogatory because it relies upon the terms such as "conception," "reduction to practice," "contribution to the alleged invention," which embody or require legal conclusions.

Plaintiffs further object to this Interrogatory to the extent it calls for information that is duplicative of information sought by other Interrogatories.  (*See, e.g.*, Interrogatory No. 2, 6.)

Plaintiffs further object to this Interrogatory on the ground that it is more properly addressed through other forms of discovery, including, for example, document production and/or fact depositions.

Plaintiffs further object to this Interrogatory as premature to the extent that it requests, prior to the agreed-upon timing set forth in the parties' Joint Proposed Scheduling Order in this case, identification of trial witnesses or the substance of their testimony.

Plaintiffs further object to the Interrogatory as premature given that Plaintiffs have not yet identified asserted claims of the Asserted Patents.

Plaintiffs reserve the right to modify or further supplement this response upon, among other things, discovery of additional facts and materials and other developments in this proceeding.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:

Plaintiffs incorporate their objections and responses as set forth in Plaintiffs' Response to Interrogatory No. 4.  Subject to the foregoing objections and their General Objections, Plaintiffs incorporate by reference Plaintiffs' supplemental response to Teva's Interrogatory No. 2.

Plaintiffs reserve the right to supplement their response to this interrogatory as discovery proceeds in this action.  Plaintiffs further reserve the right to rely on additional documents at trial that are responsive to arguments that Teva raises in expert discovery.

## INTERROGATORY NO. 5:

Identify the three individuals with the most knowledge concerning the research and development, manufacture and production, marketing and sales, and regulatory history of any product that is the subject of NDA No. 202788, including but not limited to individuals who have knowledge or information about any amendments, supplements, additions, and/or annual reports for NDA No. 202788; and for each individual identified, describe that individual's role and the extent of that individual's involvement in each matter.

## RESPONSE TO INTERROGATORY NO. 5:

Plaintiffs object to this Interrogatory on the grounds set forth in their general objections. Plaintiffs further object to this Interrogatory as overly broad and unduly burdensome as to scope. Plaintiffs further object to this Interrogatory on the ground that phrases such as "the most knowledge concerning the research and development, manufacture and production, marketing and sales, and regulatory history of any product," "knowledge or information about any amendments, supplements, additions, and/or annual reports," and "role and the extent of that individual's involvement in each matter" are vague, ambiguous, overly broad, potentially subject to more than one meaning, and/or unduly burdensome.

Plaintiffs further object to this Interrogatory on the ground that it is more properly addressed through other forms of discovery, including, for example, document production and/or fact depositions.

Plaintiffs further object to this Interrogatory as premature to the extent that it requests, prior to the agreed-upon timing set forth in the parties' Joint Proposed Scheduling Order in this case, identification of trial witnesses or the substance of their testimony.

Subject to and without waiver of the forgoing objections and their General Objections, Plaintiffs respond as follows: ███████████████████████████████████████

██████

Plaintiffs reserve the right to modify or further supplement this response upon, among other things, discovery of additional facts and materials and other developments in this proceeding.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:

Plaintiffs incorporate their objections and responses as set forth in Plaintiffs' Response to Interrogatory No. 5. Subject to the foregoing objections and their General Objections, Plaintiffs

further respond to this interrogatory as follows.  Plaintiffs identify ███████████ ████████ as individuals having the most knowledge concerning the research and development, and manufacture and production of Subsys®.  Plaintiffs further identify ██████ ██████ as an individual having the most knowledge concerning NDA No. 202788.

Plaintiffs reserve the right to supplement their response to this interrogatory as discovery proceeds in this action.

**INTERROGATORY NO. 6:**

Identify the earliest claimed priority date for each asserted claim of the Asserted Patents and describe the basis for the claim of priority.

**RESPONSE TO INTERROGATORY NO. 6:**

Plaintiffs object to this Interrogatory on the grounds set forth in their general objections. Plaintiffs further object to this Interrogatory on the ground that it is more properly addressed through other forms of discovery, including, for example, document production and/or fact depositions.  Plaintiffs further object to this Interrogatory on the ground that it is more properly addressed through other forms of discovery, including, for example, Teva's own review of the prosecution histories of the patents-in-suit.  Plaintiffs further object to this Interrogatory because it relies upon the terms such as "earliest claimed priority date" and "basis for the claim of priority," which embody or require legal conclusions.

Plaintiffs further object to this Interrogatory to the extent it calls for information that is duplicative of information sought by other Interrogatories.  (*See, e.g.*, Interrogatory No. 2, 4.)

Plaintiffs further object to the Interrogatory as premature given that Plaintiffs have not yet identified asserted claims of the Asserted Patents.

Plaintiffs reserve the right to modify or further supplement this response upon, among other things, discovery of additional facts and materials and other developments in this proceeding.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:

Plaintiffs incorporate their objections and responses as set forth in Plaintiffs' Response to Interrogatory No. 6.  Subject to the foregoing objections and their General Objections, Plaintiffs further respond to this interrogatory as follows.  The asserted claims of the patents-in-suit were conceived by or around  July 16, 2003.  Furthermore, the '972, '460, '387, '797, and '403 patents are related to U.S. Prov. App. No. 60/762,057, filed on January 25, 2006, and the '973, '459, '935, and '844 patents are related to U.S. Prov. App. No. 60/963,076, filed on August 2, 2007 and to U.S. Prov. App. No. 60/963,253, filed on August 3, 2007.  Lastly, the '972, '460, '387, '797, and '403 patents derive from U.S. App. No. 11/698,739, filed on January 25, 2007, and the '973, '459, '935, and '844 patents derive from U.S. App. No. 12/221,333, filed on August 1, 2008.

Plaintiffs reserve the right to supplement their response to this interrogatory as discovery proceeds in this action.

## INTERROGATORY NO. 7:

Separately for each of the experiments corresponding to the examples disclosed within each of the Asserted Patents, identify the following information: beginning date of the experiment; end date of the experiment; experiment number; location of the experiment; persons involved (including any non-employees or former employees) in the experiment; and identify documents sufficient to show the experiment, including but not limited to lab notebooks, correspondence, methods, protocols, and reports.

## RESPONSE TO INTERROGATORY NO. 7:

Plaintiffs object to this Interrogatory on the grounds set forth in their general objections.

Plaintiffs further object to this Interrogatory as improper under Federal Rule of Civil Procedure

33(a) because it purports to be a single interrogatory but contains multiple subparts, which constitute multiple, discrete interrogatories.  Plaintiffs further object to this Interrogatory as overly broad and unduly burdensome as to scope.  Plaintiffs further object to this Interrogatory on the ground that it is more properly addressed through other forms of discovery, including, for example, document production and/or fact depositions.

Subject to and without waiver of the forgoing objections and their General Objections, Plaintiffs respond as follows: Plaintiffs will provide documents reflecting the experiments disclosed in the patents-in-suit before the close of fact discovery.

Plaintiffs reserve the right to modify or further supplement this response upon, among other things, discovery of additional facts and materials and other developments in this proceeding.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

Plaintiffs incorporate their objections and responses as set forth in Plaintiffs' Response to Interrogatory No. 7.  Pursuant to Rule 33(d), Fed. R. Civ. P., Plaintiffs identify the following, by way of example, as documents that reflect the experiments corresponding to the examples described in the patents-in-suit:  INSYS-SUBTEVA_0011939 – INSYS-SUBTEVA_0012423; INSYS-SUBTEVA_0013473 – INSYS-SUBTEVA_0013644; INSYS-SUBTEVA_0013859 – INSYS-SUBTEVA_0013870;  INSYS-SUBTEVA_0013878  –  INSYS-SUBTEVA_0013885; INSYS-SUBTEVA_0013907 – INSYS-SUBTEVA_0013951; INSYS-SUBTEVA_0013952 – INSYS-SUBTEVA_0013983;  INSYS-SUBTEVA_0013991  –  INSYS-SUBTEVA_0014032; INSYS-SUBTEVA_0014033 – INSYS-SUBTEVA_0014076; INSYS-SUBTEVA_0014077 – INSYS-SUBTEVA_0014111;  INSYS-SUBTEVA_0014112  –  INSYS-SUBTEVA_0014300; INSYS-SUBTEVA_0014303 – INSYS-SUBTEVA_0014349;  INSYS-SUBTEVA_0014350 –

INSYS-SUBTEVA_0014355;   INSYS-SUBTEVA_0014463   –   INSYS-SUBTEVA_0014475;

INSYS-SUBTEVA_0018692   –   INSYS-SUBTEVA_0018696;   INSYS-SUBTEVA_0018697   –

INSYS-SUBTEVA_0020607;   INSYS-SUBTEVA_0020609   –   INSYS-SUBTEVA_0020954;

INSYS-SUBTEVA_0021139   –   INSYS-SUBTEVA_0024288;   INSYS-SUBTEVA_0025228   –

INSYS-SUBTEVA_0025624;   INSYS-SUBTEVA_0027823   –   INSYS-SUBTEVA_0027829;

INSYS-SUBTEVA_0032247   –   INSYS-SUBTEVA_0032282;   INSYS-SUBTEVA_0032284   –

INSYS-SUBTEVA_0035230.

Plaintiffs reserve the right to supplement their response to this interrogatory as discovery proceeds in this action.  Plaintiffs further reserve the right to rely on additional documents at trial that are responsive to arguments that Teva raises in expert discovery.

**INTERROGATORY NO. 8:**

Identify any objective indicia of non-obviousness upon which Insys intends to rely and explain the legal and factual basis thereof.

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiffs object to this Interrogatory on the grounds set forth in their general objections. Plaintiffs object to this Interrogatory as improperly seeking contentions as well as supporting materials prior to and in place of the deadlines set forth in the Local Civil Rules and/or the Court's Scheduling Order.  Plaintiffs also object to this Interrogatory as premature to the extent it seeks expert discovery prior to the deadlines for those disclosures.  Plaintiffs further object to this Interrogatory to the extent it seeks documents and things protected by the attorney-client privilege and work product doctrine.  Plaintiffs further object to this Interrogatory because it relies upon the term "objective indicia of non-obviousness" which embodies or require legal conclusions.   Teva bears the burden of proving its allegations of invalidity by clear and

convincing evidence, and has not articulated any contention that would establish a *prima facie* case of obviousness under 35 U.S.C. § 103(a).

Therefore, Plaintiffs object to this Interrogatory as improper because the patents-in-suit are to be presumed valid, *see* 35 U.S.C. § 282, and Teva has not carried its burden of proving invalidity. Plaintiffs are not required to provide evidence of validity. Subject to and without waiver of its General and Specific Objections, and to the extent Plaintiffs understand this Interrogatory, Plaintiffs respond as follows: Plaintiffs will provide their response by no later than their response to Teva's burden of proof expert reports.

Plaintiffs reserve the right to modify or further supplement this response upon, among other things, discovery of additional facts and materials and other developments in this proceeding. Plaintiffs further reserve the right to supplement this response with the opinions and information known, generated, or relied upon by Plaintiffs' experts during expert discovery in this case.


## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:

Plaintiffs incorporate their objections and responses as set forth in Plaintiffs' Response to Interrogatory No. 8. Subject to the foregoing objections and their General Objections, Plaintiffs further respond to this interrogatory as follows.

### A.    Long-Felt, Unmet Need

The invention of the patents-in-suit, including the commercial embodiment Subsys®, satisfied a long-felt, unmet need for sublingual fentanyl spray for the management of breakthrough pain in adult cancer patients who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain.

The long-felt need for a product like Subsys® is reflected in a published U.S. patent application that laments the "relatively slow" absorption of transmucosal formulations and cites an ongoing "need for alternative means for the delivery of fentanyl." Watts 2015, ¶¶ [0006]–[0007]]. This document demonstrates that at least one of Insys's competitors, discouraged with the perceived ability of transmucosal products to offer fast relief, has contemplated nasal sprays as an alternative to sublingual ones. This is telling, as nasal sprays carry a separate set of challenges, such as the risk of delivery directly into the cerebrospinal fluid (*see, e.g.*, Sakane 1991, p. 2456; Graff 2005, pp. 1187–88), the potential for deposition in the airways beyond the nose (*see, e.g.*, FDA 1999 Bioavailability and BE Studies, p. 11), and the potential for a pseudo-first-pass effect due to fentanyl-metabolizing enzymes in the nasal mucosa (*see, e.g.*, Sarkar 1992, p. 1 (regarding cytochrome P-450 enzymes in the nasal mucosa); Feierman 1996, p. 932 (regarding fentanyl's susceptibility to cytochrome P-450 enzymes). In sum, the long-felt need for a drug like Subsys® supports non-obviousness.

### B.  Unexpected Results

The ability of Subsys® to provide significant pain relief as early as five minutes after dosing (as reflected in the claimed pharmacokinetic parameters) was unexpected. *See, e.g.*, INSYS-SUBTEVA_0006766-770, -774-818, -824-890. There are in fact substantial differences in at least the ingredients and pharmacokinetic profile of Subsys® as compared to other fentanyl products that result in clinically important, unexpected differences in the extent of absorption of fentanyl. *See, e.g.*, Subsys Label, p. 3. The patents-in-suit report these (*see, e.g.*, '459 patent, col. 63–64), and the FDA acknowledged them in its Summary Basis for Approval of Subsys®: "One 400 mcg spray of FSS resulted in 34% and 36% greater Cmax and AUCinf values,

respectively, compared to an Actiq dose of 400 mcg . . . ."  FDA 2012 Summary Basis for Approval, p. 8.  Indeed, Subsys® is considered not to be equivalent on a mcg per mcg basis from other transmucosal fentanyl products.  Subsys Label, p. 4; *see also id.*, p. 8 ("SUBSYS is not bioequivalent with other fentanyl products.");  *id.*, pp. 18–19.  As such, the unexpected ability of Subsys® to provide significant pain relief as early as five minutes after dosing further suggests non-obviousness.

C.    **Commercial Success**

The parties are discussing production of documents relating to commercial success. Therefore Insys provisionally asserts commercial success as an objective indicia of non-obviousness and will either supplement or withdraw its assertion once the parties have reached resolution.

Plaintiffs reserve the right to supplement their response to this interrogatory as discovery proceeds in this action.  Plaintiffs further reserve the right to rely on additional documents at trial that are responsive to arguments that Teva raises in expert discovery.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

OF COUNSEL:

*Attorneys for Plaintiffs*

*/s Chad J. Peteman*
Chad J. Peterman
Lucas L. Kressel
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Naveen Modi
Michael A. Stramiello, Ph.D.
PAUL HASTINGS LLP
875 15th St, NW
Washington, DC 20008
(202) 551-1700

January 21, 2019

# **Exhibit G**

# REDACTED

# **Exhibit H**

# REDACTED

# Exhibit I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INSYS THERAPEUTICS, INC. and        )
INSYS DEVELOPMENT COMPANY, INC.,    )
                                    )
            Plaintiffs,             )
                                    )
        v.                          )    C.A. No. 17-1303 (CFC)
                                    )    CONSOLIDATED
TEVA PHARMACEUTICALS USA, INC.,     )
                                    )
            Defendant.              )

**PLAINTIFFS' AMENDED SUPPLEMENTAL OBJECTIONS AND RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES (NO. 8)**

Pursuant to Fed. R. Civ. P. 26 and 33, Plaintiffs Insys Therapeutics, Inc. and Insys

Development Company, Inc. (collectively, "Insys" or "Plaintiffs") hereby make the following

objections and responses to Defendant Teva Pharmaceuticals USA, Inc.'s ("Teva's") First Set of

Interrogatories (No. 8) (hereinafter, "Interrogatories").

Pursuant to Fed. R. Civ. P.26(e), Plaintiffs reserve the right to supplement their responses

as discovery progresses in this action.

**PLAINTIFFS' PRELIMINARY STATEMENT**

Plaintiffs have not completed their investigation relating to this action, have not

completed discovery in this action, and have not completed preparation for trial. As discovery

proceeds, facts, information, evidence, documents and things may be discovered, which are not

set forth in these responses, but which may have been responsive to these Interrogatories. The

following responses are based on Plaintiffs' knowledge, information and belief at this time, and

are complete as to Plaintiffs' best knowledge at this time. Furthermore, these responses were

prepared based on Plaintiffs' good-faith interpretation and understanding of the Interrogatories,

and are subject to correction for inadvertent errors or omissions, if any. Pursuant to Fed. R. Civ.

P. 26(e), Plaintiffs reserve the right to supplement their responses as discovery progresses in this action.  For instance, Plaintiffs reserve the right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, evidence, documents, and things developed during the course of discovery and trial preparation, notwithstanding the reference to facts, evidence, documents, and things in these responses.  In addition, Plaintiffs assume no obligation to voluntarily supplement or amend these responses to reflect information, evidence, documents or things discovered following service of these responses.  Nevertheless, these responses are given without prejudice to subsequent revision or supplementation, including objections, based upon any information, evidence, and documentation, which hereinafter may be discovered.

## GENERAL OBJECTIONS

Plaintiffs incorporate herein by reference the General Objections set forth in Plaintiffs' Objections and Responses to Defendant's First Set of Interrogatories (Nos. 1-8), Plaintiffs' Objections and Responses to Defendant's Second Set of Interrogatories (No. 9), and Plaintiffs' Objections and Responses to Defendant's First Set of Requests for Production.

## DEFINITIONS

Plaintiffs hereby incorporate by reference the Definitions set forth in Plaintiffs' September 28, 2018 First Set of Requests for the Production of Documents and Things as if fully set forth herein, except for the specific definitions set forth below.

1.      As used herein, "'403 patent" means Insys' United States Patent No. 10,016,403.

2.      As used herein, "patents-in-suit" means the '972 patent, the '973 patent, the '459 patent, the '460 patent, the '935 patent, the '387 patent, the '797 patent, the '844 patent, and the '403 patent.

## OBJECTIONS AND RESPONSES

### INTERROGATORY NO. 8:

Identify any objective indicia of non-obviousness upon which Insys intends to rely and explain the legal and factual basis thereof.

### RESPONSE TO INTERROGATORY NO. 8:

Plaintiffs object to this Interrogatory on the grounds set forth in their general objections. Plaintiffs object to this Interrogatory as improperly seeking contentions as well as supporting materials prior to and in place of the deadlines set forth in the Local Civil Rules and/or the Court's Scheduling Order. Plaintiffs also object to this Interrogatory as premature to the extent it seeks expert discovery prior to the deadlines for those disclosures. Plaintiffs further object to this Interrogatory to the extent it seeks documents and things protected by the attorney-client privilege and work product doctrine. Plaintiffs further object to this Interrogatory because it relies upon the term "objective indicia of non-obviousness" which embodies or require legal conclusions. Teva bears the burden of proving its allegations of invalidity by clear and convincing evidence, and has not articulated any contention that would establish a *prima facie* case of obviousness under 35 U.S.C. § 103(a). Therefore, Plaintiffs object to this Interrogatory as improper because the patents-in-suit are to be presumed valid, *see* 35 U.S.C. § 282, and Teva has not carried its burden of proving invalidity. Plaintiffs are not required to provide evidence of validity. Subject to and without waiver of its General and Specific Objections, and to the extent Plaintiffs understand this Interrogatory, Plaintiffs respond as follows: Plaintiffs will provide their response by no later than their response to Teva's burden of proof expert reports.

Plaintiffs reserve the right to modify or further supplement this response upon, among other things, discovery of additional facts and materials and other developments in this proceeding. Plaintiffs further reserve the right to supplement this response with the opinions and

information known, generated, or relied upon by Plaintiffs' experts during expert discovery in this case.

**AMENDED SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

Plaintiffs incorporate their objections and responses as set forth in Plaintiffs' Response to Interrogatory No. 8. Subject to the foregoing objections and their General Objections, Plaintiffs further respond to this interrogatory as follows.

**A.    Unexpected Results**

The ability of Subsys® to provide significant pain relief as early as five minutes after dosing (as reflected in the claimed pharmacokinetic parameters) was unexpected. *See, e.g.*, INSYS-SUBTEVA_6766-770, -774-818, -824-890. There are in fact substantial differences in at least the ingredients and pharmacokinetic profile of Subsys® as compared to other fentanyl products that result in clinically important, unexpected differences in the extent of absorption of fentanyl. *See, e.g.*, Subsys Label, p. 3. The patents-in-suit report these (*see, e.g.*, '459 patent, col. 63–64), and the FDA acknowledged them in its Summary Basis for Approval of Subsys®: "One 400 mcg spray of FSS resulted in 34% and 36% greater Cmax and AUCinf values, respectively, compared to an Actiq dose of 400 mcg . . . ." FDA 2012 Summary Basis for Approval, p. 8. Indeed, Subsys® is considered not to be equivalent on a mcg per mcg basis from other transmucosal fentanyl products. Subsys Label, p. 4; *see also id.*, p. 8 ("SUBSYS is not bioequivalent with other fentanyl products."); *id.*, pp. 18–19. As such, the unexpected ability of Subsys® to provide significant pain relief as early as five minutes after dosing further suggests non-obviousness.

**B.**    **Copying**

Teva has copied the invention of the Asserted Claims of the patents-in-suit.  As set forth in Plaintiffs' Preliminary Infringement Contentions Against Teva for the '972, '973, '459, '460, '935, '387, '797 and '844 patents, dated August 22, 2018, and Plaintiffs' Preliminary Infringement Contentions Against Teva for the '403 patent, dated January 25, 2019, documents produced by Teva in this Consolidated Litigation confirm that Teva copied the invention of the Asserted Claims of the patents-in-suit.  Documents produced by Teva also show that Teva was aware of one or more of the patents-in-suit during the time when Teva was developing its ANDA Products.

\*       \*       \*

Plaintiffs reserve the right to supplement their response to this interrogatory as discovery proceeds in this action.  Plaintiffs further reserve the right to rely on additional documents at trial that are responsive to arguments that Teva raises in expert discovery.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____

OF COUNSEL:

William A. Rakoczy
Paul J. Molino
Jeffrey A. Marx
Joseph T. Jaros
Tara Mythri Raghavan
Chris P. Galligan
Maja E. Sherman
Kevin P. Burke
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60654
(312) 527-2157

March 19, 2019

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Plaintiffs*

5

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 19, 2019, copies of the foregoing were caused to be

served upon the following in the manner indicated:

John W. Shaw, Esquire                                    *VIA ELECTRONIC MAIL*
Karen E. Keller, Esquire
Nathan R. Hoeschen, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Defendant*

J.C. Rozendaal, Esquire                                  *VIA ELECTRONIC MAIL*
Paul A. Ainsworth, Esquire
Deirdre M. Wells, Esquire
Josephine J. Kim, Esquire
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1100 New York Ave. NW, Suite 600
Washington, DC  20005
*Attorneys for Defendant*

/s/ Jennifer Ying
_____
Jennifer Ying (#5550)

# Exhibit J

# REDACTED